UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Bobby T. Sheppard, | : | Death Penalty Case |
| | : | |
| Petitioner, | : | Case No. 1:00cv493 |
| | : | |
| -vs- | : | Judge Walter Herbert Rice |
| | : | |
| Margaret Bagley, Warden, | : | Magistrate Judge Merz |
| | : | |
| Respondent. | : | |

_____

**MERITS BRIEF/TRAVERSE OF PETITIONER BOBBY SHEPPARD**

_____

Geoffrey J. Moul (0070663)
Murray Murphy Moul + Basil LLP
326 S. High Street / Suite 400
Columbus, Ohio 43215
(614) 469-0400

and

Timothy R. Payne (0069329)
Assistant State Public Defender
Office of the Ohio Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215
(614) 466-5394

Counsel for Petitioner Bobby Sheppard

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………..……………....…….…i

I.  BACKGROUND……………………………………………...…………..1

II.  STANDARDS OF REVIEW……………………………..…………………………1

    A.  AEDPA……………………………………………………………………...1

        1.  AEDPA Standards………………………………………...……1

            a.  "Contrary To"……………………………………..3

            b.  "Unreasonable Application Of"…………………………...3

        2.  AEDPA Is Inapplicable To Claims Not "Adjudicated on the Merits."……………………………………………………..…..5

        3.  Application of AEDPA To Claims Dismissed By State Courts in Summary Manner…………………………………………….6

    B.  Presumption of Correctness………………………….………………….7

    C.  Procedural Default…………………………………………….………..9

III.  SHEPPARD WAS DENIED HIS RIGHT TO A FAIR SENTENCING PHASE TRIAL BASED ON THE EVIDENCE, INCLUDING EVIDENCE OF MITIGATION (Claims 3, 5, 7)……………………………………..……12

    A.  Bobby Sheppard Presented a Defense to the Jury in the Sentencing Phase that Revolved Around Dr. Smalldon's Unrebutted Diagnosis of Sheppard as a Paranoid Schizophrenic…………….……………………..……...13

    B.  Rather Than Offer Rebuttal Evidence, the State Responded to Smalldon's Testimony and Diagnosis by Assaulting Sheppard's Right to Assert Mental Illness, with Unseemly Personal Attacks, Improper Appeals to Juror Ignorance, and Inappropriate Assertions of Personal Beliefs...……..14

        1.  Using Accusations of Underhandedness, the Prosecutor Assaulted Smalldon, the Defense Team, and the Right of Defendant to Put On Mental Illness in Mitigation…………………………….14

        2.  Judge Crush Exacerbated Sheppard's Battle to Establish His Mental Illness in the Face of Prosecutorial Misconduct by Excluding Evidence Relevant to His Mental Illness………….…20

3.      Judge Crush Then Gave Credence To and Highlighted the Prosecution's Sandbagging Theme When He Incorrectly Instructed the Jury That the Prosecutor Did Not Have the Right to Examine Sheppard……………………………………………...………21

4.      Juror Stephen Fox Took the Prosecutor's Bait…………………..22

5.      Fox's Misconduct Came to Light………………………………..22

6.      The Judge Denied a Motion for a New Trial Because Fox Stated In Chambers That the Extraneous Information Did Not Influence His Verdict…..………………………………….……….………23

7.      Throughout the Direct Appeals, the State of Ohio Continued to Defend the Jury Verdict by Relying on Fox's Statement That the Extraneous Information Did Not Influence Him..……………….25

8.      Testimony In This Case Establishes That the Entire Basis Upon Which Judge Crush Refused to Grant a Mistrial (and a New Trial) Was Erroneous, As Was the State of Ohio's Basis for Defending the Jury Verdict: Fox Admits That In Fact the Extraneous Information Influenced His Verdict, and Jones Had No Foundation For Asserting That Smalldon's Testimony Was Consistent With Her Explanation of Paranoid Schizophrenia To Fox……………26

C.      The Prosecutors' Misconduct Warrants The Grant of A Writ…………..28

D.      The Juror Misconduct Similarly Worked With The Prosecutorial Misconduct To Deny Sheppard A Fair Trial At The Sentencing Phase....36

1.      Fox Has Admitted Prejudice……………………………………..36

2.      Irrespective of Fox's Testimony, A Review of the Record Leaves No Doubt That Fox Was Likely To Be Influenced, And Thus Sheppard Was Prejudiced………………………………...…...38

E.      Those Improprieties Were Made Worse When The Trial Court Excluded Certain Mitigating Evidence. (Claim 3)…..…………………………..42

IV.   THE SENTENCING JURY WEIGHING PROCESS WAS FURTHER INFECTED BY ILLEGAL INSTRUCTIONS (Claims 2, 4)…..…………….…45

A.      The Trial Court's Penalty Phase Jury Instructions Misled the Jury (Claim 4)………………………………………………………………….…...45

1.      AEDPA Standard of Review………………………...……………45

2.    Procedural Bar to This Claim……………………………...………46

3.    Cause and Prejudice/Merits……………………………………...47

      a.    Trial Counsel Unreasonably Failed to Object to the
            Duplicative Aggravators…………………………………47

      b.    Counsel's Deficient Performance Resulted in Actual
            Prejudice…………………………………………………49

      c.    *Strickland/Brecht*……………………………………...……51

4.    The Trial Court Erred When It Refused The Defense Request To
      Instruct Jurors That They Could Consider One Of The Life
      Sentences If They Could Not Unanimously Agree On Death. Tr.
      1155-1156……………………………………...…………..……….52

5.    The Trial Court Erred By Refusing Defense Counsel's Request to
      Instruct Jurors That the Aggravated Murder Itself Was Not An
      Aggravating Circumstance Which They Should Consider………56

6.    The Instruction that Prosecutors Were Not Allowed To Do a
      Psychological Exam of Mr. Sheppard Made it Highly Probable
      That the Jury Would Disregard Smalldon's Mitigating
      Evidence……………………………………………………………58

V.    THE TRIAL JUDGE'S WEIGHING PROCESS WAS FLAWED BY
      CONSIDERING INVALID AND DUPLICATIVE AGGRAVATORS, AND BY
      IGNORING MITIGATING EVIDENCE (Claims 2, 6)……………….. ……….60

      A.    The Trial Court Violated Bobby Sheppard's Sixth, Eighth and Fourteenth
            Amendment Rights By Arbitrarily Refusing to Give Weight or Effect to
            the Mitigating Evidence of Mr. Sheppard's Mental Illness. (Claim 6)….60

            1.    AEDPA Standard of Review……………………………...………..60

            2.    Procedural Bar to This Claim……………………………...………61

            3.    Merits……………………………………………………...………..61

                  a.    A Capital Sentencer May Not Arbitrarily Reject Relevant
                        Mitigating Evidence……………………………………...61

                  b.    The Trial Judge Lacked a Reasonable Basis For Refusing
                        to Weigh Mental Illness as a Mitigating Factor…………62

c.    The Trial Judge's Rejection of Dr. Smalldon's Testimony
Was the Result of Bias…………………………………..…64

B.    The Trial Judge Violated Sheppard's Rights Under the Eighth and
Fourteenth Amendments By Weighing an Invalid Aggravator in its
Weighing Process………………………………………………………...66

VI.    IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS,
THE OHIO SUPREME COURT WEIGHED DUPLICATIVE AGGRAVATING
CIRCUMSTANCES AS PART OF ITS INDEPENDENT WEIGHING DUTY
(Claims 12)………………………………………………………...……...67

A.    The AEDPA Does Not Apply, Nor Does Procedural Default…………...68

B.    By Weighing Duplicative Aggravators, the Supreme Court of Ohio
Deprived Sheppard of a State Created Liberty Interest………………......68

1.    Ohio Law Granted Sheppard the Right to Have the Ohio Supreme
Court Engage In an Independent Weighing of the Aggravating
Circumstance Against the Mitigating Circumstances Considering
Only Non-Duplicative Aggravators………………...……………68

2.    Sheppard's Right to Have the Ohio Supreme Court Engage In an
Independent Weighing of the Aggravating Circumstance Against
the Mitigating Circumstances Considering Only Non-Duplicative
Aggravators Rose to the Level of a Protected Liberty Interest…..71

3.    The Ohio Supreme Court Double Counted and Therefore Denied
Bobby Sheppard His Liberty Interest In an Independent Review
Without Duplicative Specifications………………………..……….72

VII.    THE TRIAL COURT VIOLATED BOBBY SHEPPARD'S SIXTH, EIGHTH
AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND IN
IMPARTIAL JURY FOR THE PENALTY DETERMINATION IN A CAPITAL
CASE BY WRONGLY EXCUSING FOR CAUSE A PROSPECTIVE JUROR
BECAUSE OF HER VIEWS ON REMORSE AS A MITIGATING FACTOR
(Claim 1)………………………………………………………...………….74

A.    AEDPA Standard of Review…………………………………….………74

B.    Procedural Bar to This Claim…………………………………...………75

C.    Merits……………………………………………………………….………75

1.    Ms. Wells' Excusal For Cause Was Wrong. She Met the Standard For Jury Service In a Capital Case Under the Relevant Supreme Court Decisions……………………………………….………..…77

2.    Ms. Wells' Wrongful Exclusion For Cause Is Not Subject To Harmless Error Analysis……………………….………………...79

VIII.    BOBBY SHEPPARD'S CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE OF SYSTEMATIC RACIAL AND GENDER DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS FOR HAMILTON COUNTY CAPITAL CASE GRAND JURIES, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS (Claim 11)……………………………….………79

A.    AEDPA Standard of Review……………………….……………79

B.    Procedural Bar To This Claim…………………….……………..80

C.    Merits………………………………………………….…………80

IX.    THE INSTRUCTION ON REASONABLE DOUBT GIVEN TO BOBBY SHEPPARD'S JURY ALLOWED THE STATE TO CONVICT HIM AND OBTAIN A DEATH SENTENCE BASED ON A STANDARD OF PROOF BELOW THAT REQUIRED BY THE DUE PROCESS CLAUSE (Claim 8)….86

A.    AEDPA Standard of Review……………………….……………86

B.    Procedural Bar To This Claim…………………….……………..87

C.    Merits…………………………………………………….………87

X.    THE OHIO SUPREME COURT'S ARBITRARY REFUSAL TO REVIEW LIFE SENTENCES IMPOSED IN SIMILAR CASES AS PART OF THE STATUTORILY MANDATED PROPORTIONALITY REVIEW DENIED BOBBY SHEPPARD DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT (Claim 13)…………………………...…………90

A.    AEDPA Standard of Review……………………….……………90

B.    Procedural Bar To This Claim…………………….……………..91

C.    Merits…………………………………………………….………91

1.    Ohio's Proportionality Review Statutes Contain Specific Directives………………………………………………...……93

2.  Ohio's Courts Have Ignored the Statutory Directives to Include Life Sentence Capital Cases In Proportionality Review............95

3.  Bobby Sheppard Has a Constitutionally Protected Liberty Interest in Proportionality Review that Includes Life Sentences Imposed in Similar Cases…………………………………………………..95

4.  Bobby Sheppard Was Arbitrarily Deprived of His Protected Liberty Interest in Proportionality Review That Includes Life Sentence Capital Cases……………………………….……96

XI.   BOBBY SHEPPARD'S DEATH SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OHIO'S CAPITAL PUNISHMENT SYSTEM OPERATES IN AN ARBITRARY, CAPRICIOUS AND DISCRIMINATORY MANNER IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS (Claim 14)…………………………………………..…100

A.   AEDPA Standard of Review……………………………………...100

B.   Procedural Bar To This Claim…………………………………….…100

C.   Merits………………………………………………………..……..100

XII.   BOBBY SHEPPARD WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS (Claim 9)……... ……...107

A.   Trial Counsel Failed to Challenge the Duplicative Aggravating Circumstances that the Jury and Judge Weighed Against Bobby Sheppard at the Penalty Phase………………………………………….……………108

B.   Trial Counsel Should Also Have Submitted at Least Some Evidence, By Affidavit or Testimony, to Support Their Motion for a New Trial On the Basis of Juror Misconduct……………………………………….....…108

XIII.   BOBBY SHEPPARD WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEALS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS…………....…110

A.   These Claims Are Not Procedurally Defaulted………….………….111

B.   *Mapes* Confirms That Petitioner Was Denied Effective Counsel On Appeal……………………………………………………….…111

XIV.  BOBBY SHEPPARD'S CONVICTIONS AND DEATH SENTENCE ARE
      INVALID AS A RESULT OF THE CUMULATIVE EFFECT OF THE
      CONSTITUTIONAL ERRORS IN THE COMPOSITION OF HIS GRAND
      JURY, VOIR DIRE, JURY INSTRUCTIONS, EXCLUSION OF RELEVANT
      MITIGATING EVIDENCE, PROSECUTORIAL MISCONDUCT,
      UNRELIABLE AND ARBITRARY SENTENCING AND INVALID
      APPELLATE REWEIGHING IN VIOLATION OF THE FIFTH, SIXTH,
      EIGHTH AND FOURTEENTH AMENDMENTS (Claim 15)……...………...115

      A.    AEDPA Standard of Review…………………………………….……..115

      B.    Procedural Bar To This Claim……………………………….……115

      C.    Merits………………………………………………….……………..115

# I.    BACKGROUND

There can be no good faith dispute that in the sentencing phase of Bobby Sheppard's trial, prosecutorial and juror misconduct, as well as the trial court's ratification of the prosecutorial errors, all combined to deny Bobby Sheppard his Constitutional right to a fair trial before a jury based on relevant, admissible evidence, including the unrebutted evidence in mitigation of Sheppard's paranoid schizophrenia. And, although as set forth below, other Constitutional errors exist that warrant the granting of a writ as well, the prosecutorial misconduct and juror misconduct are so serious, flagrant and blatant that they overshadow all other errors and demand the immediate grant of a writ of habeas corpus without further delay.

# II.    STANDARDS OF REVIEW

## A.    AEDPA

### 1.    AEDPA Standards

The AEDPA establishes the following new standard of review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State proceedings unless the adjudication of the claim --
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State proceeding.

28 U.S.C. § 2254(d) (post-AEDPA).

In *Terry Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court addressed the issue of interpretation of the amendments to §2254(d) and the

standard of review thereunder.   The judgment of the Court reversing the denial of a writ

of habeas corpus and the opinion of the Court with respect to everything except the

standard of review under §2254(d) as amended by the AEDPA were delivered by Justice

Stevens.   Justice O'Connor, who joined in the judgment and the opinion of Justice

Stevens except with respect to the standard of review, wrote a concurring opinion stating

her view and the view of four other Justices on the standard of review.   Thus, Justice

O'Connor's concurring opinion speaks for the majority of the Court on the standard of

review, whereas Justice Stevens' opinion on that issue speaks for a minority of the Court.

Justice O'Connor summarized the majority view of the standard of review under

§2254(d) as amended by the AEDPA:

> In sum, §2254(d)(1) places a new constraint on the power
> of a federal habeas court to grant a state court prisoner's
> application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court.   Under
> §2254(d)(1), the writ may issue only if one of the following
> two conditions is satisfied -- the state-court adjudication
> resulted in a decision that (1) "was contrary to...clearly
> established Federal law, as determined by the Supreme
> Court of the United States," or (2) "involved an
> unreasonable application of...clearly established Federal
> law, as determined by the Supreme Court of the United
> States."   Under the "contrary to" clause, a federal habeas
> court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

Elsewhere in the opinion, Justice O'Connor further elucidated the meaning of the

"contrary to" and "unreasonable application" with the following standards.

### a. *"Contrary To"*

Justice O'Connor, in her opinion for the majority on the interpretation of the standard of review, approved of the Fourth Circuit's interpretation of the "contrary to" clause in its decision in *Green v. French*, 143 F.3d 865 (1998), cert. denied, 525 U.S. 1090 (1999). Justice O'Connor read *Green* to hold that a state court decision can be "contrary to" clearly established precedent in two circumstances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. (citation omitted.)

125 S.Ct. at 1519.

Justice O'Connor provided an example of the first type of "contrary to" state court decision where the state court applies a rule that contradicts the rule set forth in Supreme Court cases. If a state court denied a state prisoner's ineffective assistance of counsel claim on the ground that the prisoner did not show prejudice by a preponderance of the evidence, in view of the *Strickland* standard which requires only that the prisoner show "a reasonable probability that...the result of the proceeding would have been different," then the state court decision would be "contrary to" clearly established precedent. An example of the second type of "contrary to" state court decision would be a decision in which a state court reaches a different result from that reached by the Supreme Court on "facts that are materially indistinguishable from a decision of this Court." *Id.* at 1519-1520.

### b. *"Unreasonable Application Of"*

Justice O'Connor, again speaking for the majority, also approved of and adopted

the Fourth Circuit's explanation in *Green* of the circumstances in which the "unreasonable application" clause applies.    Justice O'Connor summarized the Fourth Circuit's interpretation as follows:

> First, a state court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular prisoner's case.    Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. (citation omitted.)

120 S.Ct. at 1520.    Thus, a state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case would be an "unreasonable application of" clearly established Federal law.    *Id.*    Justice O'Connor noted in passing that the Fourth Circuit's formula may have "problems with precision," since it might be difficult to distinguish a decision involving an "unreasonable extension of a legal principle" from a decision involving an unreasonable application of law to the facts.    *Id.* at 1521.

Although Justice O'Connor agreed with the Fourth Circuit's description of the circumstances in which the "unreasonable application" clause applies, she nevertheless strongly disagreed with the Fourth Circuit's definition of what constitutes an "unreasonable application."    Justice O'Connor declared the Fourth Circuit's view--that a state court decision is unreasonable only if it applied federal law "in a manner that reasonable jurists would all agree is unreasonable"--to be erroneous:

> Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the

4

> state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner as the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.

120 S.Ct. at 1521-1522 (emphasis added). Justice O'Connor, taking note of her opinion in *Wright v. West*, 502 U.S. 1021 (1991), in which she maintained that federal habeas corpus courts had an independent obligation to say what the law is even if the state court decision was reasonable, stated that the inclusion of the term "unreasonable" in the AEDPA amendments changed the standard of review:

> In §2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under §2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable.

120 S.Ct. at 1522.

### 2. AEDPA Is Inapplicable To Claims Not "Adjudicated on the Merits."

The language of section 2254(d)(1) expressly limits the provision's application to claims that were "adjudicated on the merits in State court proceedings." There is no disagreement among the circuits that where a state court did not decide a claim on the merits, or "adjudicate the merits" in AEDPA terms, the deferential AEDPA standard does not apply, and a federal habeas court must conduct *de novo* review. *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); *Maples v. Stegall*, 2003 FED App. 0296P, August 19,

2003 (6th Cir.) (applying *de novo* standard); *Fisher v. Lee*, 215 F.3d 438, 447 (4th Cir. 2000); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). This is true where state courts reject a petitioner's claim on a procedural ground rather than resolving the merits of the claim. *See McGregor v. Gibson, 248 F.3d 946, 951* (10th Cir. 2001) (en banc); *Hudson v. Hunt*, 235 F.3d 892, 895 (4th Cir. 2000).

Petitioner Sheppard presented several issues to the state Supreme Court on direct appeal which that court simply failed to address, even in summary fashion. There is no mention of these claims in the Ohio Supreme Court's opinion, and thus the claims cannot be deemed to have been "adjudicated on the merits." Pursuant to the authority cited above, it is now entirely clear that this Court must review these claims under a *de novo* standard of review, as it would have prior to enactment of the AEDPA.

### 3.    Application of AEDPA To Claims Dismissed By State Courts in Summary Manner

In addition, there were a number of claims in Petitioner Sheppard's case which the state Supreme Court adjudicated without giving any discussion or reasoning. This Court must determine how to apply the AEDPA's "contrary to or unreasonable application" clause in those instances where the state court either decided a claim in summary fashion or did not apply federal law when deciding the claim.

In *Harris v. Stovall*, 212 F. 3d 940, 943 n.1 (6th Cir. 2000), the Sixth Circuit said that even when a state court decides a federal issue "by form order or without extended discussion, a habeas court should … focus on the result of the state court's decision" and perform the AEDPA's unreasonable application analysis. The *Harris* court held that when the state court does not articulate the reasoning for its decision, "federal courts are

obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts." *Id.* at 943 (emphasis added). The court explained that this "independent review" is "not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Id.*

Thus, at a minimum, under *Harris v. Stovall,* this Court must conduct an "independent review" of all claims in Petitioner Sheppard's case that received a summary disposition in the Ohio Supreme Court to determine if the result was contrary to or an unreasonable application of clearly established federal law. In reality, however, "[w]here, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record ... [and therefore] the distinction between *de novo* review and 'reasonableness' review becomes insignificant." *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998). Petitioner recognizes that this Court may be controlled by the holding of *Harris v. Stovall*, but Petitioner respectfully suggests that the view that an unreasoned state court determination is entitled to the AEDPA "reasonableness" review is incorrect.

**B.    Presumption of Correctness**

Pursuant to section 2254(e)(1) of the AEDPA, state court factual findings are entitled to a presumption of correctness. 28 U.S.C. section 2254(e)(1); *see also*, *Powell v. Collins*, 328 F.3d 268, 281 (6th Cir. 2003), citing *McQueen v. Scroggy*, 99 F.3d 1302,

1310 (6th Cir. 1996).[1]  This presumption only applies to basic, primary or historical facts and "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *Powell*, *supra*, citing *McQueen*, *supra*, at 1310 (emphasis added).

The presumption of correctness does not apply to mixed questions of law and fact, or questions of law, both of which are reviewed *de novo*.  *Powell*, *supra*, citing, *inter alia*, *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Skaggs v. Parker*, 253 F.3d 261, 266 (6th Cir. 2000); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000).  *See also McGhee v. Yukins*, 229 F.3d 506 (6th Cir. 2000).   Similarly, the presumption of correctness does not apply in instances where the state fact-findings were inadequate (which triggers a petitioner's entitlement to an evidentiary hearing in federal court),  or where the state findings were insufficiently historical, *e.g.*, were conclusional, legal, or  a "mixed factual-legal" conclusion.

Questions of harmless error and prejudice are considered to be mixed questions of law and fact.  *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000) (section 2254(e)(1)'s "presumption of correctness applies only to state court determinations of historical facts, and the question of **whether the prosecutor's statements created prejudicial error is a mixed question of fact and law to which the presumption does not apply**") (emphasis added);  *Pitts v. LeCureux*, 1998 U.S. App. LEXIS 17112 (6th Cir., July 22, 1998), unreported ("Notwithstanding the trial judge's conclusions [that counsel's error was not prejudicial], we review this question *de novo* because the **determination of prejudice is a mixed question of law and fact.**") (emphasis added); *see also Johnson v. Gibson*,  254

---

[1]  *See also Childress v. Johnson*, 103 F.3d 1221, 1225 (5th Cir. 1997) (noting that AEDPA's section 2254(e)(1) "appears to retain the traditional presumption of correctness afforded to state court factual

F.3d 1155 (10th Cir. 2001); *Keating v. Hood*, 191 F.3d 1053, 1064 (9th Cir. 1999);

*Bonner v. Holt*, 26 F.3d 1081, 1083 (11th Cir. 1994); *Deputy v. Taylor*, 19 F.3d 1485,

1496 (3rd Cir. 1994); *Orndorff v. Lockhart*, 998 F.2d 1426, 1432 (8th Cir. 1993); *Lowery*

*v. Collins*, 988 F.2d 1364, 1372 and n.34 (5th Cir. 1993).

Here, applying the Sixth Circuit's decision in *McGhee*, *supra*, any state court fact-findings regarding 1) the prejudice of juror misconduct, 2) the prejudice resulting from the prosecutor's improper arguments, 3) the deficient performance and resulting prejudice caused by Petitioner's defense counsel, and 4) the harmlessness of any other constitutional errors committed in Petitioner's case, are not entitled to a presumption of correctness by this Court.

## C.    Procedural Default

The Respondent cites a number of state procedural bars for some of the claims in Mr. Sheppard's habeas petition. What Respondent neglects to say, however, is that just because a state asserts a procedural bar doesn't make it so. Federal courts are not reduced to blind acceptance of state procedural bars. To the contrary, the issue of whether to enforce a state procedural bar is reserved to the federal court's independent determination: "[W]e have consistently held that the question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question." *Henry v. Mississippi*, 379 U.S. 443, 447 (1965). Accord *Couch v. Jabe*, 951 F. 2d 94, 96 (6th Cir. 1991): "[W]hether a state court rested its holding on procedural default, thus barring federal habeas review, is a question of law to be reviewed *de novo*."

---

determinations.")

The Sixth Circuit's four-part *Maupin* test is used when federal courts determine whether to enforce a state procedural bar. This requires the federal court to determine if there is an applicable procedural rule and, then, whether the state chose to enforce it. "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule... Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986).

The rest of the *Maupin* analysis is necessary only when there <u>is</u> an applicable procedural bar that the state court <u>actually enforced</u>. At that point, the federal court must decide -- again, for itself -- "whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim....This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims." *Id.*

And finally, <u>if</u> there is an applicable state procedural bar, <u>and if</u> the state court actually enforced the bar, <u>and if</u> it is in fact an adequate, independent and legitimate state procedural bar, the federal court can still review the claim whenever the petitioner demonstrates "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.*

"Cause" can be many things in many cases, as long as it is "something external to the petitioner, something that 'cannot fairly be attributed to him.'" *Gravely v. Mills*, 87 F. 3d 779, 785 (6th Cir. 1996) (citation omitted). "Cause" can run the gamut from state concealment of evidence, *Amadeo v. Zant*, 486 U.S. 214 (1986), *Strickler v. Greene*, 119

10

S. Ct. 1936 (1999); to "a showing that the factual or legal basis for a claim was not reasonably available to counsel" at the time the default occurred, *Coleman v. Thompson*, 501 U.S. at 753; to ineffective assistance of appellate counsel, *Mapes v. Coyle*, 171 F. 3d 408 (6th Cir. 1999)[2]; to ineffective assistance of trial counsel, *Gravely v. Mills*, 87 F. 3d at 785.

The *Maupin* court's instruction on how to determine the "prejudice" prong of "cause and prejudice" is also important. The court held that "in analyzing a petitioner's contention of prejudice, the court should assume that the petitioner has stated a meritorious constitutional claim." *Maupin*, 785 F. 2d at 139 (emphasis added). This means the federal court must assume that a claim has merit and ask whether the constitutional error involved meets the test for prejudice articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."

When necessary to discusses procedural issues for the individual claims discussed below, Petitioner will apply the *Maupin* test.

---

[2]  It is well established that an independently raised and non-defaulted claim of ineffective assistance of appellate counsel for failing to raise a violation of federal law on direct appeal can constitute the required cause and prejudice necessary to excuse the default of an underlying constitutional claim. *See Murray v. Carrier*, 477 U.S. 478 (1986); *Rachel v. Bordenkircher*, 590 F.2d 200, 203-204 (6th Cir. 1978); *see also Edwards v. Carpenter*, 529 U.S. 446 (2000). Petitioner raised independent claims of ineffective assistance of appellate counsel in his March 9, 2000 Application to Reopen Direct Appeal filed in the state court of appeals pursuant to Ap. R. 26(B) and *State v. Murnahan*, 63 Ohio St. 60 (1992). Those claims are not defaulted. The First District Court of Appeals denied the application finding that Petitioner had failed to show good cause for filing it beyond the 90-day requirement under Ap. R. 26(B)(2)(b). *State v. Sheppard*, (Oct. 2, 2000) Hamilton Ap. Nos. C950402 and C95550744, unreported. However, while the Ohio Supreme Court affirmed the denial, it did so on different grounds. *State v. Sheppard*, 91 Ohio St.3d 329 (2001). The Ohio Supreme Court did not apply a procedural bar to Petitioner's application to reopen but instead denied the application on its merits, applying, *inter alia, Strickland v. Washington*, 466 U.S. 668 (1984). Thus, because the last state court rendering a judgment on Petitioner's claims of ineffective assistance of appellate counsel did not clearly and expressly rely on a state procedural bar, those claims cannot be deemed defaulted. *Harris v. Reed*, 489 U.S. 255, 262 (1989).

### III.  SHEPPARD WAS DENIED HIS RIGHT TO A FAIR SENTENCING PHASE TRIAL BASED ON THE EVIDENCE, INCLUDING EVIDENCE OF MITIGATION
(Claims 3, 5, 7)

Bobby Sheppard had a right to a fair trial before a jury in the sentencing phase. That right carried with it the right to be convicted only after the jury considered all the evidence at the sentencing phase, including the mitigating evidence.  He was denied that right through prosecutorial misconduct, jury misconduct and judicial error.

The Supreme Court has held repeatedly that a jury's verdict "must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961). In *Turner v. Louisiana*, 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546 (1965), the Court explained that under the Sixth and Fourteenth Amendments, "trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id*. at 472-73.  And, in a death penalty case, this right to a fair trial is the right to have the opportunity to present and have the sentencing jury consider all the relevant evidence, including defendants' mitigating evidence. *Penry v. Lynaugh*,    492 U.S. 302, 319 (1989) (a capital defendant has the right to have the sentencing jury "give effect to [a defendant's mitigating] evidence in imposing sentence.")  Of course, the right to a fair trial based on all the relevant and admissible evidence necessarily carries with it the prohibition of prosecutorial and juror misconduct that effectively deny a defendant of that right.

A.    **Bobby Sheppard Presented a Defense to the Jury in the Sentencing Phase that Revolved Around Dr. Smalldon's Unrebutted Diagnosis of Sheppard as a Paranoid Schizophrenic.**

During the second phase of his trial, the sentencing phase before a jury, Bobby Sheppard presented evidence in mitigation on several statutory mitigating factors, but the heart of his case in mitigation lay in his mental illness, paranoid schizophrenia, as diagnosed by Dr. Jeffrey Smalldon. Tr. 1018 - 1135. Smalldon's testimony on Sheppard's paranoid schizophrenia was evidence to be weighed as part of the mitigation process under either R.C. § 2929.04 (B) (3) (at the time of the offense the offender lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to requirements of law) or R.C. § 2929.04 (B) (7) (any other factor relevant to whether the offender should be sentenced to death).

Well before trial began, the prosecution was aware that Sheppard's mental health would be put at issue in the sentencing phase as mitigation evidence. *See* ROW Appendix, Vol. I (Trial Court "A"), p. 48 (trial court entry of September 24, 1994 granting defense motion to employ psychologist Dr. Smalldon to assist in preparation for mitigation). And, the trial judge ordered Dr. Smalldon to turn over all of his records, including the raw data from his psychological tests, to the state in advance of trial. ROW Appendix, Vol. I, (Trial Court "A"), p. 321; Tr. 554-576, 1089-90. Prosecutors were then able to take those records and data and consult with their own psychologist about them. Tr. 1089-90, 1266-67. In addition, prior to trial, the prosecution was afforded access to a written report of a court-ordered psychiatric examination of the defendant conducted by Dr. William Walters of the Court Psychiatric Center. This psychiatric examination and written report was ordered by the trial court pursuant to a suggestion of

defendant's incompetence to stand trial. *See* ROW Appendix, Vol. I (Trial Court "A"), p. 295, 297, 306-07. In accordance with state law, a written report of the examiner was required to be filed with the court and provided to both the prosecutor and defense counsel. R.C. § 2945.371.

**B.** **Rather Than Offer Rebuttal Evidence, the State Responded to Smalldon's Testimony and Diagnosis by Assaulting Sheppard's Right to Assert Mental Illness with Unseemly Personal Attacks, Improper Appeals to Juror Ignorance, and Inappropriate Assertions of Personal Beliefs.**

The state offered no evidence to rebut Bobby Sheppard's illness. It did not call an expert to rebut Dr. Smalldon's diagnosis and testimony or offer medical records to the contrary. Rather, the state attempted to defeat Sheppard's unrebutted evidence in mitigation by encouraging the jury to disregard the evidence altogether, through the use of improper tactics. Through accusation, innuendo, misstatements of law and misstatements of fact, the prosecutor encouraged the jury to find that the defense claim of paranoid schizophrenia could not be believed and was "absolute sham mitigation." *See* Tr. 1230.

**1.** **Using Accusations of Underhandedness, the Prosecutor Assaulted Smalldon, the Defense Team, and the Right of Defendant to Put On Mental Illness in Mitigation.**

The prosecutors encouraged the jury to discredit Sheppard's mental illness evidence based on the repeated accusation that the use of the mental illness evidence as mitigation rather than as an NGRI defense was an ambush, designed to prevent the prosecutors' expert from evaluating Smalldon's diagnosis of Sheppard. The prosecutor's claim of underhanded tactics started in the initial penalty phase closing argument, where the prosecutor accused the defense and Dr. Smalldon of attempting to ambush the state by not preparing a written report:

> We also known [sic] from Doctor Smalldon that, although
> in a normal case, he prepares a report ahead of time that
> both sides get, both sides can look at, both sides can ask
> him about, he didn't do that in this case.   A little bit of
> ambush.

Tr. 1173.[3]

These assertions of underhandedness then continued by innuendo in the state's

final closing, where the prosecutor misstated both the fact that it did not have access and

the law on whether it was entitled to access to the defendant for a mental health

examination:

> [D]id the state have access to the defendant?  I don't know.
> He (Dr. Smalldon) knows.  He knows.  He doesn't make a
> report.  You know, when I said in opening statement to you
> that I have no idea what mitigation that he is going to bring
> in, I had not [sic] idea.  I heard it with you.  I sat there, took
> notes.  That's the first time.

Tr. 1227.

The assault on the credibility of Smalldon and the right of the defendant to put

mental illness in mitigation culminated when the prosecutor expressly and  through

innuendo railed that Dr. Smalldon and defense counsel's presentation of mental illness as

a mitigating factor (rather than an NGRI defense) was an unscrupulous tactic intended to

keep the state from exposing Bobby's mental illness as a fraud:

> DETERS:  Doctor Smalldon….Very slick guy…. I want
> this jury to know how slick it is to put this doctor, this
> psychologist, to use their expert only in mitigation.
>
> MR. RANZ (defense counsel):  An objection, Your Honor.
>
> THE COURT:  Overruled.  Argument.

---

[3] In fact, Smalldon said only that he normally prepared expert reports in cases where he testifies as to the
*competency* of a defendant.  Tr. 1098.

MR. DETERS (prosecutor):  We have no right to examine him for his mental condition, none at all, if they only used it in mitigation.  Think about it….You know, Mr. Ranz has a great problem explaining to you why that's not really not guilty by reason of insanity.   If I am on this jury, I think to myself why didn't they bring this up in the first (phase of trial) -

MR. CRISCI (defense counsel):   Objection, if the Court pleases.

THE COURT:  Overruled.

MR. DETERS:  Why was this not brought out?…Don't you think this type of psychological testing, this type of information that you heard from Dr. Smalldon, may have found him not guilty by reason of insanity?

MR. CRISCI:  Objection.

THE COURT:  Overruled.

MR. DETERS:  But why was that not even a whisper?  Why was there not even a whisper of that defense in the guilt phase of this trial?  Because they know if they do that, we have access to the defendant.

MR. RANZ:  There is an objection, Your Honor, to that.
THE COURT:  Overruled.

MR. DETERS:  …. They (defense counsel) don't want that to happen.  They don't want someone else to talk to him.  They just want Doctor Smalldon to talk to him.

MR. CRISCI:  Objection.

THE COURT:  Overruled.  This is argument.

MR. DETERS:  That's fine.  Thank you, Judge.  That's fine.  They want the unchallenged testimony of Doctor Smalldon.  That's fine.  You need to understand why that happened.  Doctor Smalldon's unchallenged testimony, and Judge Crush will charge you, he'll tell you that because he was offered only for mitigation, that we didn't have access to him.

Tr. 1210 - 1212.

The prosecutors then continued to inject their personal beliefs that the entire defense strategy of putting the mental illness in mitigation was dishonest and that the alleged sandbagging suggested that Sheppard or the defense counsel would have lied had the state not had a videotape:

> MR. DETERS:  Who knows what kind of testimony that we would have heard from the defense if we didn't have the actual videotape.
>
> MR. RANZ:  Objection.
>
> THE COURT:  Proceed.  Go ahead.
>
> MR. DETERS:  I'm sure that he would have been seeing ghosts everywhere… You have a defendant who desperately wants you to believe that he is mentally ill with little or no proof.  And it is presented in such a way that we cannot examine the defendant himself…

Tr. 1226.

The state then tried to bolster the claim of ambush and that therefore the Smalldon testimony could not be believed because it was untested, by appealing to the jury's ignorance and asserting personal opinions.   For example, using nothing more than personal beliefs, the prosecution challenged the mental health tests relied on and performed by Smalldon in making his diagnosis:

> He was asked is there some type of validity scale built into that? He said yes, there is L scale, known as the lie scale.  *I don't put much validity into that.*

Tr. at 1174.

And still later, again relying on mere personal opinions of what tests measure and the ignorance of the jury, the prosecutor minimized the effectiveness of the tests and the scope of the evaluation performed to complete Dr. Smalldon's diagnosis:

> Let's go through the three things [relied on by Smalldon in making his diagnosis. First]  MMPI 2, it was done in October, when the doctor was first retained. He gives a little blip on the screen, uh huh, he is schizophrenic.

Tr. 1213.

The prosecutor then attacked Smalldon's theory that a head injury could trigger a mental illness with nothing more than personal belief that such a theory was bogus:

> The bottom line is . . . Smalldon made a great leap to say that because the defendant took a true false test and because mother says that there is people in the family that did do some strange things and because the defendant had a slight, *I'm not going to bang my head, but I can tell you that I can bang it as hard as the defendant did in that accident because the defendant had a slight knock on the head,* that you know, they watched him, observed him, sent him home. Because of all that, he now suffers from a mental disease or defect?

Tr. 1178.

And, without any evidentiary foundation on which to challenge what source of medical history a psychologist should and should not rely upon when diagnosing mental illness, the prosecutor injected his personal opinion that Smalldon's diagnosis was not reliable because Smalldon relied on testimonials from family members:

> So he talks to the family . . Give me what is it that he needs to ask the family about. . . the mother is depressed . . . One of the sisters is depressed . . .Has this doctor ever seen one medical record . . .How ludicrous. Aunt Martha was sad at Christmas time. Well, she is depressed. His great aunt always talks to herself . . . This is junk.

Tr. at 1216.

18

Finally, laying the foundation that Smalldon's diagnosis could not believed because the state had been ambushed and therefore no second opinion was available, the prosecutors then appealed to the ignorance of the jury by asking the jury to "see for themselves" that Sheppard was not paranoid schizophrenic. Tr. 1223-1225.[4]  Smalldon offered unrebutted testimony that a snapshot of a person based by the untrained eye may not suggest paranoid schizophrenia. Tr.1102 ("there would be no way to tell one way or the other from that videotape what the mental condition of Mr. Sheppard might have been at the time"), Tr. 1102-1103 (nothing in videotape inconsistent with paranoid schizophrenia), Tr. 1060 (diagnosis typically involves evaluation for look for two of five symptoms), Tr. 1082 ("many aspects of the interlife or the internal world of people with severe mental illness are, as you would imagine, not directly accessible to view"). Nonetheless, the prosecutors repeatedly played the videotape of the crime scene (even though Supreme Court case law clearly states that the nature and circumstances of the offense are not to be weighed as an aggravating circumstance), purportedly to demonstrate that the jury could see for themselves that Sheppard was not paranoid schizophrenic, encouraging them to decide for themselves because the state had been ambushed. Tr. 1221 – 1225.

---

[4] (starting videotape and arguing  "You are the most important witness to his mental condition right there…Didn't sound very flat in affection in walking into the place and says freeze, mother fucker, does he?…You can hear yourself.  Goes directly to what the doctor says in contradicting every point of it."; "He marches back to the register.  Is that somebody under delusions?...He wants the money…is that delusional? Absolutely not."); *see also, Id.* at 1221 ("During the event…He is communicating, he is communicating very well with is friends…is that delusional?")  All of these and more examples in pages 1221-1225, and the question of "is he delusional," prey directly on the ignorance of the jury.

**2.     Judge Crush Exacerbated Sheppard's Battle to Establish His Mental Illness in the Face of Prosecutorial Misconduct by Excluding Evidence Relevant to His Mental Illness.**

Two of the factors Dr. Smalldon relied upon as a basis for his diagnosis of paranoid schizophrenia were Mr. Sheppard's family history of mental illness, and a mild concussion that Mr. Sheppard suffered in a 1993 car accident about a year before the crime. Family members believed that following the accident, Bobby Sheppard started to exhibit psychotic symptoms. During his testimony, Dr. Smalldon tried to discuss an organic psychiatry textbook that documented the connection between mild head injury (Mr. Sheppard's concussion) and the onset of psychotic illness. Yet, incredibly, the trial judge *sua sponte* interposed an objection without waiting for the prosecutor, Tr. 1080 – 1081, and instructed jurors to disregard Smalldon's testimony that literature on neurological aspects of psychiatry recognized the head injury/psychosis connection.

Likewise, the trial court excluded relevant evidence of Sheppard family's history of mental illness on the maternal side, including Mrs. Sheppard's hospitalization for depression and the multiple forensic psychiatric hospitalizations of Mrs. Sheppard's brother Darryl Sheppard. Judge Crush allowed admission of only one page of Delores Sheppard's records (Defendant's Exhibit 18 A), which contained no detail at all on her diagnosis of depressive disorder. Tr. 1138 – 1145.[5]

The Darryl Sheppard records which the trial judge excluded were from the Pauline Warfield Lewis, Oakwood and Dayton psychiatric hospitals. They documented his sad mental deterioration which, for Darryl Sheppard, had its onset at about the same

---

[5] Defense counsel proffered the excluded records from Delores Sheppard's hospitalization (defense trial exhibit #18) and the excluded records of Darryl Sheppard's hospitalizations (defense trial exhibit #22) for the record on appeal. Tr. 1137 - 1149.

time as Bobby's, which occurred in his late teens. Darryl was sentenced to prison at Chillicothe Correctional in early 1990 on conviction for breaking and entering. There, he had a psychotic episode in which he feared that bugs were crawling all over him and eating him. Darryl then was transferred to the Oakwood Forensic Center and, from there, to the Dayton Mental Health Center Forensic Unit. At the conclusion of his criminal sentence (virtually all of which was served in forensic centers), the Dayton facility sent Darryl to the Pauline Warfield Lewis community psychiatric facility for further treatment before his release. The records from these institutions showed that, like Bobby Sheppard, Darryl's family reported that he exhibited psychotic behaviors such as abrupt acts of violence, paranoid suspicions about his food and other people, and voicing complaints that bugs and rats were invading his body beginning at about the age of twenty. The records document Darryl's history of "delusional ideations," also a trait of Bobby Sheppard's, and document that, like Bobby, Darryl Sheppard consistently denied mental illness, appeared withdrawn and remote and had used alcohol and drugs to self-medicate. In light of Dr. Smalldon's testimony that schizophrenia is understood to be hereditary, evidence of the parallels between Bobby Sheppard and his uncle were relevant and should have been presented to the jury.

### 3. Judge Crush Then Gave Credence To and Highlighted the Prosecution's Sandbagging Theme When He Incorrectly Instructed the Jury That the Prosecutor Did Not Have the Right to Examine Sheppard.

As if the jury's acceptance of prosecutorial misstatements and attacks were not damaging enough for Sheppard, the trial court ratified the state's attempts to discredit Sheppard's mitigation defense through the use of the "ambush" theme. Over defense objection, the judge charged jurors that "the State of Ohio has not been afforded access to

the defendant for purposes of a psychological examination in the penalty phase of this trial, nor, constitutionally, are they entitled to that access." Tr. 1157, 1236 - 1237.

Of course, the instruction was wrong as a matter of law, as there was nothing that prohibited the state from evaluating Sheppard after he put in issue his mental illness. *Lagrone v. Cockrell*, 2003 U.S.App. LEXIS 18150 (5th Cir. 2003); *U.S. v. Byers*, 740 F.2d 1104, 1113 (D.C.Cir.1984).

Indeed, if there was some right of Sheppard not to be evaluated, it would have been improper for the Court to: 1) allow the prosecutor to use as a sword the Defendant's exercise of that right; and 2) unfavorably comment on Petitioner's exercise of that right in an instruction to the jury.

### 4.        Juror Stephen Fox Took the Prosecutor's Bait.

Dr. Smalldon's testimony left at least one juror, Stephen Fox, uncomfortable with a verdict of death, but the prosecutor's unfair tactics convinced that juror that a second opinion was in fact needed.   Accordingly, before deliberating, Fox conducted his own investigation into paranoid schizophrenia, and as part of that effort, Fox made a telephone call to an acquaintance, Dr. Helen Jones, whom he believed to be a psychologist; he then asked her for a "boiled down definition" of paranoid schizophrenia.  Tr. 1256-1257.

The explanation on what Jones told him has changed over time, as set forth below.

### 5.        Fox's Misconduct Came to Light.

After the jury returned a verdict but before Judge Crush announced the sentence, Fox had a small party at his house. 6/24/2002 Tr. of Evid. Hearing at 144-145.  At that party,  he invited his neighbor, Assistant County Prosecutor Anne Flanagan, and during a

party conversation with Flanagan, Fox told Ms. Flanagan that he called Jones to inquire about paranoid schizophrenia because "the attorneys didn't give us enough information. I needed - I wanted to know more about paranoid schizophrenia." R. # 29, Deposition of Anne S. Flanagan, page 18; 6/24/2002 Tr. of Evid. Hearing at 146. Flanagan then told her supervisors, who alerted the trial judge to the misconduct on May 30, 1995, the morning the judge had set to pronounce Mr. Sheppard's sentence. R. # 29, Deposition of Anne S. Flanagan, pages 9, 14, 18; 6/24/2002 Tr. of Evid. Hearing at 148-149.

### 6. The Judge Denied a Motion for a New Trial Because Fox Stated In Chambers That the Extraneous Information Did Not Influence His Verdict.

Upon learning of the misconduct, the trial judge brought juror Fox into chambers for an unsworn interview and asked him a few brief questions about what he had done. In response to those questions, Fox admitted that he called Helen Jones during the penalty phase, because he thought she was a psychologist. He admitted he asked Jones for a definition of paranoid schizophrenia and claimed that Ms. Jones told him only that "those kind of people are not really in touch with reality." Tr. 1254 – 1259. Juror Fox also claimed that this extraneous information did not influence his verdict. The judge then accepted juror Fox's self-serving claims and moved directly to sentencing. Tr. 1259. The judge did not call Helen Jones in. He did not call in the other jurors to determine what Fox had stated to them. He did not call Dr. Smalldon to make any assessment of whether what was said to the juror was inconsistent with his definition of and testimony on paranoid schizophrenia. He did not call Anne Flanagan, and he did not call for an in-court hearing, where evidence and other witnesses could be heard and the facts could be tested. Rather, the judge indicated he was satisfied and ready to go

forward with sentencing, *because the juror had stated that it had no effect on him*, with the following finding: "the testimony I heard indicated that the juror was not swayed towards the prosecution by what he heard. It did not change his opinion." Tr. 1259.

Sheppard's counsel then filed a motion for new trial based on juror Fox's misconduct, a motion that was summarily denied. ROW Appendix, Vol. II (Trial Court "B"), p. 1, 58. As part of that motion, defense counsel attached an affidavit from Helen Jones in which she claimed to be a "consulting psychologist" and confirmed that she provided juror Fox with a "brief description and explanation of paranoid schizophrenia." ROW Appendix Vol. II (Trial Court "B"), p. 40. Trial counsel also reminded the Court that Dr. Smalldon had presented testimony on the very subject on which the juror had inquired. ROW Appendix, Vol. II (Trial Court "B"), p. 23.

Five months after the sentencing, the judge called a perfunctory hearing on the motion for new trial. At that hearing, Sheppard sought to have struck the statements of Juror Fox to the trial court. 10/6/1995 Proceedings, Hamilton Cty. Court of Common Pleas, Tr. p. 4. Just two days before the "hearing," the prosecution filed its own affidavit from Jones in which she swore under oath that she had "thoroughly reviewed the testimony of Dr. Smalldon," that "the explanation I gave to Mr. Fox of paranoid schizophrenia was totally consistent with the testimony of Dr. Smalldon," and "nothing I told him contradicted anything testified to by Dr. Jeffrey Smalldon." ROW Appendix, Vol. II (Trial Court "B"), p. 53.

At the hearing on the motion for new trial, the state relied on the affidavit of Helen Jones and upon Fox's statement that the extraneous information did not affect his verdict:

> . . . [S]he states that she has totally reviewed the testimony of Dr. Smalldon. Nothing she told the juror in this case was inconsistent with anything that Dr. Smalldon said. In effect, Judge, this juror, if anything was seeking some sort of confirmation of what this defense expert was saying was true. . . . She basically told him the same thing.
>
> I don't see how you can call this person, this Juror Fox, ask him about this contact and not go the next step, *did it affect you. He clearly states absolutely not, that it did nothing to change my opinion. So, in effect, I believe that there was not a showing for a need for a new trial.* I ask that you overrule that motion.

10/6/1995 Proceedings, Hamilton Cty. Court of Common Pleas, pp. 10-11.

The trial court denied the motion for a new trial, relying on Fox's statement that his verdict was not influenced and upon Jones' representation (and unestablished "expert" opinion) that her statements were consistent with Smalldon's:

> "[i]t seems to me that you can't have it both ways, either side can't have it both ways. And if you don't allow the juror to testify, then the only evidence that you have regarding how it may have affected the jury is that testimony of the psychiatrist friend who said that she didn't tell him anything that he was not already told. That stuff was favorable to the defendant.
> If we say that the Aliunde rule doesn't apply because we have the evidence from the psychiatrist, we have both her statement which shows that there was no harm done by what was said. In fact, if anything, it was a little favorable to the defendant. Secondly, the juror's own statement . . . I will overrule both motions."

*Id.* at pp. 13-14.

### 7.   Throughout the Direct Appeals, the State of Ohio Continued to Defend the Jury Verdict by Relying on Fox's Statement That the Extraneous Information Did Not Influence Him.

At the trial court and on direct appeal, the state of Ohio relied on Fox's statement that he was not influenced by Jones as a basis for defending the jury verdict. For

25

example, in the face of an objection by Sheppard, at the trial court, the state relied on it in opposition to the motion for a new trial. ROW Appendix, Vol. II (Trial Court "B"), pp. 37-38. On direct appeal, the state relied upon it in defending the trial court verdict. ROW Appendix, Vol. IV (Direct Appeal–Court of Appeals "A"), pp. 244-45. And, likewise, before the Supreme Court of Ohio, the state of Ohio again relied upon Fox's statement that he had not been influenced. ROW Appendix, Vol. VI (Direct Appeal– Ohio Supreme Court), pp. 238, 241. Indeed, both the appellate court and the state supreme court cited to Fox's assertion of "no impact" when affirming the jury verdict. *State v. Sheppard*, 1997 Ohio App. LEXIS 2501, pp. 2-3 (June 11, 1997), unreported; *State v. Sheppard*, 84 Ohio St. 3d 230, 232-33, 703 N.E. 2d 286, 290-91 (1998).

**8.    Testimony In This Case Establishes That the Entire Basis Upon Which Judge Crush Refused To Grant a Mistrial (and a New Trial) Was Erroneous, As Was the State of Ohio's Basis for Defending the Jury Verdict: Fox Admits That In Fact the Extraneous Information Influenced His Verdict, and Jones Had No Foundation For Asserting That Smalldon's Testimony Was Consistent With Her Explanation of Paranoid Schizophrenia To Fox.**

Fox has now admitted that he was untruthful when he advised Judge Crush that the verdict did not influence him. In the evidentiary hearing before this Court, Juror Fox testified that in fact, the conversation did influence his verdict of death, and indeed, it made it easier for him to vote for death:

> Q.    ... You do agree with me that the information that Ms. Jones gave to you influenced your verdict; is that correct?
> A.    I'm sure to some degree, small degree.
> Q.    So the answer's yes?
> A.    Yes.
> Q.    And, again, to use your words, you agree that it contributed to your verdict of death; is that correct?
> A.    If that's, yeah, if that's what I said.

> Q.    Well irrespective of whether that's what you said, as you sit here today you agree it contributed to your verdict?
> A.    Yes, it must have.
> Q    . . .My understanding is at a minimum, it enabled you to affirm your conclusion that Mr. Sheppard was not paranoid schizophrenic; is that correct?
> A.    Yes.
> Q.    So you will agree with me that the information given to you by Mrs. Jones made it easier for you to vote for death?
> A.    I guess, yes.

6/24/2002 Tr. of Evid, Hearing, at 137-138.

Likewise, the record now confirms that Fox was told more by Ms. Jones than he admitted to Judge Crush.   Jones told Fox that paranoid schizophrenia was "a communications disorder that a person would have difficulty communicating because of their lack of reality or they have lost touch with reality."  *Id.* at 171.  She also said that "it's hard to communicate with a schizophrenic." *Id.* at 168.

And, we now know that Jones had no basis to opine that her statements to juror Fox were consistent with Smalldon's testimony; she does not know what the accepted definition or symptoms of paranoid schizophrenia are, and even if she did, she never reviewed Smalldon's trial testimony.   Jones is not a psychologist as a matter of Ohio law; Ohio requires anyone holding herself out as a psychologist to be licensed, and she is not and never has been so licensed.  6/25/02 Evid. Hr. Tr. at 163, 165.  Rather, she is a human resource consultant who works with businesses and "[f]ocuses primarily on developing interpersonal skills . . . [a]nd team building."  *Id.* at 165-166.  Accordingly, she admits she is only qualified to give a description of paranoid schizophrenia as a "layperson" based on the "Webster's Dictionary."  *Id.* at 167.  She has no idea how the DSM-IV describes the symptoms or diagnostic criteria for paranoid schizophrenia.  *Id.* at

175.    And, despite her affidavit and the prosecution's statement to the contrary, she stated that she did "not recall" reviewing Smalldon's trial transcript and that "I would not have had occasion to."  6/25/02 Evid. Hr. Tr. at 191-193.  Indeed, she stated emphatically that she had not read the transcript of Dr. Smalldon:  "No, I did not read that.  I didn't specifically - I mean, it's 112 pages."  6/25/02 Tr. Evid. Hearing at 198.

## C.    The Prosecutors' Misconduct Warrants The Grant Of A Writ.

On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (citation omitted).  The Court must first inquire as to whether the statements were improper and then consider four factors in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).[6]

Prosecutors engage in misconduct when they misstate evidence. *Gall v. Parker*, 231 F.3d 265, 312-313 (6th Cir. 2000).  They similarly deny defendants the right to a fair trial when they make statements based on their personal beliefs, not evidence.  *Id*. at 312.  Courts frown upon such statements for two reasons:

---

[6] Here, the Court should review *de novo* the question of whether there was prejudicial error, as the issue of the effect of the prejudice of juror misconduct is a mixed question of law and fact. *See infra*, Sec. II(B)(3). Indeed, rather than make any analysis of the prejudice to the jury, the Supreme Court of Ohio simply made a finding of misconduct and then moved on to state that the misconduct was cured by the Court's independent sentencing analysis.  Accordingly, it is hard to understand how any presumption of correctness to state court fact-findings could apply.  In any event, whatever the standard of review, it is clear that the misconduct was prejudicial.

> such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985).

Likewise, the United States Supreme Court and the Sixth Circuit have repeatedly found that it is improper for counsel to make personal attacks on an opposing advocate. *United States v. Young*, 470 U.S. 1, 9 (1985); *see also, U.S. v. Preston*, 1994 U.S. App. Lexis 25624, * 10-11 (6th Cir. 1994) (finding that statement defense counsel is selling a "bill of goods" and the defense counsel is "flim flamming" the jury are improper); *U.S. v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001) (ad hominen attacks on opposing counsel are plain error); *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980) (prosecutor implied that defendant's lawyer helped destroy evidence); *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983); *McCarthy v. Bruno*, 469 U.S. 920, 105 S. Ct. 302, 83 L. Ed. 2d 236 (1984) (prosecutor suggested that defendant's hiring counsel proved his guilt and that all criminal defense counsel lie and distort facts). There simply is no place or reason for a prosecutor to disparage defense counsel.

This Court need look no further than the recent decision in *Gall v. Parker* to find a case where the Sixth Circuit found prosecutorial misconduct based on facts virtually indistinguishable from Sheppard's trial. In *Gall*, the Sixth Circuit granted habeas relief because the trial prosecutor engaged in a nearly identical strategy of assaulting the use of

an insanity defense by misstating the law and the facts and by attacking the credibility of the expert and the defense

For example, the prosecutor in *Gall* improperly downplayed the legitimacy of recognized tools for diagnosing mental illness by using what the Sixth Circuit referred to as "know-nothing appeals to ignorance" of jurors and "belittl[ing] the tests [of ] Dr.[s]:"

> For instance, the Commonwealth mocked Dr. Noelker's use of a "House, Tree Person Test" to show insanity as opposed to the Commonwealth's evidence of a "smoking gun." He asked: "isn't that a convenient time to go into a [schizophrenic state]?"…At the same time, the prosecutor minimized the testimony of Drs. Noelker and Toppen that Gall could appear both calm and sane to an "untrained observer" even if examinations and tests revealed that he was insane or severely mentally ill: "He may look sane, but folks, he isn't. Now they are telling us folks, 'you can't look and judge for yourself.'" He then argued to the jury that because Gall appeared intelligent at trial, he must be sane, and he must have been sane on April 4.

*Gall* at 314 (citations omitted).

Likewise, the prosecutor in *Gall* injected his personal beliefs as to the credibility of test results and of witnesses. The prosecutor inappropriately stated:

> For instance, the prosecutor declared in closing that he was "not convinced"…he stated that "I think you can probably be skeptical of" the results of intelligence and psychiatric tests…Similarly, he clearly expressed his personal belief about the credibility of key witnesses [including the testifying doctors]. Of Dr. Noelker, the doctor who had thoroughly examined Gall, the prosecutor stated that "I have known him for along time and I know he is [a fine man]." He then declared that Dr. Noelker was "a man of compassion" whose beliefs "slant[ ] his opinions" . . .He also stated that "I thought" aspects of Dr. Noelker's and Dr. Toppen's testimony were "really unusual, really unique."

*Gall* at 312 (citations omitted).

Accordingly, the Court in *Gall* granted a writ of habeas corpus based on prosecutorial misconduct:

> In sum, facing Gall's considerable evidence of insanity and EED, counsel for the Commonwealth chose not to rebut that evidence directly.  Instead, he expressed his personal belief as to the weakness and partiality of Gall's expert witnesses' testimony, and he mischaracterized crucial aspects of that testimony. He disparaged the very use of an insanity defense as the "last line of defense" and the "M1 Rifle"; he belittled the medical and psychological tools used to support such a defense; and he equated the doctors' testifying about Gall's condition to three blind men "asked to identify an elephant"--"you can imagine the bizarre opinions which they got back." J.A. at 1589. He then pleaded with the jury not to let Gall loose through the insanity defense. In addition to having no doubt that these tactics were improper, we find that they easily satisfy the criteria of "flagrancy" laid out in Boyle. They clearly misled the jury and prejudiced Gall's defense of insanity. The comments were not accidental or isolated, permeating the Commonwealth's closing argument as well as other portions of the trial. And they involved the central issue of the case. Moreover, as explained infra, the total strength of the evidence rebutting Gall's insanity defense was weak at best, not to mention improperly presented. After a close review of the record, we find that the Commonwealth's misconduct was sufficiently egregious to render the entire trial fundamentally unfair.

*Gall* at 315.

*Gall* is on all fours here, and *Gall* and *Boyle* demand the grant of a writ of habeas corpus under all the relevant factors:

**First**, Sheppard offered considerable evidence on his mental illness in mitigation. That evidence included the urebutted testimony of Dr. Jeffrey Smalldon. Tr. 1018-1098.

**Second**, as in *Gall*, the prosecution offered no evidence to rebut Sheppard's evidence on his mental illness.

**Third**, the prosecutor disparaged the very use of the mental illness defense in mitigation, calling the use of the defense an ambush and sandbagging. *See* Tr. Vol VI, pp. 1172, 1210-12, 1226, 1227. And, rather than offer evidence, they then bolstered the ambush theory with pleas to the ignorance of the jury and personal beliefs as to the weakness and partiality of Sheppard's expert witnesses' testimony, mischaracterized crucial aspects of that testimony, and belittled the tools used by the expert in an effort to convince the jury that the weakness in Smalldon's testimony explains the motives behind the "ambush.." *See* Tr. 1174, 1178, 1213, 1216.

**Fourth**, the repeated attacks were flagrant. They were not isolated. And, the misconduct relating to the evidence on mental illness was accompanied by misconduct in other areas. Indeed, other instances of prosecutorial misconduct existed as well.[7]

**Fifth**, they went to the heart of defense in mitigation.

In short, the record demonstrates prosecutorial misconduct that was so flagrant and persistent as to render the penalty phase of the trial unfair, and therefore, a denial of due process. The consistent holdings out of the Supreme Court have prohibited state

---

[7] Indeed, the prosecutorial misconduct was not limited to Smalldon's testimony on the evidence in mitigating or mental illness. Ohio law is clear that the horror of the moment as characterized by the victim is a non-statutory factor which a prosecutor may not comment on. *State v. Combs,* 62 Ohio St. 3d 278, 581 S. Ct. 1081 (1991). Yet, the prosecutor commented on Mr. Willhide's fear. Tr. 1167. Incidentally, Sheppard concedes that these examples, as well as the statement about seeing ghosts, Smalldon being "slick" and the statement about "sham mitigation" were not specifically cited to on direct appeal as evidence that supported the prosecutorial misconduct. That hardly means this claim has not been preserved. There is no dispute the claims of misconduct by challenging defendant's strategy of using mental illness and by denigrating the defense counsel were raised on direct appeal. Sheppard is not claiming that standing alone these examples warrant relief. Rather, its that sandbagging theme and the assault on the mental illness defense are misconduct that warrant the grant of a writ. These additional examples provide context to the prosecutor's motives and actions. Indeed, "a claim of prosecutorial misconduct is evaluated in light of the record as a whole." *U.S. v. Dakota,* 197 F.3d 831, 828 (6th Cir. 1999) And, these additional examples – although standing alone may not warrant relief – go directly to the issue of context that the 6th Circuit states must be evaluated, namely the flagrancy of the misconduct. In any event, the failure to do a better job asserting prosecutorial misconduct on direct appeal constituted ineffective assistance of counsel. *See infra,* Sec. XIII. So, if for some reasons procedural default would otherwise apply (which it should not), there is cause and prejudice to excuse that default.

actions that "precluded a jury from being able to give effect to mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269-275 (1998). "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer." *Penry v. Lynaugh*, 492 U.S. 302, 319, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989) Rather, the trial must be such that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 139 L. Ed. 2d 702, 118 S. Ct. 757 (1998), *citing Penry*, 492 U.S. at 317-18; *Eddings*, 455 U.S. at 113-14; *Lockett*, 438 U.S. at 604. Sheppard was denied that right through prosecutorial misconduct that in effect encouraged the jury to completely disregard any mitigating evidence, without any basis in law or fact to ignore the evidence.

And it cannot be gainsaid that there was a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993). Indeed, how could there not have been given that the misconduct was ratified by the trial court through a wholly improper instruction to the jury that the state was prevented from access to the defendant, further assuring the impossibility that the trial jury would give any meaningful consideration to Sheppard's mitigating evidence. Tr. 1157, 1236. Of course, as set forth above, this instruction was erroneous as well. *See Lagrone v. Cockrell*, 2003 U.S.App. LEXIS 18150 (5th Cir. 2003); *U.S. v. Byers*, 740 F.2d 1104, 1113 (D.C.Cir.1984). The Fifth Amendment privilege does not apply to a psychological examination when the defendant has raised a mental illness defense. *Estelle v. Smith*, 451 U.S. 454, 465, 467 (1981). Otherwise, a Defendant's "silence may deprive the State of the only effective means it has of controverting his proof. . ." *Id.*

Finally, the decision of the Ohio Supreme Court to affirm despite the clear misconduct after reweighing was contrary to clearly established Federal Law as well as an unreasonable application of Federal Law.   The question before the Ohio Supreme Court should have been whether the misconduct had "'so infected the trial with unfairness as to make the resulting conviction a denial of due process--'" which it had. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).   No court has ever found that it is appropriate to reweigh the record where prosecutorial misconduct effectively precluded a jury from being able to give effect to mitigating evidence.  Rather, reweighing has only been approved by the Supreme Court in cases  where it was clear the Defendant had an effective opportunity to have the jury consider all evidence, but the jury found death was appropriate after being instructed on more than one aggravating factor (one of which was invalid); in those cases, the inclusion of the aggravator could be demonstrated to be harmless either through appellate reweighing or a traditional harmless error analysis. *See Clemons v. Mississippi*, 494 U.S. 738, 752, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990).  But *Clemons* and its progeny do not mean that a state supreme court can ignore an error in the sentencing phase which clearly prejudiced a Defendant's right to have a sentencing jury consider his mitigating evidence.   The Supreme Court has made it quite clear that where a sentencing jury exists, a capital defendant has a right to have that sentencing jury consider his mitigating evidence. *See Buchanan v. Angelone*, 522 U.S. 269-275 (1998);  *Penry v. Lynaugh*, 492 U.S. 302, 319, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989); *Eddings*, 455 U.S. at 113-14; and *Lockett*, 438 U.S. at 604.  Indeed, the Supreme Court has never found that reweighing could cure prosecutorial misconduct that effectively denied such a right.  That is, the notion of reweighing in this context (where

there clearly was prejudice) is irreconcilable with the right to have a jury in the state of Ohio consider mitigating evidence. *See Paxton v. Ward*, 199 F. 3d 1197, 1220 (10th Cir. 1999) ("the sentencing process here was rendered unreliable... because in reaching its result the jury was denied consideration of relevant mitigating evidence... Under these circumstances, reweighing does not address the nature of the constitutional violations or fully correct the errors.") Any holding to the contrary -- taken to its logical end -- would mean that the right to present mitigating evidence to the sentencing jury can simply be taken away altogether, which would make the right to a sentencing jury in Ohio a curious right indeed and raise questions as to merits of numerous decisions like *Davis v. Mitchell*, 2003 U.S. App. Lexis 1816 (6th Cir. 2003) (or *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct 1860 (1988) and *McKoy v. North Carolina*, 494 U.S. 433 (1990) for that matter) because all ills could be cured by appellate reweighing.

That simply is not the law. The right to have the jury consider mitigating evidence of a defendant cannot be taken away any more through prosecutorial misconduct than it could by fiat, by expressly excluding the consideration of mitigating evidence or by, for example, excluding a sentencing jury altogether in Ohio. Accordingly, that scenario set forth in *Clemons* and its progeny where reweighing may be used to cure an instructional error is markedly different than here, where the Petitioner has been prejudiced by being effectively precluded from having his mitigating evidence considered by the sentencing jury altogether.

Petitioner Bobby Sheppard is entitled to a writ of habeas corpus.

**D.** **The Juror Misconduct Similarly Worked With The Prosecutorial Misconduct To Deny Sheppard A Fair Trial At The Sentencing Phase.**

Every court that has looked at the issue has concluded that Juror Fox engaged in misconduct. Jurors are not entitled to conduct outside investigations, *Anderson v. Ford Motor Co.*186 F.3d 918 (8th Cir. 1999), because they are not permitted to consider extraneous information learned from outside the courtroom. *Remmer v. U.S.*, 350 U.S. 77 (1956).

In Ohio, jury misconduct is prejudicial where a juror's vote is in any way influenced by the extraneous information because under Ohio law, one juror was all that would have been needed to impose a life sentence in Bobby Sheppard's case: "[A] solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *State v. Brooks*, 661 N.E. 2d 1030, 1042 (Ohio 1996). And, as set forth below, the evidence in this case confirms that one juror's verdict was in fact influenced by extraneous information. For that reason, Fox's misconduct had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993).

**1.** **Fox Has Admitted Prejudice.**

At the federal evidentiary hearing in this matter, Fox clearly and plainly stated that his verdict had been influenced and that it made it easier for him to vote for death. 6/24/2002 Tr. of Evid. Hearing at 137-138. Accordingly -- to quote the state of Ohio on appeal when it previously relied on Fox's prior statement of lack of such an effect -- "speculation about what effect juror Fox's outside contact had on him is unnecessary." ROW Appendix, Vol. IV (Direct Appeal--Court of Appeals), p. 245.

And Fox's testimony is admissible here over the states' Rule 606(b) objection. Sheppard acknowledges that generally, testimony from a juror on the effect something has on his thought process would not be admissible under Rule 606, and therefore, in the typical case, Fox's statements would not be admissible. This, however, is far from a typical case given the state's long standing reliance upon Fox's testimony on the effect Jones' statement had on him and the series of state courts that relied on Fox's prior testimony of alleged "lack of influence." Throughout the entirety of the state court proceedings, the state of Ohio relied on Fox's prior statement that he was not influenced by Jones as a basis for defending the jury verdict. For example, in the face of an objection by Sheppard, at the trial court, the state relied on it in opposition to the motion for a new trial. ROW Appendix, Vol. II (Trial Court "B"), p. 37; 10/6/1995 Proceedings, Hamilton Cty. Court of Common Pleas, Tr. p. 11. On direct appeal, the state relied upon it in defending the trial court verdict. ROW Appendix, Vol. IV (Direct Appeal--Court of Appeals "A"), pp. 242-245. And, likewise, before the Supreme Court of Ohio, the state of Ohio again relied upon Fox's statement that he had not been influenced. ROW Appendix, Vol. VI (Direct Appeal--Ohio Supreme Court), pp. 238-241. Indeed, both the appellate court and the state supreme court cited to Fox's assertion of no influence or "no impact" when affirming the jury verdict. *State v. Sheppard,* 1997 Ohio App. LEXIS at pages 2-3; 84 Ohio St. 3d at 232-233.

Accordingly, the state should be judicially estopped from changing its position now that the testimony is no longer favorable to the state. To hold otherwise would be to condone a complete perversion of the judicial system and the state of Ohio. The doctrine of judicial estoppel forbids a party from taking a position inconsistent with one

successfully and unequivocally asserted by that same party in an earlier proceeding. *Warda v. Commissioner of Internal Revenue*, 15 F.3d 533, 538 (6th Cir. 1994). "The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Reynolds v. Comm*. of IRS, 861 F.2d 469, 471 (6th Cir. 1988). Judicial estoppel prohibits the state from playing fast and loose with Defendant's life and right to a fair trial.

The state's objection should likewise be denied under the curative admissibility doctrine, because to the prejudice of Sheppard, the prosecution and the state courts in Ohio relied on the mental impression evidence when defending and affirming the verdict. Under the doctrine of "curative admissibility" or the "opening the door" rule, the reliance upon evidence by one party opens the door for an opponent to introduce evidence on the same subject to rebut any false impression that was given. *See United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988). Applying this principle, the Sixth Circuit has held repeatedly that "when a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." *Zieman v. City of Detroit*, 1996 U.S. Lexis App. 10124, * 11 (6th Cir. 1996); *United States v. Ramos*, 861 F.2d 461, 468-69 (6th Cir. 1988) The doctrine of curative admissibility rests upon "the necessity of removing prejudice in the interest of fairness," *United States v. Winston*, 145 U.S. App. D.C. 67, 447 F.2d 1236, 1240 (1971), *quoting Crawford v. United States*, 91 U.S. App. D.C. 234, 237, 198 F.2d 976, 979 (1952).

In short, Fox's testimony is admissible. And, it is dispositive.

**2.     Irrespective of Fox's Testimony, a Review of the Record Leaves No Doubt that Fox Was Likely To Be Influenced, and Thus Sheppard Was    Prejudiced.**

Even aside from that candid and highly relevant admission by Fox that the information influenced him, and that it made it easier to vote to die, the extraneous information Jones provided was highly likely to effect Fox (and thus prejudice Sheppard) for a number of reasons.

For starters, we know that the information Fox relied on was wrong.

First, the DSM-IV makes it clear that paranoid schizophrenia is not a communication disorder, and it is not a condition in which troubles communicating are typically present.   DSM-IV at 287; 6/05/03 Tr. of Evid. Hearing at 20.[8]   Rather, communication disorders are such conditions as "stuttering," "phonological disorder," and "expressive language disorder."  DSM-IV at 13.

Second, the definition is certainly misleading as well. The problem here is that the statement is grossly overbroad, and does not take into account the complicated nature of the disease and the complicated nature of the diagnosis that experts like Smalldon undertake when diagnosing such a serious disease.  *See* Tr. Tran. 1060-1135.  It's like saying someone is "crazy," which means quite different things to every single person. The harm here, therefore, is that the introduction of that overbroad definition allowed the juror to impose his own subjective beliefs on what it meant to be "out of touch with reality."

And, there is a high probability that the consequences of such were severe.  Take for example, a reasonable interpretation of the phrase "out of touch with reality."  Such a

statement certainly implies that a person looks and acts delusional. Yet, both Smalldon and the DSM-IV are quite clear that in fact people who suffer from paranoid schizophrenia do not exhibit "disorganized behavior." DSM-IV at 287. Indeed, as Smalldon testified to, on a relatively superficial level, paranoid schizophrenics appear quite normal. Tr. 1063.

The diminished explanation of "a communication disorder" and someone "out of touch with reality" played right into the prosecutors' closing argument. For starters, the prosecutors asked the jury to conclude that Sheppard was not paranoid schizophrenic because the videotape showed that he was "communicating, he is communicating very well with his friends." Tr. 1221. Likewise, the prosecutors essentially equated paranoid schizophrenia with disorganized behavior, when they asserted time and time again that Sheppard must not be paranoid schizophrenic because of the alleged organized planning and commission of the crime, as well as the organized fashion in which he interacted with others at the crime scene. *Id*. at 1221-1225.

And, the Supreme Court of Ohio's analysis simply missed the point. For starters, the passage to which the Supreme Court of Ohio refers in Dr. Smalldon's testimony makes clear that he is speaking not about paranoid schizophrenia in particular but about the larger family of schizophrenia. Indeed, although at times Smalldon testified that Sheppard was delusional, he testified that Sheppard similarly exhibited other symptoms of paranoid schizophrenia, including hallucinations, *Id*. at 1065, the negative symptom of effective flattening. *Id*. at 1065, 1068. But, more importantly, although the Supreme

---

[8] This Court has taken judicial notice of the diagnostic criteria for mental illness, as set forth in the DSM – IV, without any objection by the Respondent. 6/05/03 Tr. of Evid. Hearing at 3. For convenience of the Court, Petitioner will be filing a copy of relevant portions of the DSM-IV in an addendum to his traverse.

Court of Ohio can make the leap that the jury connected "out of touch with reality" to Smalldon's testimony regarding delusional thought, that analysis ignores the high probability that the introduction of the "out of touch with reality" definition actually resulted in Fox placing his own subjective beliefs of what that phrase meant. Indeed, Fox was searching for more information because he did not believe Smalldon had given him enough, so it is highly probable that Jones's statement was connected by Fox not to the definition that Smalldon had given for the disease, but rather what Fox thought mentally ill people felt and exhibited.

In short, the record establishes the high probability of influential jury misconduct. In the face of the prosecutorial misconduct, it is hardly conceivable that Juror Fox would ignore the statements by Helen Jones, whom he believed to be an expert and who was someone without bias. The information was wrong and oversimplified, and it is not unreasonable to conclude that Fox relied upon the definition.

Lastly, any purported state court fact-findings regarding the lack of influence or impact resulting from juror Fox's improper communication with Helen Jones is not entitled to any deference, or presumption of correctness, by this Court.[9]    The determination constitutes a "mixed question of law and fact" to which the presumption of correctness, as shown above, does not apply. Further, any state court fact-findings in this regard were not the result of a full and fair evidentiary hearing, accompanied with the

---

[9] Sheppard does not know whether the State continues to object to the introduction of any evidence in this case, and if so, what evidence or what the legal basis for the challenge is now that evidence has been introduced. To the extent its claim lay in some alleged lack of due diligence theory, Sheppard points out that it was not reasonable to expect he and his counsel should have anticipated that Juror Fox would fail to tell the judge the truth when asked if his verdict was influenced and when asked what he was told by Jones. Likewise, Sheppard and his counsel could not be expected to conclude that Jones would lie and say that she had read a transcript when she had not. And, finally, Sheppard renews his contention that it was the trial court's duty to conduct a more thorough inquiry if that was needed. Sheppard will not rehash those

typical opportunity for testing of the facts.  The trial court inquiry of Fox was not made under oath, and we now know that Fox did not tell the whole truth.  In contrast, the record here is full and complete.  And, that record demands the grant of a writ.

**E.**  **Those Improprieties Were Made Worse When The Trial Court Excluded Certain Mitigating Evidence (Claim 3)**

The misconduct and errors discussed above worked to effectively deny Sheppard his right to have the jury consider the mitigation evidence that Sheppard offered and that was admitted.  And, as set forth below, Sheppard was expressly denied his right to have other evidence in mitigation on his mental illness considered by the sentencing jury.

The Supreme Court has never wavered from the command that a capital defendant ought to be able to introduce *any* relevant evidence in support of a sentence less than death:  "So long as the evidence introduced and the arguments made… do not prejudice a defendant, it is preferable not to impose restrictions.  We think it desirable to the jury to have as much information before it as possible when it makes the sentencing decision."  *Gregg v. Georgia*, 428 U.S. 153, 203 – 204 (1976).  Indeed, the R.C. 2929.04(B)(7) "residual category" (under which the excluded testimony was offered) was added to the Ohio Revised Code because the Supreme Court struck down Ohio's death penalty law as too restrictive in *Lockett v. Ohio*, 438 U.S. 586 (1978).  As the *Lockett* Court held, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering,  as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id.* at 604.  The Court has often re-emphasized this:   "States cannot limit the sentencer's consideration of any

---

arguments in great detail, but rather, refers the Court to his Objections to the Report and Recommendation

relevant circumstance that would cause it to decline to impose the death penalty…. [T]he State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).

And, the relevance of mitigating evidence is an expansive, not limited, concept in capital sentencing. The Supreme Court explained this in *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990):

> Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. Whether the fact-finder accepts or rejects the evidence has no bearing of the evidence's relevancy….It is not necessary that the item of evidence alone convinces the trier of fact of the truth of the proposition for which it is offered.

The trial court's exclusion of Dr. Smalldon's attempt to testify as to an organic psychiatry textbook that documented the connection between mild head injury (Mr. Sheppard's concussion) and the onset of psychotic illness, Tr. 1080 – 1081, undermined Sheppard's ability to give credibility and strength to his expert and his testimony, who specifically sought to rely upon evidence of Sheppard's family history of mental illness. In short, Smalldon's testimony as to the treatise was relevant mitigating evidence because it "tend(ed) logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *McKoy v. North Carolina,* 494 U.S. 433, 440 (1990).

And, the Ohio Supreme Court's analysis on this issue had no basis in state law and was also "contrary to" clearly established federal law. The Ohio Supreme Court mistakenly thought that Dr. Smalldon's testimony about the treatise should be excluded

---

of the Magistrate.

as hearsay. *See State v. Sheppard*, 703 N.E. 2d at 293 – 294. In fact, however, there was no basis to exclude Dr. Smalldon's discussion of the treatise under the hearsay rule. Dr. Smalldon said that, in reaching his diagnosis, he took into account professional literature, including this psychiatric treatise, documenting the connection between mild head injury and the onset of psychosis. Tr. 1077 – 1078. It was perfectly permissible, therefore, for Smalldon to rely on and testify about the underlying facts or data upon which his opinion is premised under Ohio R. Evid. 703, 705.

The same holds true of the other excluded family records of mental illness. As explained above, the Sheppard family's history of mental illness on the maternal side was an important factor supporting Dr. Smalldon's diagnosis, but the trial judge excluded virtually all of these records. He admitted only one page of Delores Sheppard's records (Defendant's Exhibit 18 A), which contained no detail at all on her diagnosis of depressive disorder. Tr. 1138 – 1145.[10]  The sparse information contained on these two pages gave jurors omitted evidence certifying Darryl Sheppard's illness and demonstrating how devastating Darryl Sheppard's mental illness, paranoid schizophrenia, was, and about the striking parallels between Darryl Sheppard's disease and Bobby Sheppard's.[11]  The exclusion of the evidence, therefore, had a substantial or injurious effect or influence on the jury's verdict, because it precluded the jury from considering evidence that would have helped Smalldon fend off the improper assault by the

---

[10] On March 14, 2001 Respondent submitted to this Court all of the excluded records in its Motion to Submit Trial Exhibits Pursuant to Order Dated December 13, 2000. R. # 26.

[11] Defense counsel proffered the excluded records from Delores Sheppard's hospitalization (defense trial exhibit #18) and the excluded records of Darryl Sheppard's hospitalizations (defense trial exhibit #22) for the record on appeal. Tr. 1137 - 1149.

prosecutors on the foundation for his testimony. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). [12]

## IV.    THE SENTENCING JURY WEIGHING PROCESS WAS FURTHER INFECTED BY ILLEGAL INSTRUCTIONS (Claims 2, 4)

### A.    The Trial Court's Penalty Phase Jury Instructions Misled the Jury (Claim 4)

When reviewing claims of instructional error, courts must ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), quoting *Boyde v. California*, 494 U.S. 370, 380 (1990). As set forth below, a reasonable likelihood exists that instructional error resulted in the application of an instruction in a way that violated the constitution.

#### 1.    AEDPA Standard of Review

Bobby Sheppard raised a number of jury instruction errors in Proposition of Law No. 27 of his direct appeal brief to the Ohio Supreme Court. ROW Appendix Vol. VI, pp. 141 – 143. The Ohio Supreme Court did not review any of the jury instruction claims presented to it, not even in summary fashion. *See State v. Sheppard*, 703 N.E. 2d 286 (Ohio 1998). Thus, Respondent argues that this Court should look behind the Ohio Supreme Court's opinion, so to speak, and review the analysis of the Ohio Court of

---

[12] The AEDPA standard of review applies to only certain excluded evidence. First, the judge *sua sponte's* objection to testimony by defense expert Dr. Jeffrey Smalldon about a psychiatric treatise, Tr. 1080 – 1081, was addressed by the Ohio Supreme Court on its merits as a federal constitutional claim, applying federal law. *State v. Sheppard*, 703 N.E. 2d 286, 293 – 294 (1998). Thus, there is no procedural default on these issues, and AEDPA standard of review in § 2254 (d) applies to this particular issue. The issues concerning exclusion of most of the medical and psychiatric records of Mr. Sheppard's mother and uncle and exclusion of testimony about the psychiatric treatise were raised as federal constitutional issues in Proposition of Law No. 3 of Mr. Sheppard's brief on direct appeal to the Ohio Supreme Court. ROW Appendix Vol. VI, p. 63 – 66. Thus, there is no procedural default on these issues. But, the Ohio Supreme Court did not address the exclusion of these at all. As previously argued, pre-AEDPA standards of review, therefore, apply in instances where state courts do not address an issue even in summary fashion, but rather fail altogether to address it.

Appeals. This is incorrect. Under the AEDPA, finality is the key. Habeas courts must survey the clearly established federal law that existed when the petitioner completed his direct review and decide whether the state court properly applied that law at that time.

Thus, the relevant state court decision is that of the Ohio Supreme Court, which failed to adjudicate the merits of any jury instruction claim. In the absence of even a summary disposition of the instruction claims, the *Harris v. Stovall* standard of review does not apply. As the *Schriver* court holds, when the state court wholly fails to address a petitioner's claims, there is no adjudication on the merits, §2254 (d) of AEDPA does not come into play and the pre-AEDPA *de novo* standard of review must apply. This Court can make its own, independent decision on the instruction issues outside the strictures of AEDPA.

### 2. Procedural Bar to This Claim

Respondent does not raise a procedural bar to any jury instruction claim in this Ground for Relief, except for one: the claim that the trial judge erroneously instructed jurors to weigh duplicative aggravating circumstances. ROW, page 77.

Bobby Sheppard's response to the one jury instruction procedural bar that Respondent invokes will be brief: Trial counsel's ineffectiveness (which was properly raised and preserved on direct appeal) supplies the cause and prejudice necessary to excuse the procedural default on the duplicative aggravators issue. *Edwards v. Carpenter*, 529 U.S. 446, 453 - 545 (2000). Because of the waiver, the issue of trial counsel's ineffectiveness for failing to object to the duplicative aggravators was raised in Twenty-Second Assignment of Error of Mr. Sheppard's brief to the Court of Appeals. ROW Appendix Vol. IV, pages 183 – 184. The Court of Appeals denied this claim on its

merits.  ROW Appendix Vol. IV, page 406.  Trial ineffectiveness was again raised in the state supreme court at Proposition of Law No. 23.  ROW Vol. VI, pages 135 – 137.  The Ohio Supreme Court did not review this claim.

For purposes of procedural default analysis, the last state court to consider the duplicative aggravators claim, the Ohio Court of Appeals, invoked a procedural bar that the Ohio Supreme Court did not "cure."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Trial counsel's ineffectiveness, however, was raised and preserved at both levels of Bobby Sheppard's direct appeals.  This supplies the cause and prejudice necessary to excuse this procedural default.[13] *Edwards v. Carpenter*, 529 U.S. 446, 453 – 545 (2000).

### 3.    Cause and Prejudice / Merits

#### a.    *Trial Counsel Unreasonably Failed to Object to the Duplicative Aggravators.*

Bobby Sheppard's case was a felony-murder, that is, a fatal shooting that occurred during the course of an aggravated robbery. He was charged with one count of aggravated murder that carried two aggravating circumstances: (1) that Mr. Sheppard was the principal offender in the commission of an aggravated murder during an aggravated robbery and (2) the aggravated murder was committed for purposes of escaping detection for the aggravated robbery.  R.C. §§ 2929.04 (A) (3), (7).

Mr. Sheppard's case went to trial in 1995. By that time, the law on duplicative aggravating circumstances was clear and well-settled.  Since 1984, the state supreme court had held that capital specifications were duplicative if they "arise from the same act

---

[13] The Supreme Court has long held that ineffectiveness constitutes cause: "[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not 'conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance.' (Citation omitted.)  Ineffective assistance of counsel, then, is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

or indivisible course of conduct." *State v. Jenkins*, 473 N.E. 2d 264 (1984), paragraph five of the syllabus. The *Jenkins* court condemned the charging of duplicative aggravators as the "overzealous" application of multiple aggravators at the penalty phase and held that they should have been merged into only one. *Id*. at 294 – 295. *Jenkins* concerned the identical two duplicative aggravating circumstances -- R.C. §§ 2929.04(A)(3) and (A)(7) -- that were charged against Mr. Sheppard. The Ohio Supreme Court again held that these two aggravators were duplicative in *State v. Cooey*, 544 N.E. 2d 895, 917 (1989) and *State v. Brewer*, 549 N.E. 2d 565 (1989). Just as in *Jenkins*, *Cooey* and *Brewer*, the two capital specifications in Mr. Sheppard's case arose from one indivisible course of conduct and should have been merged into only one aggravator instead of the two the jury was instructed to weigh against him at trial. Tr. 1235. The state court of appeals so found: "These specifications are duplicative and should be merged when they arise from the same indivisible course of conduct… Here, the specifications should have been merged." ROW Appendix, Vol. IV, p. 405.[14]

Trial counsel's failure to object to the weighing of these duplicative aggravating circumstances thus "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Counsel clearly failed to understand the law with respect to this issue. The failure to object could not have been a "strategic [choice] made after a thorough investigation of law and facts relevant to plausible options." *Id*. at 690 – 691. In light of the circumstances that existed at the time of Mr. Sheppard's trial, counsel's omission was "outside the wide range of professionally competent assistance." *Id*. at 690.

---

[14] Respondent does not challenge the state court's finding in the Return of Writ.

### b. *Counsel's Deficient Performance Resulted in Actual Prejudice.*

The *Strickland* prejudice test requires a petitioner to show "a reasonable probability that, absent (counsel's) errors, the sentencer – including an appellate court, to the extent that it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 696. The Supreme Court recently emphasized that a petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability of a different result. *Williams (Terry) v. Taylor,* 529 U.S. 362, 405 (2000).

The jury and judge at Bobby Sheppard's trial weighed an aggravating factor that did not belong in the weighing process. One of the two aggravators submitted to the jury was invalid because it was duplicative. Federal law is clear about how to correct the prejudice that flows from uncorrected weighing of an invalid aggravating factor. The problem in this case is that the prejudice was never corrected.

Ohio is a "weighing" state because "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." *Stringer v. Black*, 503 U.S. 222, 229 (1992). *See* R.C. § 2929.03 (D)(2) ("the trial jury…shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors…") The "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily

and thus, unconstitutionally." *United States v. McCullah*, 76 F. 3d 1087, 1111 (10th Cir.1996).

Thus, when the sentencer weighs a duplicative aggravator that it should not have, a reviewing court cannot just "assume that it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer*, 503 U.S. at 232.  The reviewing court must either conduct its own reweighing, omitting the invalid aggravator, or conduct a constitutional harmless error analysis.  *Clemons v. Mississippi*, 494 U.S. 738, 750, 752 (1990).  As the Supreme Court explained, "[w]hile federal law does not require the state appellate court to remand for resentencing, it must, short of remand, either itself reweigh without the invalid aggravating factor or determine that weighing the invalid aggravating factor was harmless error." *Sochor v. Florida*, 504 U.S. 527, 532 (1992).

In Bobby Sheppard's case, neither of these corrective processes occurred on direct review by the Ohio Supreme Court. The state supreme court has a statutory duty to independently reweigh and determine the appropriateness of every capital case it reviews. R.C. § 2929.05 (A).  However, the existence of the admittedly duplicative aggravator seems to have escaped the Ohio Supreme Court's notice altogether. Not only did that court *not* do a constitutional harmless error analysis or a *Strickland* analysis, it failed to correct the constitutional error at all by also incorrectly weighing *two* aggravators against Bobby Sheppard when conducting its independent reweighing.  *State v. Sheppard*, 703 N.E. 2d at 296.  The state Supreme Court failed to do the constitutionally required *Clemons / Stringer / Strickland* analysis and instead perpetuated the error.  The state

Supreme Court's review (or, failure to review) on this error was thus contrary to clearly established federal law and entitles Petitioner Sheppard to a writ of habeas corpus.

### c. *Strickland / Brecht*

Absent correction by the state supreme court, the task of assessing prejudice flows now to this Court. There are actually two separate inquiries here: the prejudice prong of *Strickland* in order to satisfy the cause and prejudice test, and the *Brecht* standard of prejudice that habeas petitioners must meet, which is whether the constitutional error had a "substantial and injurious effect or influence" on the sentencing determination. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). If Bobby Sheppard meets the *Brecht* standard for harmful error, then he would also satisfy the *Strickland* test for prejudice in the cause and prejudice analysis.

Here, the Sixth Circuit's analysis in *Workman v. Bell*, 160 F. 3d 276 (6th Cir. 1998) is particularly helpful. In *Workman*, the court decided that federal courts could indeed perform constitutional harmless error analysis, using the *Brecht* standard, when reviewing a state jury's consideration of duplicative aggravating factors. *Workman*, 160 F. 3d at 291. The *Workman* court sustained the petitioner's death sentence using this analysis because there were at least three valid aggravating circumstances submitted to the jury and, most important, because the petitioner had offered *no* mitigating evidence. *Id*. at 290 - 291.

By contrast, Bobby Sheppard's trial was a case rich in mitigation. Jurors were instructed to consider four mitigating factors: Dr. Smalldon's unrebutted testimony about Mr. Sheppard's mental illness; Mr. Sheppard's youth (barely 18 at the time of the crime); Mr. Sheppard's lack of any significant criminal history; and any other factors in his

character, history and background. Tr. 1235. Surely it is reasonably probable that, with one of those aggravators removed from death's side of the scale, at least one juror would have recommended life over death. Put another way, this is a case where the jury's unlawful weighing of the duplicative aggravator did have a substantial and injurious effect or influence on the penalty verdict. At the very least, the circumstances in this case present such a close question that there existed "grave doubt about whether a trial error … had 'substantial and injurious effect or influence' that the error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

In short, trial ineffectiveness constitutes cause and prejudice to excuse the default on the Second Ground for Relief. On the merits, this claim constitutes harmful constitutional error requiring reversal in habeas. The Court should grant relief on this Ground.

**4.    The Trial Court Erred When It Refused The Defense Request To Instruct Jurors That They Could Consider One Of The Life Sentences If They Could Not Unanimously Agree On Death. Tr. 1155 - 1156.**

At the conclusion of penalty phase evidence, Bobby Sheppard's attorneys asked the trial judge to instruct jurors that they could turn to consideration of a life sentence if they could not reach a unanimous finding that the death penalty was appropriate. Tr. 1155 - 1156. The trial judge refused to give this instruction unless the jury was "hung." Tr. 1156. This refusal was an important legal error that appellate counsel should have raised on appeal.

The instruction that counsel requested was entirely proper under Ohio law. As the Ohio Supreme Court explained in *State v. Springer*, 586 N.E. 2d 96, 100 (Ohio 1992):

> We believe that the requirement of Ohio's death penalty
> statute that a life sentence be recommended and imposed

> under circumstances where the penalty of death cannot be recommended or imposed represents a clear statement of policy that an offender be sentenced to a term of life imprisonment where the trial jury is unable to unanimously agree that the penalty of death is appropriate.

This trial judge instructed jurors that their penalty phase verdict had to be unanimous yet refused to explain that jurors could turn to consideration of a life sentence if they did not unanimously agree on death. The court's refusal was clear legal error not only under *Springer*, but also under the state supreme court decision in *State v. Brooks*, 661 N.E. 2d 1030 (Ohio 1996).

In *Brooks,* the state supreme court held that Ohio's death penalty statute "contains no limiting language as to when a jury may contemplate a life sentence." *Brooks*, 661 N.E. 2d at 1041. The *Brooks* court held that Ohio law required the jury to be instructed that "when it cannot unanimously agree on a death sentence, to move on in their deliberations to a consideration of which life sentence is appropriate, with that determination to be unanimous." *Id.* at 1042. The purpose of giving this instruction is to ensure that jurors understand they can properly contemplate and impose a life sentence when one or more jurors believes that mitigating evidence is sufficient to preclude the death penalty, even though the rest of the jurors are of the mind to impose death. The *Brooks* court recognized that failure to give correct instructions on the process to be used in determining the sentence risks juror confusion and the possible erroneous imposition of the death sentence. *Id.* at 1041 - 1042.

All that defense counsel requested was that the trial judge correctly inform Mr. Sheppard's jurors that they could move to considering a life sentence in the event they could not all agree that death was the appropriate penalty. The judge refused. Thus, as in

*Kubat v. Thieret*, 867 F. 2d 351, 373 (7th Cir. 1989) Bobby Sheppard's jurors "were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, [Bobby Sheppard] would not be sentenced to death." The trial court's refusal to correctly inform jurors on their role in the sentencing process as defined by state law constituted a violation of the Eighth and Fourteenth Amendments. *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).

This instruction was needed to assure no violation of Fourteenth and Eighth Amendment rights. In a line of cases beginning with *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988) and including *McKoy v. North Carolina*, 494 U.S. 433 (1990) the Supreme Court made it clear that any requirement that mitigating factors must be found unanimously is incoherent. For that reason, the Sixth Circuit in *Davis v. Mitchell* held that a Ohio jury instruction that excludes a *Stringer/Brooks* type instruction is defective if the omission of that instruction leaves the jury with the impression that it "must first unanimously reject the death penalty before it can consider a life sentence." *Davis v. Mitchell*, 2003 U.S. App. Lexis 1816 at *16-19. The Court held that the Ohio jury instruction at issue (which is nearly identical to the instructions for Sheppard's case) that omitted the *Brooks/Stringer* instruction ran afoul of *Mills v. Maryland*, 486 U.S. 367 (1988) because without such an instruction the "constitutionally required non-unanimous mechanism that will prevent a recommendation of death is obscured to such an extent that it cannot even be said to be implied by the instructions in this case." *Id*. at *17.

The reasoning in *Davis* controls this case. Sheppard's requested instructions were proper under Ohio law and required to make the proposed (and ultimately offered) instructions clear that unanimity was not required on whether mitigating factors were

outweighed by the aggravating factors. In finding the Ohio instruction was defective, the *Davis* court found that the following substantive provisions at issue in *Davis* and present in Sheppard's instructions -- coupled with the omission of the *Brooks* instruction --- would lead a jury to conclude that unanimity was required in all of the jury's conclusions.

**First**,  instead of instructing the jury that it need not be unanimous in rejecting the death penalty, both the trial court in *Davis* and Sheppard's trial court instructed that in order to return a verdict for life imprisonment, each juror must first affirmatively find that death was not appropriate:

> **Davis Instruction:**  "you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors."

*Davis* at *16.

> **Sheppard Instruction**:    "If find that the prosecutor has proved, beyond a reasonable doubt, that the aggravating circumstances outweigh mitigating factors, then you must impose the death penalty.
>
> If you find that the prosecutor has failed to prove, beyond a reasonable doubt, that the aggravating circumstances outweigh mitigating factors, then you must impose a life sentence."

Sheppard. Tr. 1233.

**Second**, both the *Davis* instruction and the Sheppard instruction then emphasized the unanimity principle at all stages of the deliberations:

> **Davis Instruction**:  "since this is a criminal case the law requires that in order for you to reach a decision all 12 of you must be in agreement."

*Davis* at *17.

> ***Sheppard Instruction***:  "Your verdict *must* be unanimous.
> That means, that you *must* agree to it.  Cannot be 11 to 1,
> 10 to 2, 9 to 3 et cetera.  *It must be 12 nothing.*"

Sheppard Tr. 1239.

***Third***, in *Davis*, the verdict form stated a unanimity requirement, by "setting out twelve signature lines under the statement 'we the jury . . do find.'"  *Davis* at *18.  Likewise, the trial court for Sheppard ordered that all jurors sign the same verdict form:  "with regard to the verdict that you render, *all 12 must sign in ink*."  Tr. 1239.

In short, in Sheppard's case, the requested ***Stringer*** instruction was requested and required.  The trial court refused to give them.  Without those, the jury may well have mistakenly believed that a bottom-line vote of 11 to 1 for death would amount to a "hung jury" or sentencing "mistrial," and/or that a life sentence could not properly be imposed.  As such, the instructions "would have led a reasonable jury to apply an unconstitutional standard of unanimity at all stages of the deliberative process."

**5.    The Trial Court Erred By Refusing Defense Counsel's Request to Instruct Jurors That the Aggravated Murder Itself Was Not an Aggravating Circumstance Which They Should Consider.**

When defense counsel asked the judge to instruct jurors that the aggravated murder itself was not one of the aggravating circumstances to be weighed, the judge refused, saying it would be "self-evident from the instruction."  Tr. 1254.  As it turned out, however, that was not the case, because the instructions also stated that the jury must consider "the nature and circumstances of the aggravating circumstances."  Tr. 1234.  This made it anything but self-evident that the crime was not part of the "nature and circumstances of the aggravating circumstances" that jurors should weigh against Mr. Sheppard.

The instruction that defense counsel requested was absolutely correct and should not have been refused. The Ohio Supreme Court holds that the aggravated murder is <u>not</u> one of Ohio's statutory aggravating circumstances and thus <u>cannot</u> be weighed against the defendant in a capital case. *State v. Wogenstahl*, 662 N.E. 2d 311 (Ohio 1996), paragraphs one and two of the syllabus. Indeed, the nature and circumstance of the offense are only to be weighed to the extent that they have mitigating value. *Id.*

The trial judge's refusal to correctly instruct jurors not to consider the murder as an aggravator, coupled with the contradictory instruction telling jurors to weigh the nature and circumstances of the aggravating circumstances, amounted to constitutional error for two reasons. First, there was a more than reasonable likelihood that this opened the door to consideration of the crime as a non-statutory aggravating factor. As the Sixth Circuit has held, "an instruction to a death-sentence jury that it may disregard the statutory criteria for imposing a death sentence may be constitutionally impermissible in light of the probability that such an instruction would result in arbitrary and unpredictable results." *Mapes v. Coyle*, 171 F. 3d 408, 415 (6th Cir. 1999).

Second, jury weighing of the aggravated murder as a non-statutory aggravating factor was contrary to Ohio's death penalty statute, R.C. § 2929.04 (A), which specifies the only aggravating circumstances which juries can properly find and weigh in a capital case. And, as federal courts have recognized, a state's failure to abide by its own statutes violates a defendant's protected "liberty interest" under the Fourteenth Amendment's Due Process Clause: "[W]here a state has provided a specific method for the determination of whether the death penalty shall be imposed, 'it is not correct to say that the defendant's interest' in having that method adhered to 'is merely a matter of state

procedural law.'" *Fetterly* v. *Paskett*, 997 F. 2d 1295, 1300 (9th Cir. 1993) (citation omitted).

 Ohio has chosen to circumscribe its aggravating circumstances to those included in R.C. § 2929.04 (A). Thus, Bobby Sheppard, like any other Ohio capital defendant, had a state created "liberty interest" that protected against the weighing of non-statutory aggravating factors. The trial court's arbitrary refusal to clearly and correctly instruct jurors not to weigh a non-statutory aggravator, the aggravated murder, and the circumstances thereof, violated Mr. Sheppard's due process rights.

### 6. The Instruction that Prosecutors Were Not Allowed To Do a Psychological Exam of Mr. Sheppard Made It Highly Probable That the Jury Would Disregard Smalldon's Mitigating Evidence.

Over defense objection, the judge charged jurors that "the State of Ohio has not been afforded access to the defendant for purposes of a psychological examination in the penalty phase of this trial, nor, constitutionally, are they entitled to that access." Tr. 1157, 1236 – 1237. Of course, this was not at all true. The state never requested an exam, and had it, it would have been entitled to an exam. *See Lagrone v. Cockrell*, 2003 U.S.App. LEXIS 18150 (5th Cir. 2003); *U.S. v. Byers*, 740 F.2d 1104, 1113 (D.C.Cir.1984). The Fifth Amendment does not apply to a psychological examination when the defendant has raised a mental illness defense. *Estelle v. Smith*, 451 U.S. 454, 465, 467 (1981). Otherwise, a Defendant's "silence may deprive the State of the only effective means it has of controverting his proof. . . ." *Id.*

The irony is that if in fact the state was not entitled to the exam, the judge's instruction would have been an example of a practice the Supreme Court has repeatedly condemned in decisions holding that the Due Process Clause prohibits state actors from

punishing a defendant for relying on or exercising a constitutional right.  For example, a state cannot penalize a defendant who moves to suppress evidence by using his suppression hearing testimony against him at trial.  *Simmons v. United States*, 390 U.S. 377, 393 - 394  (1968).   State prosecutors cannot penalize a defendant by making adverse reference to a defendant's reliance on his Fifth Amendment right not to testify. *Griffin v. Illinois*, 308 U.S. 609, 615 (1965).   Nor can the state penalize a defendant by using his reliance on his *Miranda* rights as evidence of guilt or sanity.  *Doyle v. Ohio*, 426 U.S. 610, 619 –620; *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986).

****

This is a case where the trial judge refused to give clear and correct instructions that would have accurately informed jurors of exactly what aggravating circumstances they should or should not weigh. The judge compounded this error by instructing jurors to weigh an invalid, duplicative aggravating circumstance against Mr. Sheppard, thus placing unwarranted weight on death's side of the scale.  The judge also failed to correctly inform jurors that they had the ability to consider a life sentence if even one juror believed death was not appropriate. Finally, the judge's gratuitous and flatly incorrect instruction emphasizing that the state was not allowed to have its own psychological examination of Mr. Sheppard, coupled with the prosecutor's arguments, denied Bobby Sheppard his right to have his mitigating evidence considered by the jury. Because of these instructional errors, there is "a reasonable likelihood" that Mr. Sheppard's death sentence was the result of an unreliable weighing process.  The Court should grant habeas relief on this Ground.

### V.    THE TRIAL JUDGE'S WEIGHING PROCESS WAS FLAWED BY IGNORING MITIGATING EVIDENCE WHEN COMPLETING HIS INDEPENDENT SENTENCING EVALUATION
(Claims 2, 6).

**A**.    **The Trial Court Violated Bobby Sheppard's Sixth, Eighth and Fourteenth Amendment Rights By Arbitrarily Refusing to Give Weight or Effect to the Mitigating Evidence of Mr. Sheppard's Mental Illness. (Claim 6)**

**1. AEDPA Standard of Review**

This is yet another direct appeal claim which the state Supreme Court did not deign to review. The trial judge's flawed sentencing process, in which he weighed an invalid aggravator and at the same time arbitrarily refused to give mitigating weight to Mr. Sheppard's mental illness, was presented to the state supreme court on direct review in Proposition of Law No. 9 of Mr. Sheppard's brief. This was presented as a violation of Mr. Sheppard's right to due process and his rights under the cruel and unusual punishment clause guaranteed by the Eighth and Fourteenth Amendments. ROW Appendix Vol. VI, pp. 42 - 47.

The Ohio Supreme Court failed to address Proposition of Law 9. *State v. Sheppard*, 703 N.E. 2d 286, 293 –296 (Ohio 1998)(court's review of "Penalty Phase Issues"). As Mr. Sheppard previously argued, in those instances when the state court completely fails to decide a claim presented to it, the *Harris v. Stovall* standard of review does not apply. When there has not even been a summary state court adjudication on the merits, §2254 (d) of AEDPA does not come into play. This Court can make its own, independent decision on the merits of this issue using the pre-AEDPA *de novo* standard of review.

### 2.    Procedural Bar to This Claim

Respondent has not asserted a procedural defense to Mr. Sheppard's claim that the trial judge arbitrarily failed to give mitigating weight and effect to his mental illness. *See* ROW, page 72.

### 3.    Merits

Under Ohio law, the trial judge is the final sentencer in every death case where jurors return a verdict recommending death. The judge is required to conduct his own independent weighing process and can either accept or reject the jury's recommendation. If the judge does impose death, he must write a sentencing opinion explaining his decision. R.C. §§ 2929.03 (D) (3), (F).         .

The trial court arbitrarily rejected the most important mitigating factor in Bobby Sheppard's case, his paranoid schizophrenia. Despite the unrebutted and thorough testimony by defense expert Dr. Jeffrey Smalldon, this trial judge categorically refused to weigh mental illness as a mitigating factor under either R.C. § 2929.04 (B) (3) or (B) (7). He excluded this factor from those he weighed against the aggravating circumstances. Sentencing Opinion, ROW Vol. IV, pp. 14 - 15.[15] The discussion that follows deals with the constitutional error involved in the trial court's refusal to weigh mitigating evidence of Bobby Sheppard's mental illness.

### a.    *A Capital Sentencer May Not Arbitrarily Reject Relevant Mitigating Evidence*.

No law dictates how much or how little weight a sentencer should give to mitigating factors. That being said, however, a sentencer cannot just arbitrarily refuse to

---

[15]   The opinion found that Bobby's lack of a father, his periodically ill mother, youth and lack of prior adjudicated wrongdoing were the only mitigating factors in his case. Sentencing Opinion, ROW Vol. IV, p. 13 – 16.

weigh unquestionably relevant mitigating evidence.   The Eighth and Fourteenth Amendments require sentencers to give at least some weight and effect to mitigating factors.  Put another way, the constitution does not permit the sentencer in a capital case to give no weight to mitigating evidence.   *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982):  "The sentencer…may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration."

> b.    *The Trial Judge Lacked a Reasonable Basis For Refusing to Weigh Mental Illness as a Mitigating Factor.*

The trial judge rejected Dr. Smalldon's expert testimony about Mr. Sheppard's mental illness without any objectively reasonable basis.  This purely arbitrary refusal violated *Eddings*.  The judge's stated basis for rejecting Mr. Sheppard's mental illness as a mitigating factor was because Mr. Sheppard's actions in carrying out the crime did not show an "alienation from reality," or demonstrate that Mr. Sheppard felt "radically removed" from what was going on around him, or show that he was "suffering from delusions."  Sentencing Opinion, ROW Vol. IV, p. 14 – 15.

It is evident that the trial judge rejected the expert testimony because Mr. Sheppard was not acting or looking "crazy" during the crime.  That was unreasonable. As the court recognized in *McGregor v. Gibson*, 2001 WL 359509 (10th  Cir. 2001), courts cannot use a "snapshot" of a defendant's behavior during a limited period of time as a reliable indicator of whether he was suffering from paranoid schizophrenia.   It takes a trained mental health professional to ask the right questions and make an accurate diagnosis.  The *McGregor* court relied on this dialogue between trial counsel and a psychiatrist who examined the defendant to demonstrate this point:

> Q: Doctor, can someone who has and who is schizophrenic, can they function in society and walk around and say, not be readily observed as say, a nut, a crazy or something of that nature?
>
> A. (By the doctor)… [Y]ou know, he doesn't carry a sign, "I'm a schizophrenic" and unless you ask him very specifically questions like, do you hear imaginary voices or do you think people can read your mind or something like this, which you probably wouldn't do, you know, if you just met him in the street or just talk to him, you might never find out, you know, what is wrong just by seeing him and talking to him briefly. Unless you know what kinds of questions to ask, you wouldn't get the answers that would allow you to realize how sick the patient really is.

*McGregor*, 2001 WL 359509 at *11.

The fact that a person carries out a crime does not mean, *a fortiori*, that he is not mentally ill, although this is apparently what the trial judge thought. It should have been apparent to the judge that a person can have the wherewithal to commit a crime yet still be acutely mentally ill. Mr. Sheppard's uncle Darryl was a ready example that the judge had before him. Darryl Sheppard's records (those that the judge admitted, as well as those the judge refused to admit) showed that Darryl was originally convicted of breaking and entering and sentenced to the Chillicothe Correctional Institute. From there, Darryl was treated at both the Oakwood and Dayton Forensic Hospitals and was diagnosed with chronic paranoid schizophrenia, from which he reportedly began suffering symptoms at the age of 20.[16] Darryl Sheppard's saga should have proved to the trial judge that commission of a crime is not incompatible with mental illness.

---

[16] The trial court admitted two pages of Darryl Sheppard's records. Defense Exhibit 22-A. Tr. 1146 – 1148. All of the excluded Darryl Sheppard records (defense trial exhibit #22) were proffered for the appeal. Tr. 1137 - 1149. Respondent submitted the excluded records pursuant to this Court's order on March 14, 2001 (Doc. # 26).

c.    *The Trial Judge's Rejection of Dr. Smalldon's Testimony Was the Result of Bias.*

The Sixth Circuit has held that trial courts cannot simply reject out of hand an expert's testimony about a defendant's mental illness. *Levine v. Torvik*, 986 F. 2d 1506, 1512 – 1514 (6th Cir. 1993). Yet this trial judge lacked an objectively reasonable basis for his refusal to accept Dr. Smalldon's testimony that Bobby Sheppard suffered from paranoid schizophrenia. Rather, it appears that the judge rejected Dr. Smalldon's testimony because he was unwilling to give fair consideration to the mental illness mitigating factor that was the centerpiece of Mr. Sheppard's penalty phase defense.

On several occasions, the judge made biased, insensitive comments about mental illness. When defense counsel requested admission of medical records of Mr. Sheppard's mother, who was hospitalized with depression, the trial judge belittled them: "Shows somebody who has diabetes, hypertension, asthma, gout, obesity, a bunch of children, who is depressed. Now we could put 75 percent of the women and teenagers in the United States in hospitals, not for obesity, but we could for being periodically depressed." Tr. 1143 – 1144. The judge scornfully dismissed Bobby's mother as "a mental wreck," remarked "I hope that people who are depressed are not all mental cases" and derisively referred to Bobby's uncle Darryl as "nuts." Tr. 1144, 1145, 1148. The biased tenor of these remarks prompted defense counsel to protest that "the Court's viewpoint of psychological problems should not be the criteria for deciding whether or not the jury is seeing this." Tr. 1145.

The judge also refused to allow admission of medical records demonstrating the history of mental illness in Mr. Sheppard's family, yet then criticized Dr. Smalldon for "the cavalier way in which the psychologist found mental illness in large numbers of the

defendant's family based on a few anecdotes from the defendant's mother…" Sentencing Opinion, ROW Vol. IV, p. 15. The judge objected *sua sponte* when Dr. Smalldon referred to a psychiatric textbook discussing the connection between head injury and the onset of mental illness, then made the completely unfounded conclusion that "the Court…does not find that very minor blow (a concussion from a car accident for which Mr. Sheppard was hospitalized) significant or consider it a cause of schizophrenia, or any other lasting disorder." Sentencing Opinion, ROW Vol. IV, p. 16.

The judge's actions at trial and his words in the sentencing opinion demonstrate that the refusal to weigh Mr. Sheppard's mental illness as a mitigating factor was not objectively reasonable. As in *Levine*, 986 F. 2d at 1515, this was a case of "the out-and-out rejection" of an expert's testimony for no other reason than that the expert conflicted with the judge's own "viewpoint of psychological problems." This violated constitutional tenets for capital sentencing. As *Eddings* teaches, sentencers can decide how much weight to give mitigating evidence, but they cannot, as here, arbitrarily decide to give no weight or effect to relevant mitigating evidence of a defendant's mental illness.

The trial judge who sentenced Bobby Sheppard to death improperly weighed an invalid aggravating factor and at the same time arbitrarily refused to consider relevant mitigating evidence of Mr. Sheppard's mental illness. His death sentence was imposed in violation of Eighth and Fourteenth Amendment capital sentencing and due process guarantees. The Court should grant habeas relief on this Ground.

**B.**  **The Trial Judge Violated Sheppard's Rights Under the Eighth and Fourteenth Amendments By Weighing an Invalid Aggravator In Its Weighing Process.**

As the trial court did with the jury instructions, when conducting its own independent sentencing review, the state trial court violated Ohio law set forth above and weighed duplicative aggravators to the prejudice of Sheppard.   Sentencing Opinion, ROW Vol. IV, p. 11.

This claim is not as the state contends subject to AEDPA analysis.  The weighing of duplicative aggravating circumstances against Bobby Sheppard was presented to the state courts at both levels of direct review.  This issue was raised in the Fifth and Sixth Assignments of Error in Bobby Sheppard's brief to the Hamilton County Court of Appeals. It was presented as a federal constitutional issue, citing the relevant Supreme Court Eighth Amendment decisions condemning the weighing of invalid aggravators. ROW Appendix, Vol. IV, p. 125 – 137. This same issue was again presented to the Ohio Supreme Court as a federal constitutional claim in Propositions of Law Nos. 5 – 8.  ROW Appendix Vol. VI, p. 82 – 88. Again, however, the state supreme court simply did not review the claim, not even in summary fashion.  *See State v. Sheppard*, 703 N.E. 2d 286 (Ohio 1998).  Thus, the state Supreme Court did not adjudicate the merits of this claim. Without a state court adjudication on the merits, §2254 (d) of AEDPA does not come into play and the pre-AEDPA *de novo* standard of review must apply.   *Maples v. Stegall*, 2003 FED App. 0296P, August 19, 2003 (6th Cir.).

Likewise, the claim is not procedurally barred.  The state appellate court found that the two aggravating circumstances in Mr. Sheppard's case were in fact duplicative and should have been merged into one.  However, because trial counsel failed to object

presumably to the jury instructions, the state court of appeals found the issue was waived and did not rise to the level of plain error requiring reversal.  ROW Appendix, Vol. IV, p. 405. The Ohio Supreme Court did not address this error at all.  It simply weighed both aggravators against Mr. Sheppard in its sentencing review.  *State v. Sheppard*, 703 N.E. 2d 286, 241 (Ohio 1998).

The fact is, however, Sheppard did object in the only proper way, by appealing. Defendants are not required to object to a sentence at the time of the sentence; they do so through appeal. In this case, the independent sentencing analysis had been completed and the sentence handed down.  On Appeal, as stated above, the complaint was made that the judge weighed duplicative aggravators.

If, however, the failure to object to the trial court's independent sentencing opinion in the trial court was required, the failure constituted ineffective assistance of counsel to identify and object to the error constituted ineffective assistance of counsel for the same reasons set forth above when failing to object to the jury instructions on the issue

## VI.    IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS, THE OHIO SUPREME COURT WEIGHED DUPLICATIVE AGGRAVATING CIRCUMSTANCES AS PART OF ITS INDEPENDENT WEIGHING DUTY
### (Claim 12)

The Supreme Court of Ohio committed its own independent and new error when – in the face of an objection to the weighing of duplicative aggravators – it completed its independent weighing analysis with the use of duplicative aggravators.  "A state may not adopt a valid death penalty statute and then fail to carry it out."  *Esparza v. Mitchell*, 310 F.3d 414, 421 (6th Cir. 2000)  Yet, that is exactly what the State of Ohio did in this case

when it deprived Bobby Sheppard of the right to have the Ohio Supreme Court engage in an independent weighing of the aggravating circumstance against the mitigating circumstances considering only non-duplicative aggravators.   In so doing, the Ohio Supreme Court deprived Petitioner of his state created liberty interests, and therefore, violated the Eighth and Fourteenth Amendments. *See Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175, 100 S. Ct. 2227 (1980).

A.     **The AEDPA Does Not Apply, Nor Does Procedural Default.**

The error being complained of is the independent error committed in the first instance by the Supreme Court of Ohio and therefore has not been adjudicated on the merits by the State of Ohio.   This claim was alleged in the Petition and the Amended Petition, in the Twelfth Claim for Relief.   Respondent does not allege any procedural default when discussing the Twelfth claim for relief.   Accordingly, the claim is reviewed by this court *de novo*.

B.     **By Weighing Duplicative Aggravators, the Supreme Court of Ohio Deprived Sheppard of a State Created Liberty Interest.**

1.     **Ohio Law Granted Sheppard the Right to Have the Ohio Supreme Court Engage In an Independent Weighing Of the Aggravating Circumstance Against the Mitigating Circumstances Considering Only Non-Duplicative Aggravators.**

As this Court is aware, Ohio is a "weighing" state because "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." *Stringer v. Black*, 503 U.S. 222, 229 (1992).

In that weighing process, Ohio law at the time of Bobby Sheppard's trial guaranteed a death penalty eligible defendant  four stages of review of the appropriate

sentence:  1) the jury; 2) the trial judge; 2) the appellate court; and 3) the Ohio Supreme Court.  R.C. §§ 2929.03 and 2925.05.  During each of these stages, the weigher has the non-discretionary obligation to review the evidence *de novo* and be independently convinced by the state that death is the appropriate sentence.  *See* R.C. § 2929.03 (D)(2) ("the trial jury…shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors….")  And, where the prosecutor fails to  persuade the appellate weigher that aggravating circumstances do not outweigh mitigating circumstances, Ohio law provides that the weigher has the non-discretionary obligation to find that life is the only appropriate sentence. R.C. § 2925.05.

The Ohio Supreme Court has interpreted that statutory weighing scheme as clearly, unmistakably and expressly requiring that all weighing be completed without consideration of duplicative aggravating factors.  *See State v. Jenkins*, 473 N.E. 2d 264 (1984),  paragraph five of the syllabus ("capital specifications which are duplicative cannot be part of the weighing process and must be merged into one factor; such factors are duplicative if they arise from the same act or indivisible course of conduct").  To address aggravators, therefore, since 1984, the Ohio Supreme Court has held that capital specifications were duplicative and must be merged into one for weighing purposes if they "arise from the same act or indivisible course of conduct."  *State v. Jenkins*, 473 N.E. 2d 264, 294-295 (1984),  paragraph five of the syllabus.   Specifically, the *Jenkins* court concluded that the felony murder specification and the escaping detection aggravating circumstances were duplicative in a case where the act giving rise to the murder committed to escape detection killing was the same as the felony murder -- R.C.

§§ 2929.04(A)(3) and (A)(7). Likewise, in *State v. Cooey*, 544 N.E. 2d 895, 917 (1989) and *State v. Brewer*, 549 N.E. 2d 565 (1989), the Supreme Court has affirmed that law, and in numerous other decisions the law of Ohio has provided that duplicative specifications may not be considered during any weighing process.

Those interpretations of Ohio's death penalty scheme make good sense. The "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally.*"* *United States v. McCullah*, 76 F. 3d 1087, 1111 (10th Cir.1996). Indeed, as recognized in *United States v. McCullah*, 76 F.3d 1087, 111 (10th Cir. 1996), where one aggravating factor "necessarily subsumes" another, there is a tendency to skew the weighing process and create the risk that the death sentence will be imposed unconstitutionally: "The mere finding of an aggravating factor cannot but imply a qualitative factor . . . .When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot assume it would have made no difference if the thumb had been removed from death's side of the scale. *Id* at 1112 (internal citations and quotations marks omitted).

In short, there is nothing discretionary about the judicial duty of the Ohio Supreme Court under R.C. § 2925.05 to complete the independent weighing analysis, nor is there any discretion in Ohio's death penalty law permitting the sentencer to weigh duplicative aggravating factors. Only if weighing takes place with non-duplicative factors can the supreme court affirm a death sentence; otherwise, the sentencer has the non-discretionary obligation to impose life. R.C. §§ 2925.03 and 2925.05.

**2.    Sheppard's Right to Have the Ohio Supreme Court Engage In an Independent Weighing of the Aggravating Circumstance Against the Mitigating Circumstances Considering Only Non-Duplicative Aggravators Rose to the Level of a Protected Liberty Interest.**

The Fourteenth Amendment provides in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law," and it protects "the individual against arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  Protected liberty interests under the 14th Amendment "may arise from two sources -- the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  Liberty interests may be created by state common law (*Perry v. Sindermann*, 408 U.S. 593 (1972)) as well as statutory laws, including state criminal procedures.  *See Evitts v. Lucey*, 469 U.S. 387, 396, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985). ("Even though a State has no constitutional obligation to grant criminal defendants a right to appeal, when it does establish appellate courts, the procedures employed by those courts must satisfy the Due Process Clause."); *Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175, 100 S. Ct. 2227 (1980) (when "a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.") Arbitrary denials of those state created rights constitute violations of due process. *Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175, 100 S. Ct. 2227 (1980) and *Paul v. Davis*, 424 U.S. 693, 711, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976), ("It is apparent from

our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.")

3. **The Ohio Supreme Court Double Counted and Therefore Denied Bobby Sheppard His Liberty Interest In an Independent Review Without Duplicative Specifications.**

As discussed above, Bobby Sheppard's case went to trial in 1995. By that time, the *Jenkins* court prohibition on weighing duplicative aggravators had been well established (and remains so today). Just as in *Jenkins, Cooey and Brewer*, the two capital specifications in Mr. Sheppard's case arose from one, indivisible course of conduct and should have been merged into only one aggravator instead of the two the jury was instructed to weigh against him at trial. Tr. 1235. Indeed, the state court of appeals so found: "These specifications are duplicative and should be merged when they arise from the same indivisible course of conduct…. Here, the specifications should have been merged." ROW Appendix Vol. IV, p. 405.    Sheppard's trial counsel, jury and trial judge, however, denied the protections in *Jenkins*.   These duplicative aggravators went to the jury when trial counsel failed to object to the duplication.  Again, the appellate court considered Sheppard's objection to the trial court process and found that such had been waived.  ROW Appendix Volume IV, page 405.    Nonetheless, the appellate court understood its duty not to weigh duplicative aggravators, and, therefore, when engaging

in its independent sentencing determination, it completed its statutory weighing obligations properly by separating the two and finding death to be appropriate.

Contrary to Respondent's claim, the same cannot be said of the Ohio Supreme Court. Instead, the Ohio Supreme Court ignored its statutory obligation to affirm the death sentence only if non-duplicative aggravating circumstances outweighed the mitigating circumstances. When the issue came before the Ohio Supreme Court, the court did not address the trial court error in using duplicative aggravators at all. More distressing for Sheppard, however, was the fact that the Supreme Court then committed its own independent error: *when completing its statutorily required obligation to weigh the aggravating circumstances against mitigating circumstances, it violated its own clear interpretation of Ohio's death penalty structure and weighed both of the duplicative aggravators against Mr. Sheppard in its sentencing review.* *State v. Sheppard*, 703 N.E. 2d 286, 241 (Ohio 1998). In its "Independent Sentence Evaluation," the Supreme Court of Ohio expressly weighs the duplicative factors against the mitigating evidence: first, when evaluating the "appropriateness and proportionality" of the sentence, the supreme court of Ohio emphasizes that it "find[s] that the *two* aggravating circumstances . . .were proven beyond a reasonable doubt." *Id*. at 239-240. And under the heading "Sentence Evaluation," it then states, "weighing the evidence presented in mitigation *against the two aggravating circumstances,* we find that the aggravating circumstances outweigh the mitigating factors." *Id*. at 241.

Thus, although Sheppard had a liberty interest in having the Ohio Supreme Court complete its own weighing of the evidence using non-duplicative factors, the Ohio

Supreme Court deprived Sheppard of that constitutional right to appellate review, which is by definition prejudicial.

### VII.    THE TRIAL COURT VIOLATED BOBBY SHEPPARD'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND AN IMPARTIAL JURY FOR THE PENALTY DETERMINATION IN A CAPITAL CASE BY WRONGLY EXCUSING FOR CAUSE A PROSPECTIVE JUROR BECAUSE OF HER VIEWS ON <u>REMORSE AS A MITIGATING FACTOR</u>
(Claim 1)

### A.    <u>AEDPA Standard of Review</u>

The state Supreme Court did not review this claim at all. The wrongful excusal of the juror referenced in this habeas claim was preserved by objection at trial, Tr. 332, and presented to the state Supreme Court on direct review in Proposition of Law No. 20 of Mr. Sheppard's brief.  It was presented as a federal constitutional issue, citing the relevant Supreme Court case law on excusal for cause of jurors based on their beliefs about capital punishment. ROW Appendix Vol. VI, p. 83 – 87.

The Ohio Supreme Court addressed Propositions of Law 21 and 22 under the "Jury Selection Issues" section of its opinion in Mr. Sheppard's case but neglected to address Proposition of Law 20.  *State v. Sheppard*, 703 N.E. 2d 286, 291 –292 (Ohio 1998).  Thus, the state Supreme Court did not adjudicate the merits of this claim, not even in summary fashion.[17]  The *Harris v. Stovall* standard of review does not apply when the state court completely fails to decide a claim presented to it.  Without a state court adjudication on the merits, §2254 (d) of AEDPA does not come into play and the

---

[17] It is here that Respondent claims this Court can simply look backward from the state Supreme Court decision and decide whether the Court of Appeals' reasoning on this issue was contrary to or an unreasonable application of federal law.  As Mr. Sheppard explained in Section II, this is contrary to the AEDPA dictate that federal courts review the state court decision at the time the petitioner's case became final on direct appeal.

pre-AEDPA *de novo* standard of review must apply. This Court can make its own, independent decision on the merits of this issue outside the strictures of AEDPA.

**B.    Procedural Bar to This Claim**

There is no procedural bar to this Court's review, nor has Respondent asserted one in the Return of Writ.

**C.    Merits**

This Ground for Relief concerns prospective juror No. 23, Joyce Wells. The trial judge wrongly excused Ms. Wells for cause when she expressed her belief that a defendant's remorse was an important mitigating factor against the death penalty. This was a perfectly permissible consideration that should not have led to Ms. Wells' disqualification. The prosecutor and trial court literally did not allow her the chance to explain her views about how she would weigh the mitigating factor of remorse.

When questioned about the death penalty, Ms. Wells told the attorneys and the court that it was a serious matter she would have to weigh carefully. She also stated that a defendant's repentance or remorse was an important factor to her. Tr. 327.

The prosecutor then told Ms. Wells – incorrectly – that Ohio law did not permit jurors to consider repentance as a mitigating factor, and then asked if she could sign a death verdict even if she could not consider that.[18] Tr. 327 – 328. Before Ms. Wells could answer the prosecutor's question he interrupted her and challenged her for cause:

> PROSPECTIVE JUROR NO. 23: If he didn't have the opportunity –
>
> MR. DETERS: Ma'am, you know, some people just feel that way. That's fine. If you can't do it, you can't do it,

---

[18] The prosecutor misstated Ohio law here. Remorse or repentance <u>is</u> a proper mitigating factor for consideration under Ohio R. C. § 2929.04 (B) (7), the catch-all "any other factor" provision. *See, e.g., State v. Brewer*, 549 N.E. 2d 491, 505 (Ohio 1990).

> but also keep in mind that the State of Ohio, the victim's family, as well as the defendant have a right to a fair trial here.
>
> PROSPECTIVE JUROR NO. 23:  That's correct.
>
> MR. DETERS:  If you can't do it, that's fine… Judge, … we challenge for cause…

Tr. 328.

After this one-sided colloquy in which the prosecutor did the talking for Ms. Wells, the trial judge asked whether she could impose the death penalty if the prosecution proved its case.   Ms. Wells replied that while she was not familiar with what "circumstances" could be brought to light, if she felt the person was not sorry for what he did, she could impose the death sentence.  Tr. 328 – 329.  The judge then asked a very leading converse question:

> THE COURT:  In other words, if he was sorry for it, asked God for forgiveness, you could not impose the death penalty?
>
> PROSPECTIVE JUROR NO. 23:  Right.

Tr. 329.

Defense counsel then had a turn to question Ms. Wells, who, for the first time, was actually permitted to talk for herself.   She said she would not have a problem with a weighing process where each side presented reasons for or against the death penalty.  Nor would she have a problem assigning different weights to aggravating circumstances and mitigating factors.  Tr. 329 - 330.  When asked if she could consider signing a death verdict with the other jurors, Ms. Wells replied: "I would have to listen very carefully to the mitigating factors.  If one of those would be remorse or not, then I could deal with it in that way."  Tr. 331.

When defense counsel attempted a follow-up question, the judge interrupted, asserted that Ms. Wells had a "bottom line" and again asked her if she would not be able to impose the death penalty if the person showed remorse and asked for forgiveness. Tr. 331. Defense counsel objected to the leading question, but Ms. Wells never got the chance to answer it. Over defense objection, the trial court simply granted the prosecutor's motion to excuse her for cause. Tr. 332.

Between the actions of the prosecutor and trial judge, Ms. Wells was interrupted in her attempts to answer questions, misinformed about whether she could consider remorse as a mitigator, and asked leading questions that assumed she was unable to impose the death penalty if the defendant showed remorse.

Unlike the trial judge, however, this Court must consider the _entirety_ of Ms. Wells' voir dire. And the record shows that when she was actually permitted to articulate her views, nothing in her responses indicated that she would either automatically impose or refuse to impose the death sentence on the basis of remorse or lack of remorse. Further, there is absolutely nothing about her desire to consider remorse that was improper or warrant for her removal from the Petitioner's jury.

**1.**    **Ms. Wells' Excusal For Cause Was Wrong. She Met the Standard For Jury Service In a Capital Case Under the Relevant Supreme Court Decisions.**

The United States Supreme Court holds that a prospective juror in a capital case may be excused for cause only if that juror's views (either for or against capital punishment) "would prevent or substantially impair the performance of his duties…in accordance with his instructions and his oath." _Wainwright v. Witt_, 469 U.S. 412, 420 (1985); _Ross v. Oklahoma_, 487 U.S. 81, 85 (1988).

The Sixth Circuit's recent capital decision in *Gall v. Parker*, 231 F. 3d 265 (6th Cir. 2000) offers particularly instructive analysis of the applicable Supreme Court decisions on this issue. In *Gall*, habeas counsel raised the trial court's wrongful exclusion for cause of a juror who was uncomfortable but not unable to return a death sentence. Despite the traditional deference shown to trial judges, the Sixth Circuit examined the entirety of the juror's responses in voir dire and concluded that the totality of the record "showed that [the juror] was not 'so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its' death penalty scheme, the standard that *Witt* requires for exclusion." *Gall*, 231 F. 3d at 331.

The trial judge's disqualification of Ms. Wells likewise does not justify complete deference in habeas review. Ms. Wells' voir dire responses – those where she was able to speak for herself – indicated that a defendant's remorse or repentance was important to her; that she could engage in the weighing process; that she could assign different weights to different aggravating and mitigating factors; and that she could deal with remorse as part of the weighing process. Ms. Wells demonstrated the ability to consider fairly all the possible penalties while giving weight, but not dispositive weight, to remorse or repentance. Under Ohio law, this was a perfectly legitimate way to weigh the sentence in a capital case. Yet the trial judge ignored these responses in favor of the dogmatic conclusion that Ms. Wells had a "bottom line."

This is an instance where fair consideration of the record as a whole indicates that Ms. Wells' consideration of remorse or repentance did not substantially impair or prevent her from performing her duties as a juror in accordance with the court's instructions and her oath. As in *Gall*, her exclusion for cause was constitutional error.

### 2.    Ms. Wells' Wrongful Exclusion For Cause Is Not Subject To Harmless Error Analysis.

As the *Gall* court recognized, the wrongful exclusion for cause of even one juror requires reversal of the death sentence:  "A violation under *Witt* is reversible error not subject to harmless error analysis."  *Gall,* 231 F. 3d at 332 citing *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) and *Davis v. Georgia*, 429 U.S. 122, 123 (1976).  This Court must therefore vacate Bobby Sheppard's death sentence and grant the writ on this ground.

### VIII.   BOBBY SHEPPARD'S CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE OF SYSTEMATIC RACIAL AND GENDER DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS FOR HAMILTON COUNTY CAPITAL CASE GRAND JURIES, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS
(Claim 11)

### A.   Standard of Review

Petitioner raised this claim under Issue Six and Issue Five(C) in his March 9, 2000 Application to Reopen Direct Appeal filed in the state court of appeals pursuant to App. R. 26(B) and *State v. Murnahan*, 63 Ohio St. 60 (1992), alleging ineffective assistance of appellate counsel.   The First District Court of Appeals denied the application finding that Petitioner had failed to show good cause for filing it beyond the 90-day requirement under App. R. 26(B)(2)(b).  *State v. Sheppard*, (Oct. 2, 2000) Hamilton App. Nos. C950402 and C95550744, unreported.  However, the Ohio Supreme Court affirmed the denial, but did so on different grounds.  *State v. Sheppard*, 91 Ohio St.3d 329 (2001).  The Ohio Supreme Court did not apply a procedural bar to Petitioner's application to reopen, but instead denied the application on its merits, applying, *inter alia, Strickland v. Washington*, 466 U.S. 668 (1984).  Thus, although there is a lack of discussion and analysis in the Ohio Supreme Court's decision specifically regarding the

ineffective assistance of appellate counsel claim for failing to raise this claim on direct appeal, it appears that this claim was "adjudicated on the merits," and the AEDPA standard of review applies.

**B.      Procedural Bar To This Claim**

As stated above, the last reasoned state court decision did not apply a procedural bar to Petitioner's *Murnahan* claim of ineffective assistance of appellate counsel (for failing to raise the claim of the improper reasonable doubt instruction), but instead decided the claim on the merits.   Therefore, the claim of ineffective assistance of appellate counsel was itself not defaulted and thus can serve as the cause and prejudice under the well-recognized *Maupin* test, *supra*, to defeat any claim of procedural default of the underlying constitutional claim.

**C.      Merits**

There is no constitutional right to be indicted by a state grand jury.  *Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992).   "If a state chooses to use a grand jury, it must select members of the grand jury without discrimination based on race or color."   *Id.*, citing *Aldridge v. Marshall*, 765 F.2d 63, 68 (6th Cir. 1985).

The selection of grand juries in Hamilton County is tainted with racism. Specifically, Hamilton County has a longstanding practice of racial discrimination in the selection of grand jury forepersons.

In the State of Ohio, the grand jury foreperson does not have to be selected from the grand jury venire.  R.C. § 2939.02.  Instead, a common pleas court judge may simply choose someone from the county population.  The foreperson need only be a registered voter of the county.

In Hamilton County, the presiding common pleas court judges have traditionally gone outside the grand jury venire list to choose individuals to be grand jury forepersons on capital cases. Hamilton County Common Pleas Court Judge (and former assistant prosecutor) Melba Marsh confirmed that this was the traditional practice in a federal deposition she gave in 1998. *Hawkins v. Coyle*, Case No. 1:97CV479 (S.D. Ohio, Judge Dlott). *See* Petition for Writ of Habeas Corpus, Exhibit I (Marsh depo. pp. 34 – 36).

Thus, Hamilton County Common Pleas Court Judges continued to exercise their statutory prerogative to choose grand jury forepersons for capital cases at least as of the time of Judge Marsh's deposition in 1998.[19]

The statistics that resulted from that judicial participation are indisputable. Members of Mr. Sheppard's African-American race have been systematically underrepresented as capital grand jury forepersons over a significant period of time in Hamilton County, as have women.

Between 1982 and 1998, there were 87 capital grand juries in Hamilton County which returned a total of 134 capital indictments. *See* Petitioner's June 20, 2000 Amended Second or Successive Petition to Vacate, Exhibit B (Affidavit of Diane Wiley, President of the National Jury Project Midwest, with attached appendices). There were only 4 African-American forepersons out of those 87 grand juries. *Id.* There was less than a quarter as many African-American forepersons as should be expected based on the percentage of African-Americans in Hamilton County (African-Americans comprised

---

[19] Petitioner acknowledges the Affidavit of Kenneth Ruzick, the foreman of the grand jury in the case *sub judice*, and his attestation that he was selected not by a Hamilton County Judge but by the jury commissioner's office. *See* Affidavit of Kenneth Ruzick, attached to Respondent's August 2, 2000 Memorandum in Opposition to Motion to Recuse Judges filed in the First Appellate District Court of Appeals (Appendix to Return of Writ, Vol. VII, p. 140). This fact, however, does not defeat Petitioner Sheppard's claim. *Jefferson v. Morgan*, 962 F.2d 1185, 1190 (6th Cir. 1992) ("[T]he fact that the grand jury that indicted Jefferson contained two blacks does not defeat his equal protection claim.").

approximately twenty-one percent (20.9%) of the Hamilton County population according to the 1990 U.S. Census). This racial underrepresentation is statistically significant.

Hamilton County's grand jury selection process has also involved discrimination based on gender. The exclusion of women from the grand jury may also provide a basis for a constitutional claim. *See Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). Between 1982 and 1998 there were only 19 female forepersons for the 87 grand juries which returned capital indictments. *See* Petitioner's June 20, 2000 Amended Second or Successive Petition to Vacate, Exhibit B (Affidavit of Diane Wiley, President of the National Jury Project Midwest, with attached appendices). This was less than half as many female forepersons as would be expected, based on the percentage of the female population in Hamilton County. This gender underrepresentation is also statistically significant.

Kenneth Ruzick, a white male, was the foreperson of the grand jury that indicted Bobby Sheppard in 1994. The judicial selection of grand jury forepersons ensured that the forepersons, at least in Hamilton County capital cases, were overwhelmingly white males during the relevant time period. The judicial selection of grand jury forepersons was not only discriminatory, but also further exacerbated racial and gender disparity in the composition of the grand jury.

A defendant can establish a *prima facie* case of racial discrimination in either of two ways: "(1) underrepresentation of the petitioner's race on the particular grand jury that indicted the petitioner and a selection system that is subject to abuse; **or** (2) underrepresentation of the petitioner's race on numerous grand juries over a significant period of time." *Jefferson v. Morgan*, 962 F. 2d 1185, 1191 (6th Cir. 1992). Certainly the latter showing is made in Petitioner's case.

An accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination.  "[D]iscrimination on the basis of race in the selection of members of a grand jury ... strikes at the fundamental values of our judicial system" because the grand jury is a central component of the criminal justice process. *Rose v. Mitchell*, 443 U.S. 545, 556 (1979).  As stated in decision in *Powers v. Ohio*, 499 U.S. 400, 411 (1991), the grand jury, "acts as a vital check against the wrongful exercise of power by the State and its prosecutors."

It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime.  *See Vasquez v. Hillery*, 474 U.S. 254, 263 (1986).  The integrity of these decisions depends on the integrity of the process used to select the grand jurors.  If that process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decisions.  *See Rose*, 443 U.S. at 555-556 ("Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process").

The Supreme Court in an unbroken line of cases has held that a criminal conviction cannot stand under the Equal Protection Clause if it is based on an indictment of a grand jury which excluded individuals on the basis of their race.  *Alexander v. Louisiana*, 405 U.S. 625, 628 (1972); *Bush v. Kentucky*, 107 U.S. 110, 119 (1883);  *Neal v. Delaware*, 103 U.S. 370, 394 (1881).  *See Castaneda v. Partida*, 430 U.S. 482, 492-495 (1977).  A criminal defendant "is entitled to require that the State not deliberately

and systematically deny to members of his race the right to participate as jurors in the administration of justice." *Alexander*, 405 U.S. at 628-629.

To achieve an impartial jury, the panels from which grand jurors are chosen must also be drawn from a "fair cross section" of the community. *Campbell v. Louisiana*, 118 S. Ct. 1419 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975); *Atwell v. Blackburn*, 800 F.2d 502 (5th Cir. 1986) (fair cross section requirement applies to grand jury panels); *Machetti v. Linahan*, 679 F.2d 236 (11th Cir. 1982) (same). If racial discrimination occurs in the selection process of the grand jury, the conviction must be reversed notwithstanding "overwhelming" evidence of guilt. *Vasquez*, 474 U.S. 254.

In Ohio, the grand jury foreperson has the same full voting powers as other grand jury members. However, a judge does not rely on lists generated by a jury commissioner, but may select <u>anyone</u> to be the grand jury foreperson if that person satisfies the qualifications of a juror. *See* R.C. § 2939.02; Petition for Writ of Habeas Corpus, Exhibit I (Marsh depo.) at 34. After this selection is made, the judge forwards the name to the Hamilton County Prosecutor's Office for approval. *Id*. at 35. This selection is outside of the system for choosing the other grand jurors. This selection need not comport with <u>any</u> process. Such a selection lacks integrity.

Further, a review of the demographic characteristics of grand jury forepersons that have returned capital indictments in Hamilton County shows that they are heavily skewed towards the northwestern section of Hamilton County. In addition, the same persons repeatedly appear as forepersons even in cases that are separated by several years. This indicates that grand jury forepersons in capital cases are far too often whites with a

"proven track record" of returning capital indictments to an extent that the assignment of the foremen is statistically impossible to have been random.

To achieve an impartial jury, the panels from which grand jurors and petite jurors are chosen must be drawn from a "fair cross section" of the community. *Campbell*, 118 S.Ct. 1419; *Taylor,* 419 U.S. at 527; *Rose*, 443 U.S. 545. The Fourteenth Amendment prohibits the selection of grand jury venires in a discriminatory manner which gives rise to disproportionately unrepresentative results. *Casteneda*, 430 U.S. at 494.

The racism permeating from the exclusion of minorities from grand juries and from selection as grand jury forepersons appears in the disproportionate racial impact of the death penalty's application in Hamilton County. Since the death penalty was reinstituted in Ohio in 1981, one hundred ninety-seven (197) death sentences have been imposed. Of these one-hundred ninety-seven (197) death sentences, ninety-eight (98) (50%) have been imposed against African-Americans. According to the 1990 U.S. Census, African-Americans makes up only 10.6% of Ohio's population.

Forty-eight (48) death sentences have been imposed in Hamilton County. Of these forty-eight (48) death sentences, twenty-eight (28) (58%) have been imposed against African-Americans. According to the 1990 U.S. Census, African-Americans make up only twenty-one percent (20.9%) of the Hamilton County population.

Thirteen (13) African-Americans from Hamilton county are on Ohio's death row for the death of Caucasians, while no Caucasians from Hamilton County are on death row for the death of an African-American.

Petitioner Sheppard was prejudiced by these violations of his federal constitutional rights in that citizens of Hamilton County are being denied equal protection

of the law, in that those accused of homicide in Hamilton County face an unjustifiably disproportionate risk of losing their life in comparison to citizens accused of homicide in Ohio's other eighty-seven counties.  Furthermore, such an unconscionable proceeding results in an arbitrary, unreasoning, and capricious imposition of the death penalty. While weeding out minorities from selection as grand jury forepersons, Hamilton County disproportionately seeks death against minorities.

In sum, the systemic racial and gender discrimination produced by judicial selection of grand jury forepersons in Hamilton County during the relevant time period violated Bobby Sheppard's rights to equal protection, due process of law and fair cross section under the Sixth and Fourteenth Amendments. *Campbell*, 118 S. Ct. 1419; *Rose*, 443 U.S. 545.

**IX.    THE INSTRUCTION ON REASONABLE DOUBT GIVEN TO BOBBY SHEPPARD'S JURY ALLOWED THE STATE TO CONVICT HIM AND OBTAIN A DEATH SENTENCE BASED ON A STANDARD OF PROOF BELOW THAT REQUIRED BY THE DUE PROCESS CLAUSE**
(Claim 8)

**A.    AEDPA Standard of Review**

Petitioner raised this claim for the first time in his March 9, 2000 Application to Reopen Direct Appeal filed in the state Court of Appeals pursuant to App. R. 26(B) and *State v. Murnahan*, 63 Ohio St. 60 (1992), alleging ineffective assistance of appellate counsel.   The First District Court of Appeals denied the application, finding that Petitioner had failed to show good cause for filing it beyond the 90-day requirement under App. R. 26(B)(2)(b). *State v. Sheppard*, (Oct. 2, 2000) Hamilton App. Nos. C950402 and C95550744, unreported.  The Ohio Supreme Court affirmed the denial but did so on different grounds. *State v. Sheppard*, 91 Ohio St.3d 329 (2001).  The Ohio

Supreme Court did not apply a procedural bar to Petitioner's application to reopen but instead denied the application on its merits, applying, *inter alia*, *Strickland v. Washington*, 466 U.S. 668 (1984).    Thus, although there is a lack of discussion and analysis in the Ohio Supreme Court's decision specifically regarding the ineffective assistance of appellate counsel claim for failing to raise the improper reasonable doubt instruction on direct appeal, it would nonetheless appear that this claim was "adjudicated on the merits," and the AEDPA standard of review applies.

**B.    Procedural Bar To This Claim**

As stated above, the last reasoned state court decision did not apply a procedural bar to Petitioner's *Murnahan* claim of ineffective assistance of appellate counsel (for failing to raise the claim of the improper reasonable doubt instruction, but instead decided the claim on the merits.   Therefore, the claim of ineffective assistance of appellate counsel can serve as the cause and prejudice under the well-recognized *Maupin* test, *supra*, to defeat any claim of procedural default of the underlying unconstitutional jury instruction claim.

**C.    Merits**

The standard of proof beyond a reasonable doubt "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding.  *In re Winship*, 397 U.S. 358, 363 (1970).  By "impressing upon the fact finder the need to reach a subjective state of **near certitude** of the guilt of the accused, the standard symbolized the significance that our society attaches to the criminal sanction and thus to liberty itself.  *Jackson*, 443 U.S.

at 315, citing *Winship*, 397 U.S. at 372 (Harlan, J., concurring) (emphasis added). *See also Moore v. Parke*, 148 F.3d 705, 711 (7th Cir. 1998); *Walters v. Maass*, 45 F.3d 1355, 1360 (9th Cir. 1995); *Evans-Smith v. Taylor*, 19 F.3d 899, 910 (4th Cir. 1994).

In Petitioner Sheppard's case, during its trial phase charge to the jury, the judge gave jurors Ohio's standard instruction that they must find Bobby Sheppard guilty beyond a reasonable doubt. The judge defined reasonable doubt as follows:

> Reasonable doubt is present when the jurors…cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense.
> Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt.
> Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

Tr. 910.

The trial judge did not read the definition of reasonable doubt in his penalty phase charge to jurors. Rather, he simply referred them to the written instruction on reasonable doubt which he gave at the trial phase and told jurors to read it if the need arose. Tr. 1237 – 1238.

The trial phase reasonable doubt instruction based on being convinced of the "truth of the charge" thus also served as the definition jurors would have used at the penalty phase, if they thought to reacquaint themselves with that instruction.

This charge, taken as a whole, did not adequately convey the stringent "beyond a reasonable doubt" standard required by the Due Process Clause.

That part of Ohio's definition which tells jurors that proof beyond a reasonable doubt is proof of such a character that an ordinary person would be "willing to rely and act upon it in the most important of his own affairs" is too lenient. Courts have recognized that there is a major qualitative difference between making the judgment that a person is guilty beyond a reasonable doubt and the judgment a person exercises in matters of personal importance. In personal matters, an individual might be willing to act even when not convinced beyond a reasonable that his decision is the right one. *See, e.g., Scurry v. United States*, 347 F. 2d 468 (D.C. Cir. 1965).

The "firmly convinced" language in the instruction is likewise insufficient because it is the same language used to define the "clear and convincing evidence" standard. Ohio's courts define clear and convincing evidence in terms of evidence "which will provide in the mind of the trier of facts a firm belief or conviction to the facts sought to be established." *Cross v. Ledford*, 120 N.E. 2d 118 (Ohio 1954), paragraph one of the syllabus. Clear and convincing evidence may suffice as the standard of proof for a civil case, but it is not an adequate definition of the proof beyond a reasonable doubt that the Due Process Clause requires in criminal cases.

Then there is the use of the term "moral evidence" in the Ohio reasonable doubt instruction. The judge told jurors in Bobby Sheppard's case that reasonable doubt was not mere possible doubt "because everything …depending upon moral evidence is open to some possible or imaginary doubt."

The Supreme Court examined a reasonable doubt instruction containing this phrase in *Victor v. Nebraska*, 511 U.S. 1 (1994). There, the Court found no constitutional flaw only because that phrase was actually defined in the instruction: "Moral

evidence…can only mean empirical evidence offered to prove such matters." *Victor*, 511 U.S. at 13.

There was no such definition of the phrase "moral evidence" to guide Bobby Sheppard's jury or to place that phrase in any proper context. As a result, the reasonable doubt instruction in this case permitted jurors to convict Bobby Sheppard and sentence him to death based on considerations of subjective morality rather than empirical evidentiary proof required by Due Process. As Justice Kennedy observed in *Victor,* "(the) use of 'moral evidence'…seems quite indefensible…the words will do nothing but baffle…" *Id.* at 21 (Kennedy J., concurring). That is particularly true when, as here, jurors are given no definition of "moral evidence."

Bobby Sheppard was convicted and sentenced to death on a degree of proof below required by the Due Process Clause. This is a fundamental structural error. *Sullivan v. Louisiana*, 508 U.S. 275 (1993). The Court should therefore relieve Bobby of his unconstitutional convictions and death sentence.

### X.    THE OHIO SUPREME COURT'S ARBITRARY REFUSAL TO REVIEW LIFE SENTENCES IMPOSED IN SIMILAR CASES AS PART OF THE STATUTORILY MANDATED PROPORTIONALITY REVIEW DENIED BOBBY SHEPPARD DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT
(Claim 13)

### A.    AEDPA Standard of Review

Bobby Sheppard raised this issue in Proposition of Law No. 17 of his direct appeal brief to the Ohio Supreme Court. ROW Appendix Vol. VI, p. 109 – 110. The Ohio Supreme Court "*Poindextered*" this claim. *State v. Sheppard*, 703 N.E. 2d 286, 290 (Ohio 1998) ("we summarily reject arguments that…involve settled issues…").

"*Poindextering*" is shorthand for the summary rejection that the state Supreme Court visits upon claims that it has repeatedly denied and thus considers to be so well settled that no further discussion is necessary. *State v. Poindexter*, 520 N.E. 2d 568, syllabus (1988). The proportionality review challenge that Bobby Sheppard raised in his brief is one of the issues the state Supreme Court designated for summary rejection in *Poindexter. Id.* at 571.

When, as here, the state court decides a federal claim without discussion, the applicable standard of review should be *de novo*. *See* discussion under Part II (AEDPA Standard of Review), *supra*, subpart B.5. If not *de novo* review, then in accordance with *Harris v. Stovall*, 212 F. 3d 940, 943 n.1 (6th Cir. 2000), this Court must at least conduct a less deferential "independent review" of this claim to determine if the state supreme court's disposition was contrary to or an unreasonable application of clearly established federal law.

**B.    Procedural Bar to This Claim**

There is no procedural bar to this claim. This issue was raised as a federal constitutional issue under the Due Process Clause in Bobby Sheppard's Ohio Supreme Court brief. ROW Appendix Vol. VI, p. 109. The Ohio Supreme Court rejected it on the merits, under the *Poindexter* rule just described. Respondent does not invoke a procedural bar to this claim because it was presented to the Ohio Supreme Court on direct appeal. ROW, p. 96. This claim is, therefore, not defaulted.

**C.    Merits**

The premise of this claim is the Due Process Clause, not the Eighth Amendment. Bobby Sheppard was denied a state-created due process liberty interest because the Ohio

Supreme Court simply refused to review life sentences imposed in similar cases as part of the statutorily mandated proportionality review for capital cases in this case, as it has in all death penalty cases.

Ohio is not Tennessee. That is why *Coe v. Bell*, 161 F.3d 320, 351-352 (6th Cir. 1998) does not control this issue. In *Coe*, the Sixth Circuit addressed a claim that the Tennessee Supreme Court was not meeting its statutorily mandated proportionality review. The Court of Appeals rejected this claim, saying that Tennessee's proportionality review statute did not make "specific directives to the decision-maker" sufficient to create a due process clause liberty interest.

Ohio's proportionality review statute is markedly different from Tennessee's. Tennessee law directed the state Supreme Court to consider the excessiveness or proportionality of the death sentence under review only as compared to other death sentences. *Coe*, 161 F.3d at 352. By contrast, Ohio's statutes enacted a detailed system of proportionality review that mandated filing and consideration of capital cases in which life sentences were imposed for similar offenses. What has happened in Ohio is that the state Supreme Court has refused to enforce or follow the statutory proportionality review procedures and has announced that its proportionality review will be limited only to cases where the death sentence was imposed. Thus, as opposed to the situation in *Coe*, Ohio's proportionality review statutes *do* make "specific directives to the decision-maker" sufficient to create a due process liberty interest; and the Ohio Supreme Court's arbitrary refusal to follow those directives caused a violation of Bobby Sheppard's right to due process of law.

1.      **Ohio's Proportionality Review Statutes Contain Specific Directives.**

As enacted in 1981, the capital sentencing and review statutes applicable to Mr.

Sheppard provided as follows.  First, R.C. § 2929.05(A) specified that:

> In determining whether the sentence of death is appropriate, the Court of Appeals and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases . . .

The Ohio legislature intended to ensure that this proportionality review would

include life sentence cases.  It enacted several comprehensive procedures:

> a)      If an indictment or a count in an indictment charges the defendant with aggravate murder and contains one or more specifications of aggravating circumstances, the clerk of court in which the indictment is filed <u>shall</u> file a notice with the supreme court indicating the indictment was file. O.R.C. § 2929.021.

> b)      The trial court is <u>required</u> to prepare a written opinion identifying the aggravating and mitigating factors and the resulting balance when it imposes a life or death sentence.  <u>The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of Section 2929.04 of the Revised Code it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors.  The court or panel shall file the opinion required to be prepared by this division</u> with the Clerk of the appropriate Court of appeals and <u>with the Clerk of the Supreme Court</u> within fifteen days after the court or panel imposes sentence.  O.R.C. § 2929.03(F) (emphasis added.)

> c)      The appellate court is required to prepare its own written opinion when it reviews a death sentence.  O.R.C. § 2929.05(A).

> d)      The above opinions are required to be filed with the Ohio Supreme Court.  O.R.C. §§ 2929.03(G) and 2929.05(A).

In the first death penalty case it decided under Ohio's 1981 law, *State v. Jenkins*, 473 N.E.2d 264, 303-304 (1984), the state Supreme Court acknowledged the mandate and purpose of the statutory opinion collection system:

> To aid the courts in conducting their proportionality review under R.C. 2929.05, R.C. 2929.021 **requires** that certain information be provided to the Ohio Supreme Court with respect to capital indictments issued or dismissed. Also, under R.C. 2929.03(F), trial judges rendering opinions in capital cases *are required* to file copies of those opinions with their court of appeals and with the Ohio Supreme court. R.C. 2929.05(A) also *requires* courts of appeals to file copies of their sentencing opinions with the Ohio Supreme court. The **purpose** of these provisions is to **provide the reviewing courts** with some **basis for reviewing the proportionality of the imposition of the death sentence in comparison with sentences entered in similar cases.** (emphasis added)

There is nothing discretionary about Ohio's statutes either with regard to the creation of the capital case sentence data base or the proportionality review to be conducted in the context of that data base. Unlike the Tennessee statute analyzed in *Coe*, Ohio's statute *is* written in "explicitly mandatory language" giving "specific directives to the decision-maker" that the statutes must be followed in conducting the proportionality review required in every capital case. By directing trial judges to write opinions in life sentence cases and file the opinions with the state appellate and supreme courts, the statutes clearly intended that proportionality review encompass capital cases where life sentences were imposed for offenses similar to those committed by the defendant under review.

### 2.    Ohio's Courts Have Ignored the Statutory Directives to Include Life Sentence Capital Cases In Proportionality Review.

In *State v. Steffen*, 509 N.E.2d 383, 395 (1987), the Ohio Supreme Court announced its own proportionality review rule:

> [T]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty was been imposed . . . . *No reviewing court need consider any case where the death penalty was sought but not obtained . . .* (emphasis added)

This holding was obviously contrary to the <u>statutory</u> provisions, which explicitly directed that life sentence cases be made part of the pool of cases to be compared in a proportionality review. Thus, the *Steffen* court arbitrarily excluded from proportionality review information that the Ohio legislature had mandated be considered for the purpose of conducting that review.

### 3.    Bobby Sheppard Has a Constitutionally Protected Liberty Interest in Proportionality Review that Includes Life Sentences Imposed in Similar Cases.

In *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 461 (1989) the Supreme Court noted "a state creates a protected liberty interest by placing substantive limitations in official discretion."  As this Sixth Circuit similarly noted in *Coe*, 161 F.3d at 352, "[t]o qualify as producing a state-created liberty interest, a statute setting up procedures must put specific limits on official discretion."

The Ohio proportionality review statutes do set up a procedure that <u>requires</u> the filing and consideration of capital cases where life sentences were imposed.  This is a requirement, not something that the legislature intended for Ohio's courts to ignore in

conducting proportionality review. Thus, Mr. Sheppard does have a protected liberty interest in proportionality review that includes life sentence capital cases.

>    **4.    Bobby Sheppard Was Arbitrarily Deprived of His Protected Liberty Interest in Proportionality Review That Includes Life Sentence Capital Cases.**

As the Sixth Circuit has held, "any arbitrary denial of a state-created right for which there is no state remedy is also a violation of procedural due process." *Norris v. Schotten*, 146 F. 3d 314, 329 (6th Cir. 1998). Ohio's statutes created a scheme for a capital case proportionality review that included both life and death-sentenced capital cases. Bobby Sheppard had a right to the proportionality review mandated by law. This state's highest court has arbitrarily denied that right to Bobby Sheppard, and to every other death-sentenced defendant in this state, a denial for which there is obviously no state remedy.

Unlike the state Supreme Court, the proportionality review statutes enacted in Ohio law embrace the concept that "[t]he question of who is spared . . . is of necessity critical when attempting to analyze whether who is spared is arbitrary." Krivosha, A Historical and Philosophical Look at the Death Penalty - Does It Serve Society's Needs (1982), 16 Creighton L. Rev. 1, 36. The state Supreme Court would not have had to look hard to find a number of cases for proportionality comparison in Bobby Sheppard's appeal, cases where defendants with aggravating circumstances and mitigating factors similar to those in Mr. Sheppard's case got a life sentence rather than death.

In *State v. Frank Foster*, a 1990 case from Hamilton County, the defendant's crime was, like Sheppard's, aggravated felony murder with the aggravated

robbery/principal offender aggravating circumstance.[20] Foster robbed and shot to death, execution-style, an old high school friend. The mitigating factors in this capital case, again like Sheppard's, were youth (Foster was 22 years old) and lack of significant criminal history.  A panel of three judges imposed a life term.

Capital defendant Jermane Scott's 1996 case arose in Clark County.  Scott murdered a retired Springfield school teacher.  He was found guilty of aggravated felony murder with aggravated robbery and aggravated burglary capital specifications.[21] The mitigating factors included youth (Scott was 19 years old) and lack of significant criminal history. Jurors returned a life verdict in Scott's case.

The mitigating factors of youth (the defendant was 18) and lack of significant prior criminal history again led to imposition of a life sentence in a 1987 Hamilton County capital case, *State v. Andre Spears*, where the defendant killed a 65 year old man by stabbing him with a screwdriver over eighty times.  As in Bobby Sheppard's case, this was an aggravated felony murder crime with the aggravated robbery/principal offender aggravating circumstance.  The panel of three judges in Spears' trial rejected the death sentence and imposed a term of 20 years to life.[22]

Eddie Robertson was another capital defendant who received a life rather than death sentence for the shooting death of a young woman in 1988 felony murder case from Montgomery County.  The aggravating circumstances in this case were aggravated robbery/principal offender, the escaping detection aggravator and the killing or attempt to

---

[20] *State v. Foster*, Hamilton County Common Pleas No. B-901813, attached as Exhibit 1.

[21] *State v. Scott*, 1998 WL 350878 (Clark Ap. No. 97 CA 107, July 2, 1998), attached as Exhibit 2.

[22] *State v. Spears*, Hamilton Common Pleas Case No. B-870230;  *State v. Spears*, 1988 WL 76228 (Hamilton Ap. No. C-870619, Oct. 5, 1988), attached as Exhibits 3 and 4.

kill two or more persons aggravator. The trial judge found the mitigating factors to be youth and lack of significant criminal history.[23]

Drewey Kiser's case was one of the earliest capital cases to result in a life sentence. This was a 1982 case from Ross County where the defendant and a friend devised a plan to rob a drinking buddy. Kiser and his friend rode with the victim to a deserted area, where Kiser placed a gun to the victim's head and shot him to death. Kiser and his friend took the victim's checkbook and rolled his body into a creek. The aggravating circumstances in this case were the same two as in Mr. Sheppard's case: aggravated robbery/principal offender and killing for the purpose of escaping detection for the aggravated robbery. The mitigating factors in Kiser's case were the defendant's youth (he was 23 years old), lack of significant criminal history and alcoholism.

Each of these life sentence capital cases involved crimes that were no less heinous that that in Bobby Sheppard's case. Some of those crimes might even be called worse. All were aggravated felony murders involving robberies by youthful offenders who had no other significant criminal history, just as in Bobby Sheppard's case. In fact, Bobby Sheppard was younger than any of the defendants in these life cases, and he presented compelling expert testimony that he suffered from a severe mental illness, paranoid schizophrenia, at the time of the crime. The life sentence opinions for these cases were filed with the appellate courts and the Ohio Supreme Court as required by Ohio's statutes. They were intended to be part of Ohio's proportionality review process. Since "[t]he question of who is spared . . . is of necessity critical when attempting to analyze whether who is spared is arbitrary," then the Ohio Supreme Court should have (and could have)

---

[23] *State v. Robertson*, Montgomery Common Pleas Case No. 88-CR-3178, attached as Exhibit 5.

considered these readily available similar cases as part its proportionality universe for
Bobby Sheppard's appeal.

Ohio Supreme Court Justice Paul Pfeifer is a former state senator who
participated in drafting Ohio's death penalty statutes. Justice Pfeifer knows what the Ohio
legislature intended when the capital punishment scheme was re-enacted in 1981, and he
knows that the Ohio Supreme Court is not doing the proportionality review set out in the
statutes.  He has eloquently criticized the state Supreme Court's decision to ignore life
sentence cases:

> When we compare a case in which the death penalty was
> imposed only to other cases in which the death penalty was
> imposed, we continually lower the bar of proportionality.
> The lowest common denominator becomes the standard.
> This result is ethically indefensible… We must be willing
> to do serious proportionality review.   Even though
> approximately two hundred males currently reside on death
> row, this court has never overturned a death sentence based
> on proportionality review.   'Proportionality review' must
> be more than hollow words, it must someday mean that this
> court will overturn a sentence of death based solely on
> proportionality review.

*State v. Murphy*, 747 N.E. 2d 765, 813 – 814 (Pfeifer, J., dissenting).[24]

As Justice Pfeifer recognizes, the Ohio Supreme Court's decision in *Steffen* gutted
Ohio's statutory proportionality review process by limiting that review only to cases
where the death sentence was imposed. The proportionality review scheme enacted by
the legislature is not followed by the Ohio Supreme Court.  Bobby Sheppard's protected
liberty interest in the *real* proportionality review prescribed by Ohio's statutes has
arbitrarily been reduced to a meaningless procedure in violation of his rights under the

---

[24] Also, in an article in the Cleveland Plain Dealer, April 23, 2001, entitled "Death penalty applied unfairly,
Pfeifer declares," Justice Pfeifer stated that the proportionality review process undertaken by the Ohio

Due Process Clause. This flouting of the statutory mandate is a federal due process violation that merits habeas relief.

## XI.    BOBBY SHEPPARD'S DEATH SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OHIO'S CAPITAL PUNISHMENT SYSTEM OPERATES IN AN ARBITRARY, CAPRICIOUS AND DISCRIMINATORY MANNER IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH <u>AND FOURTEENTH AMENDMENTS</u> (Claim 14)

### A.    <u>AEDPA Standard of Review</u>

This claim was raised by Petitioner as Proposition of Law Seventeen in his direct appeal to the Ohio Supreme Court.  The Ohio Supreme Court neglected to review this claim, so review by this Court is *de novo*.

### B.    <u>Procedural Bar To This Claim</u>

There is no procedural bar to this claim.

### C.    <u>Merits</u>

The Ohio capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner, in violation of the protections mandated in *Furman v. Georgia*, 408 U.S. 238 (1972) and its progeny.

The United States Supreme Court's decision in *Woodson v. North Carolina*, 428 U.S. 280 (1976), made clear that the fatal flaw of mandatory death penalty statutes is that without specific standards, the process of deciding who is to be sentenced to death is shielded from judicial review.  As stated in Paternoster, <u>Race of Victim and Location of the Crime: The Decision to Seek the Death Penalty in South Carolina</u>, Journal of Criminal Law and Criminology (1983):

---

Supreme Court has been "little more than lip service."  In the article, Justice Pfeifer called on some entity to undertake a more thorough review.

> [T]he mandatory death penalty statute provides no standard
> to guide the jury in its inevitable exercise of the power to
> determine which first degree murderers shall live and
> which shall die. . . .   There is not way under the North
> Carolina law for the judiciary to check arbitrary and
> capricious exercise of that power.

In Ohio, the virtually uncontrolled discretion of prosecutors in indictment circumvents this requirement. The Ohio system results in the imposition of death penalties in an arbitrary and racially discriminatory manner, with blacks and those who killed white victims being more likely to get the death penalty.

Race matters in Ohio's administration of the death penalty.  According to the Ohio Commission on Racial Fairness: "Black males compose approximately five percent of Ohio's general population, yet they compose 50 percent of death row inmates."  The race of the victim also matters in this state.  As the Commission found in its Report:

> One hundred seventy-five (175) people were the victims of
> those currently residing on Ohio's death row.  Of those 175
> victims, 124 were Caucasian and 42 were African-
> American.   The numbers speak for themselves.   A
> perpetrator is geometrically more likely to end up on death
> row if the homicide victim is white rather than black.

The Commission was organized by the Chief Justice of the Ohio Supreme Court and was composed of lawyers, judges, law school faculty and private citizens.  These members were very troubled by the statistics they found:

> The implication of race in this gross disparity is not simply
> explained away and demands thorough examination,
> analysis and study until a satisfactory explanation emerges
> which eliminates race as the cause for the widely divergent
> numbers.

The Report of the Ohio Commission on Racial Fairness (1999), pages 37-38.

Racism is a factor in the administration of the death penalty in Ohio. The more current 2000 Census found that African-Americans make up 11.5% of Ohio's population. It would, however, be an understatement to say that African-Americans are over-represented on death row. While African-Americans account for 11.5% of the population, fifty percent (50%) of Ohio's death row residents are African-American.

Recent data reflects that in Ohio, in the two hundred and seven (207) aggravated murder cases where the death penalty was imposed, Whites were victims in one hundred and thirty five (135) cases (65%), whereas African-Americans were victims in fifty (50) cases (24%). There are only three (3) cases in which the death penalty has been imposed upon White defendants when there were African-American victims. This is an intolerable racial imbalance. Ohio's criminal justice system places a higher value on White victims of murder than on minority victims, while it targets minority defendants for a staggeringly disproportionate share of the death sentences.

The policies in effect in the Hamilton County Prosecutor's Office reflect a racial bias in charging and prosecuting capital offenses. Of the forty-six (46) death sentences, twenty-seven (27), or nearly sixty percent (60%) of the offenders are African-American. Approximately three-fifths of Hamilton County's death sentences have been imposed against African-Americans, even though, according to the 2000 Census, African-Americans account for approximately twenty-one percent (23%) of Hamilton County's population.

Of the forty-six (46) death sentences in Hamilton County, Whites were the victims in sixty-three percent (63%) of the cases. The number of African-American murder victims per capita, far exceeds the number of White murder victims per capita.

Thirteen (13) African-Americans from Hamilton County are on Ohio's death row for the death of Caucasians. No white person has ever been capitally indicted in Hamilton County for the sole aggravated murder of an African-American. The criminal justice system places a higher value on White victims of murder than on Minority victims, while it targets African-Americans for a staggering disproportionate share of death sentences.

Racism in the imposition of the death penalty is the ultimate example of arbitrary, disproportionate, and cruel and unusual punishment. It is the antithesis of any evolving standard of decency. Racism makes a mockery of equal justice, equal protection and due process of law, and it can never be condoned. Any system which discriminates, either *de facto* or *de jure*, cannot withstand constitutional scrutiny. The policies adopted and procedures employed by the Office of the Hamilton County Prosecutor in seeking and securing a capital conviction and death sentence against Petitioner Sheppard have deprived him of his rights to due process, equal protection, and a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Ohio has systemic Constitutional problems in the administration of capital punishment. The American Bar Association relatively recently called for a moratorium on capital punishment unless and until each jurisdiction attempting to impose such punishment "implements policies and procedures that are consistent with . . . longstanding American Bar Association policies intended to (1) ensure that death penalty cases are administered fairly and impartially, in accordance with due process, and (2) minimize the risk that innocent persons may be executed ..." As the ABA has observed in a report accompanying its resolution, "administration of the death penalty, from being fair and consistent, is instead a haphazard maze of unfair practices with no internal

consistency."  The ABA concludes that this morass has resulted from the lack of competent counsel in capital cases, the lack of a fair and adequate review process, and the pervasive effects of race.

The United Nations High Commissioner for Human Rights has recently studied the American capital punishment process and has concluded that "guarantees and safeguards, as well as specific restrictions on Capital Punishment, are not being respected.  Lack of adequate counsel and legal representation for many capital defendants is disturbing."  The High Commissioner further concluded that "race, ethnic origin and economic status appear to be key determinants of who will, and who will not, receive a sentence of death."  The report also describes in detail the special problems created by the politicization of the death penalty, the lack of an independent and impartial state judiciary, and the racially-biased system of selecting juries.  The report concluded:

> The high level of support for the death penalty, even if studies have shown that it is not as deep as is claimed, cannot justify the lack of respect for the restrictions and safeguards surrounding its use.  In may countries, mob killings and lynchings enjoy public support as a way to deal with violent crime and are often portrayed as "popular justice."  Yet they are not acceptable in civilized society.

The Ohio capital punishment system suffers from all of the problems identified in the ABA and United Nations reports: the under-funding of defense counsel, the lack of a fair and adequate appellate review process and the pervasive effects of race.[25]

The Ohio statutes also violate the mandate of the constitutional protections by requiring proof of aggravating circumstances in the guilt phase of capital trials.  The

---

[25] At the time of Petitioner's trial, Hamilton County, which has more people on death row than any other county, paid court appointed counsel at the disgracefully low rate of $30 per hour for death penalty cases. This pay rate ranked Hamilton County 87th out of 88 counties in the appointed counsel hourly rate.  *See* Exhibit J attached to Petitioner's habeas petition.

United States Supreme Court has approved schemes which separate the consideration of statutory aggravating circumstances from the determination of guilt because they provide an individualized determination and to narrow the category of defendants eligible for the death penalty. *See Zant v. Stephens*, 462 U.S. 862 (1983); *Barclay v. Florida*, 463 U.S. 939 (1983). Ohio's statutory scheme cannot provide for these constitutional safeguards. By requiring proof of the aggravating specifications simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing as required by post-*Furman* cases. *See Woodson*, 428 U.S. at 961. The jury must be free to determine whether death is the appropriate punishment for a defendant. By not requiring the state to establish guilt on the question of murder prior to the jury's consideration of the aggravating circumstances, the jury is unconstitutionally barred from making the necessary individualized determination of appropriateness. This is especially prejudicial where, as in Ohio, the consideration of aggravating circumstances is accomplished without consideration of any mitigating factors.

The Ohio scheme is also unconstitutional because it burdens a defendant's right to trial. A defendant who decides to plead guilty or no contest to an indictment, which contains one or more capital specifications, receives the benefit of having the trial court judge vested with the discretion to dismiss the specifications "in the interest of justice." Ohio R. Crim. P. 11(C)(3). Accordingly, the capital indictment may be dismissed regardless of the presence or absence of mitigating circumstances. No such corresponding provision exists if a capital defendant elects to proceed to trial before a jury. *See Lockett v. Ohio*, 438 U.S. 586 (1978) (Blackmun J. concurring). *See also United States v. Jackson*, 390 U.S. 570 (1968).

The Ohio capital statutes are also unconstitutional because they require submission of the pre-sentence investigation (PSI) report and mental evaluation to the jury or judge once requested by a capital defendant.  R.C. §2929.03(D)(1) provides:

> A pre-sentence investigation or mental examination shall not be made except upon request of the defendant.  Copies of any reports prepared under this division **shall** be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division.

(emphasis added.)    That mandatory submission prevents a capital defendant from effectively presenting his case in mitigation because all information in these reports, no matter how prejudicial, must go to the jury.  This requirement of R.C. § 2929.03(D)(1) violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The proportionality system in Ohio is also constitutionally flawed because of the method used for case comparisons. *See* Thirteenth Ground for Relief, *supra*. The state supreme court in *State v. Steffen*, 509 N.E.2d 383, 385 (Ohio 1987) held that "the proportionality review required by O.R.C. §2929.05(A) is satisfied by a review of those cases already decided by the reviewing Court in which the death penalty has been imposed."  By only reviewing cases in which death was imposed, the capital defendant is prevented from receiving a fair proportionality review.  Ohio courts have failed to find even one death sentence to be disproportionate in nineteen (19) years.

The appropriateness analysis used by the Ohio Courts of Appeals and the Supreme Court of Ohio is also infirm.  R.C. § 2929.05(A) requires the appellate courts of Ohio determine the appropriateness of the death penalty in each capital case they review.  The statute directs the court to "affirm a sentence of death only if the particular court is

persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." The Supreme Court of Ohio and the Court of Appeals have failed to follow the dictates of the statute. The appropriateness review ultimately conducted in each case is too cursory. It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984). Any death sentence upheld on appeal under these circumstances violates the defendant's due process liberty interest in that statutory right. *See Evitts v. Lucey*, at 401, 469 U.S. 387, 404 (1985).

Ohio's capital statutory scheme permits the arbitrary and discriminatory imposition of the death penalty. R.C. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violate Bobby Sheppard's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### XII. BOBBY SHEPPARD WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS
(Claim 9)

To establish a violation of the Sixth Amendment right to counsel, a defendant must demonstrate that counsel's representation was deficient and that it actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) Representation is deficient when it falls below an objective standard of reasonableness under prevailing norms. *See Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000) The claimant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." A petitioner must show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id*. at 693-94. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. The ultimate focus of the collective inquiry is the fundamental fairness of the proceeding. In this vein, the Court must determine whether the result of the proceeding is unreliable "because of a breakdown in the adversarial process that our system counts on to produce just results." *Id*. at 695.   This Court has adopted the *Strickland* standards in its habeas jurisprudence. *See Rickman*, 131 F.3d at 1155.

Sheppard's trial counsel was defective for several reasons.

**A.**   **Trial Counsel Failed to Challenge the Duplicative Aggravating Circumstances that the Jury and Judge Weighed Against Bobby Sheppard at the Penalty Phase**

As set forth above in sections V and VI, Counsel should have recognized the fact that duplicative specifications arose from one indivisible course of conduct and requested that they be merged prior to the sentencing phase of Bobby's trial.   Petitioner's arguments on these claims are set forth above at length, and will not be restated here.  *See* Sections V and VI.  Petitioner has already explained how his counsel's representation was deficient and that it actually prejudiced him because any reasonable attorney would have made the objection, and the objection would have resulted in a different verdict had the objection been granted.

The state does not assert that this claim is procedurally defaulted.

**B.**   **Trial Counsel Should Also Have Submitted at Least Some Evidence, By Affidavit or Testimony, to Support Their Motion for a New Trial On the Basis of Juror Misconduct.**

Trial counsel should have submitted additional evidence from Helen Jones in this matter.  Trial counsel could not have reasonably anticipated that Ms. Jones would lie in

her affidavit and state she had reviewed testimony when she had not.  Trial counsel -- who obtained an affidavit from Jones -- certainly could have obtained from Ms. Jones her testimony that Fox misled the Court when he advised Judge Crush that he was told only that paranoid schizophrenics are people "out of touch with reality."  As set forth above, we now know he was told much more.   Trial counsel could likewise have submitted evidence from Smalldon that such additional statements from Jones were in fact incorrect descriptions of paranoid schizophrenia.

As set forth above in Section III, the evidence from Jones and Smalldon offered at the evidentiary hearing in this case show the wholly misleading and inaccurate nature of the quickie definition of paranoid schizophrenia that juror Fox obtained during the penalty phase from his friend, the motivational psychologist.  Counsel's failure to offer proof that this juror's deliberations were contaminated by misinformation was unreasonable and prejudicial to Bobby Sheppard, for it only takes one juror to bring about a life verdict in Ohio.  Accordingly, the errors and omissions of Bobby Sheppard's trial counsel as outlined above were both unreasonable and prejudicial in the sense that they undermine confidence in the outcome of Bobby Sheppard's indictment, trial and sentence.  Bobby Sheppard was denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel at trial.  The Court should grant relief on this Ground.

And, despite the protestations from the State, as this Court has already found, procedural default does not apply this claim.    *State v. Walden*, 19 Ohio App. 3d (141) (1984) establishes that a claim presented on a motion for new trial may not be heard on a post-conviction claim in the state of Ohio.  *See* DKT 53, Dec. & Or. Denying Renw. Motion to Call Smalldon, at 7.

### XIII.  BOBBY SHEPPARD WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEALS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS

Appellate counsel failed to appeal the court's failure to instruct the jurors that unanimity was not required on whether life should be imposed. In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), the Sixth Circuit set for guidance on considerations relevant to claims of ineffective assistance of appellate counsel.

The cases decided by the Sixth Circuit suggest the following considerations that ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently:

> (1) Were the omitted issues "significant and obvious?"
> (2) Was there arguably contrary authority on the omitted issues?
> (3) Were the omitted issues clearly stronger than those presented?
> (4) Were the omitted issues objected to at trial?
> (5) Were the trial court's rulings subject to deference on appeal?
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> (7) What was appellate counsel's level of experience and expertise?
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
> (9) Is there evidence that counsel reviewed all the facts?
> (10) Were the omitted issues dealt with in other assignments of error?
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id. at 427-28.

Under that analysis, appellate counsel was ineffective.

## A.    These Claims Are Not Procedurally Defaulted.

Petitioner raised his ineffective assistance of counsel claim in his March 9, 2000 Application to Reopen Direct Appeal filed in the state court of appeals pursuant to App. R. 26(B) and *State v. Murnahan*, 63 Ohio St. 60 (1992), alleging ineffective assistance of appellate counsel.    The First District Court of Appeals denied the application finding that Petitioner had failed to show good cause for filing it beyond the 90-day requirement under App. R. 26(B)(2)(b). *State v. Sheppard*, (Oct. 2, 2000) Hamilton App. Nos. C950402 and C95550744, unreported.   However, the Ohio Supreme Court affirmed the denial, but did so on different grounds. *State v. Sheppard*, 91 Ohio St.3d 329 (2001).   The Ohio Supreme Court did not apply a procedural bar to Petitioner's application to reopen but instead denied the application on its merits, applying, *inter alia*, *Strickland v. Washington*, 466 U.S. 668 (1984).   Thus, although there is a lack of discussion and analysis in the Ohio Supreme Court's decision specifically regarding the ineffective assistance of appellate counsel claim for failing to raise this claim on direct appeal, it appears that this claim was "adjudicated on the merits," and the AEDPA standard of review applies.

## B.    *Mapes* Confirms That Petitioner Was Denied Effective Counsel On Appeal

As set forth above in Section IV 4, the trial court instructed jurors at the penalty phase that their verdict had to be unanimous. Tr. 1232-1239.   At the same time, however, the court refused defense counsel's request to instruct the jury on what to do in the absence of a unanimous finding on the death sentence, *i.e.,* turn to consideration of one of the life verdicts. Tr. 1232-41.   Counsel's request was proper under Ohio law.   *See State v. Springer*, 63 Ohio St. 3d 167 (1992).   *See also*, *Davis v. Mitchell*, 318 F.3d 682 (6th

Cir. 2003); *State v. Brooks*, 75 Ohio St. 3d 148 (1996). The trial court's instruction that the jury's verdict had to be unanimous, coupled with the court's refusal to correctly inform jurors that unanimity did not preclude deliberation on a life verdict, misled jurors and operated to prevent jurors from granting mercy and considering mitigating evidence even in the absence of unanimity. *See supra* p. 52-56. The instruction violated both state of Ohio law and the Eighth and Fourteenth Amendments. *See, e.g., Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003); *Kubat v. Thieret*, 867 F. 2d 351 (7th Cir. 1989); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Mills v. Maryland*, 486 U.S. 367 (1988); *Scott v. Anderson*, 58 F. Supp. 2d 767 (N.D. Ohio 1998). Counsel's failure to raise this meritorious issue on direct appeal was unreasonable and prejudicial and, therefore, ineffective as a matter of Constitutional law.

 *Mapes v. Coyle* is directly on point and demands the grant of habeas relief based on the ineffective assistance of appellate counsel. There, like here, the Court held that Ohio appellate counsel's failure to appeal the same instructional error at issue here that ran afoul of *Stringer/Brooks/Mills* rose to the level of ineffective assistance of appellate counsel. *Mapes*, 171. F3d. at 428-429.

 First, as Mapes found, the omitted issue was obvious and significant. By 1984: (1) Ohio's death-penalty statute did not require unanimous rejection of a death sentence before a jury could consider a life sentence and in fact implied the opposite; (2) the Supreme Court had indicated that *all* relevant mitigating evidence, including evidence relating to a defendant's prior criminal record, which the given instruction did not allow each juror to do.

Second, there "appears to be no authority that would have tempered counsel's enthusiasm for bringing them, satisfying the second criterion." *Id.*

Third, these issues were clearly stronger than some of those presented. Indeed, appellate counsel brought 25 assignments of error and indicated that winnowing of issues was not a primary consideration, as at least seven of those assignments were "boilerplate" assignments of error that he plugs in all appeals. *See* 6/24/03 Tr. of Evid. Hearing at 19-23, 25 (Hoefle, stating that assignments of error 13, 14, 14, 16, 23, 24, 25 in direct appeal to Court of Appeals were "boilerplate" and at page 25 stating Supreme Court brief raised same issues).

Fourth, the lack-of-unanimity and prohibition-of-mitigating-evidence issues were objected to at the sentencing phase.

Fifth, this omitted issue would have been subject to *de novo* review upon appeal. Thus, appellate counsel cannot have strategically reasoned that a court of appeals would defer to the trial court's rulings.

Sixth, although appellate counsel testified in this case, they could not recall why it was that he asserted some claims and omitted others. *See e.g.,* 6/24/03 Tr. of Evid. Hearing at 28, 29 (Hoefle testifying at p.28 he did "not have any memory today as to why [he], what [he] was thinking about when [he] did the brief")

Seventh, the omitted issue was not dealt with in other assignments of error.

Finally, there seems to be no reasonable justification for omitting these issues. Indeed, Sheppard has offered expert testimony from Adele Shanks, who similarly agrees based on her vast experience in death penalty appeals that only an incompetent attorney would omit the claims. According to Adele Shanks, the omission of this issue did not

meet with the "prevailing professional norms" of the day in for appellate counsel in Ohio at the time of appeal, and therefore, rose to the level of ineffective assistance of appellate counsel under the Mapes factors. *See* 6/25/03 Tr. of Evid. Hearing at 215-216, 236-254.

And, that is not the only basis on which appellate counsel was ineffective. Likewise, appellate counsel could have done a more effective job in how it presented the claims of prosecutorial misconduct. In its argument to be more persuasive, counsel should have cited to the following specific examples of misconduct. Any reasonable counsel would have cited to legal misstatement in penalty phase argument that mitigation "no way can outweigh what Bobby Sheppard did," Tr. 1179, as well as assertions that phase argument that Bobby's chronological age of 18 was not a mitigating factor under R. C. §2929.04 (B)(4) because he was "street smart" and knew how to buy beer and marijuana illegally. Tr. 1169- 1170, 1206. Effective counsel would have also cite to the assertion that prosecutors had no idea what mitigating evidence would be presented, as if they were at a disadvantage, when in fact during voir dire the judge ordered defense to turn over all documents, reports, raw data and other records Dr. Smalldon would be testifying about. Tr. 1173, 1227. And, counsel would have cited to additional examples improper penalty phase expressions of personal opinion and attacks on defense, including but not limited to: 1) calling Dr. Smalldon a "very slick guy" who is "slick" enough to testify only in  mitigation. Tr. 1210; 2) argument that "Who knows what kind of testimony that we would have heard from the defense if we didn't have the actual videotape… I'm sure  that he (Bobby) would have been seeing ghosts everywhere…" Tr. 1226; and 3) concluding by arguing that Bobby's penalty phase defense "absolute sham mitigation." Tr. 1230.

The failure to buttress the claims of misconduct with these examples was ineffective and prejudicial.  First, the omitted issue was obvious and significant.  Second, there appears to be no authority that would have tempered counsel's enthusiasm for bringing them, satisfying the second criterion.  Third, these examples of misconduct were objected to at trial.  And fourth, there seems to be no reasonable justification for omitting these issues.

Finally, Sheppard was prejudiced by these errors, as without them, his sentence would not have been affirmed.

## XIV.   BOBBY SHEPPARD'S CONVICTIONS AND DEATH SENTENCE ARE INVALID AS A RESULT OF THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS IN THE COMPOSITION OF HIS GRAND JURY, VOIR DIRE, JURY INSTRUCTIONS, EXCLUSION OF RELEVANT MITIGATING EVIDENCE, PROSECUTORIAL MISCONDUCT, UNRELIABLE AND ARBITRARY SENTENCING AND INVALID APPELLATE REWEIGHING IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
### (Claim 15)

**A.     AEDPA Standard of Review**

This claim was raised by Petitioner as Proposition of Law Twenty-four in his direct appeal to the Ohio Supreme Court.   The Ohio Supreme Court neglected to review this claim, so review by this Court is *de novo*.

**B.     Procedural Bar To This Claim**

There is no procedural bar to this claim.

**C.     Merits**

Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone may cumulatively produce a trial setting that is fundamentally unfair in violation of a defendant's constitutional rights.  *Walker v. Engle*,

703 F.2d 959, 963 (6th Cir. 1983) (individual errors not sufficient to establish a due process violation may do so when aggregated); *United States v. Pierce*, 62 F.3d 818, 834 (6th Cir. 1995)(same).   The accumulation of non-reversible errors must lead the court to the firm belief that an injustice has been done resulting in a "fundamentally unfair" proceeding.  *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993) (finding that four errors taken in isolation were harmless, but when considered cumulatively necessitated reversal); *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir. 1988) (errors not depriving a person of due process considered alone may cumulatively produce a trial that is "fundamentally unfair").

In *Walker v. Engle*, *supra*, the Sixth Circuit Court of Appeals found that the "cumulative effect" of state misconduct in prosecuting the case against petitioner constituted a denial of fundamental fairness.  Similarly, in *Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988), the Sixth Circuit held that various trial errors, considered cumulatively, produced a trial setting that was fundamentally unfair.  It has also been held that such cumulative effect analysis applies to ineffective assistance of counsel claims.  *See Rodrigues v. Hoke*, 928 F.2d 534, 538 (2nd Cir. 1991).[26]

The holdings in *Walker,* and *Cooper* regarding the cumulative effect of prosecutorial misconduct, and the cumulative effect of trial court errors, are particularly applicable here.   As discussed herein, at the sentencing in this case the prosecutor committed repeated, flagrant misconduct by, *inter alia*:

♦    improperly invoking his personal beliefs;

♦    unfairly inflaming the passions of the jury with improper argument of the nature and circumstances of the offense as an aggravating factor,

---

[26] Whether counsel's assistance is constitutionally effective depends upon whether it was "reasonably effective assistance, **considering all the circumstances**." *Strickland*, 466 U.S. at 669 (emphasis added).

including gratuitously re-showing the video-tape of the killing;

♦     improperly denigrating defense counsel;

♦     improperly denigrating and assailing the credibility of the defense's mental heath expert, Dr. Smalldon, whom the prosecutor referred to as a "Very slick guy";

♦     improperly asserting, despite never moving the trial court for their own mental health examination of Petitioner or ever receiving a ruling from the court denying such, that defense counsel was underhanded for using Dr. Smalldon only at mitigation and for not entering an insanity plea at the guilt-innocence phase so as to deny the state access to Petitioner.

This prosecutorial misconduct should be considered for its cumulative effect. Indeed, part of the assessment of unconstitutional prosecutorial misconduct is whether the misconduct was isolated or extensive. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

This prosecutorial misconduct should also be considered in conjunction with certain errors of the trial court at sentencing. This is because the issues are clearly inter-related. The impact upon the jury of the prosecutorial misconduct regarding the defense's theme of Bobby's paranoid schizophrenia and their use of Dr. Smalldon was exacerbated by the trial court's errors in improperly instructing the jury as to the prosecution's ability to examine Bobby and in refusing to admit relevant evidence to support the existence of the same mental illness in Bobby's family. Moreover, the prosecutorial misconduct and the trial court errors should be considered in conjunction with the juror misconduct, as they all served to destroy or diminish the effect of Dr. Smalldon, his opinions and diagnosis of Bobby as suffering from paranoid schizophrenia, and the heart of the defense mitigation theme. Indeed, it is quite possible that the prosecution's arguments attacking Dr. Smalldon and complaining of their inability to have their own mental health expert examine Bobby and testify at sentencing led or

contributed to juror Fox's decision to commit misconduct and turn elsewhere, outside the trial, for psychiatric information.   In any event, the misleading, oversimplified advice given to Fox by supposed psychologist Helen Jones, that paranoid schizophrenics are those who are "out of touch with reality," compounded the prejudicial impact to Petitioner already incurred by the improper actions of the prosecutor and trial court.

Here, given the exacerbating and compounding nature of these various errors and improprieties at Petitioner's sentencing, a consideration of the cumulative effect of these errors establishes a denial of Petitioner's constitutional rights and warrants a grant of the writ of habeas corpus vacating Petitioner's sentence of death.

The granting of habeas relief in this case due to the unfair sentencing process is especially warranted in light of the sentence imposed  -  the death penalty.  The United States Supreme Court has long recognized that capital cases demand heightened standards of reliability because of the unique severity and finality of the death penalty. *Beck v. Alabama*, 447 U.S. 625 (1980).  *See also Ried v. Covert*, 354 U.S. 1 (1957) (advising to bear in mind that "death is different," that "[t]he taking of human life is different," and that "[i]t is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights"); *Andres v. United States,* 333 U.S. 740, 751 (1948) ("[i]n death cases, doubts … should be resolved in favor of the accused");  *California v. Ramos*, 464 U.S. 992 (1983) ("the court … has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determinations.")  *See also, Burger v. Kemp*, 483 U.S. 776, 785 ("our duty to search for constitutional error with painstaking care is never more exacting than it is in a

capital case").

Respectfully submitted,

**s/Geoffrey J. Moul**
Geoffrey J. Moul (0070663)
Trial Attorney for Petitioner
Murray Murphy Moul + Basil LLP
326 South High Street, Suite 400
Columbus, OH  43215
Telephone:  (614) 469-0400
Facsimile:  (614) 469-0402
E-mail:  moul@mmmb.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles L. Wille
Assistant Attorney General
Capital Crimes Section
30 E. Broad Street, 26th Floor
Columbus, OH  43215

**s/Geoffrey J. Moul**

119