COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

ORIGINAL

EXHIBIT
1

STATE OF OHIO                :    CASE NO. B-901813
                                  C-900850
              Plaintiff       :

   vs.                            SEPARATE OPINION AS
                                  TO MITIGATING FACTORS
FRANK A. FOSTER                   AND AGGRAVATING
              Defendant           CIRCUMSTANCES
                                  (Corrected)

FILED
COURT OF APPEALS
DEC 3 - 1990
JOSEPH T. DETERS
CLERK OF COURTS
HAMILTON COUNTY

The panel of three judges having imposed a sentence of life imprisonment on the defendant Frank A. Foster, pursuant to Division (D) of Revised Code 2929.03 states herewith its specific findings at to which of the mitigating factors set forth in Division (B) Section 2929.04 of the Revised Code are found to exist, what other mitigating factors are found to exist, what aggravating circumstances the offender was found guilty of committing, and why the panel did not find beyond a reasonable doubt that the aggravating circumstance was sufficient to outweigh the mitigating factors. This opinion will be filed with clerk of the First District Court of Appeals and the clerk of the Supreme Court pursuant to R.C. 2929.03(F).

The panel found the defendant guilty of Specification One to Count Four, the aggravating circumstance to the murder that the murder was committed while he was committing an aggravated robbery and he was the principal offender in the commission of the aggravated murder.

FILED
DEC 05 1990
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

The three judge panel has specifically reviewed the evidence offered regarding the background of the defendant. It seems unnecessary in this opinion to repeat all of the pertinent factors of his background that may have impacted upon his conduct.

The mitigating factors the panel found to exist were the defendant's youth; his lack of any history of prior criminal convictions or delinquency adjudications; the defendant's chaotic childhood and the fact that the criminal act was committed at a time when the defendant was under the influence of drugs and alcohol.

While the three judge panel recognizes that all of the records in this case indeed indicate the defendant had a very tragic and unfortunate upbringing, with no love or parental guidance, with use of alcohol and other drugs and with constant negative reinforcement of his personality, the three judge panel is also satisfied that the records, testimony and evidence reflect conclusively that the defendant has never suffered from a mental disease or defect which would have prevented the defendant from distinguishing right from wrong or would have prevented him from conforming his conduct to the requirements of the law. In other words, the defendant has never suffered from any psychosis.

In making its decision the panel was controlled by the requirement that the burden is on the prosecution to establish the greater weight of the aggravating circumstance beyond a reasonable doubt.

In brief the evidence was that Foster and his co-defendant Carpenter went out bar-hopping about 9:00 p.m. the evening before the murder. They met Viars, the victim, whom they knew from high school, in one of the three or four saloons they visited in the course of the evening. The three of them spent until about 2:30 a.m. the next morning drinking and smoking marihuana. At some point Viars flashed a roll of bills. Subsequent thereto Foster allegedly said to Carpenter, "I'm planning to rob Viars."

At about 2:30 a.m. when they were driving on a lonely road Foster, in whose car the three were traveling, stopped the car and said "everyone out for a pee." When they got out of the car Foster pulled a pistol and told Viars to give him the money. Viars refused and tried unsuccessfully to attract the attention of a passing vehicle. Thereafter Foster fired three shots at Viars who fell to the ground. He then ordered Carpenter to get the money which the later found in Viars sock. Foster then fired three more shots into Viars back, two of which were fatal.

Heinous as was such a robbery-murder it was the conclusion of the panel in view of Foster's prior law abiding record; the absence of any record of violence; the fact that he was not in need of funds and worked regularly, that he lost control of himself under the influence of drugs and alcohol. Although this is no excuse or justification, it must be taken into consideration in sentencing.

The panel had the benefit of a detailed report from its Court Psychiatric Clinic, copy of which is attached. This report details Foster's chaotic background.

This three judge panel found, upon a review of the relevant evidence in both proceedings, the testimony, exhibits, statement of the defendant, not under oath, arguments of respective counsel, along with the presentence report and psychiatric report requested by defendant, that the prosecution had failed to prove beyond a reasonable doubt that the aggravating circumstance which the defendant, Frank A. Foster, was found guilty of committing outweighed the mitigating factors in the case.

The panel was of the opinion that by providing for three alternative sentences for aggravated murder, the legislature must have intended to reserve the sentence of death for those cases where there was little or nothing in mitigation. We concluded that this was not such a case.

William J. Morrissey, Judge

Will - J. Watt, P.J.

Gilbert Bettman, Judge

Ann Marie Tracey, Judge

## C O U R T   R E P O R T

### CENTRAL PSYCHIATRIC CLINIC
### COURT PSYCHIATRIC CENTER

222 E. Central Parkway - Third Floor
Cincinnati, Ohio   45202
(513) 352-3111

NAME  Frank Foster                    DATE OF BIRTH    1-2-68

DOCKET NUMBER  B90-1813               OFFENSE Aggravated Murder with
                                              Specifications
REF. DATE 8-30-90    EVAL. DATE 10-12-90   COURT DATE  10-19-90

The Honorable William J. Morrissey
Hamilton County Court of Common Pleas
Cincinnati, Ohio   45202

CONFIDENTIAL

Dear Judge Morrissey:

This report is in response to your request that Mr. Frank Foster be psychologically evaluated for the purposes of a Mitigation hearing, pursuant to Ohio Revised Code 2929.03. Mr. Foster has been convicted of Aggravated Murder with Specifications. Mr. Foster was evaluated by the undersigned, Nancy Schmidtgoessling, Ph.D., Clinical Psychologist, on September 28, October 8, and October 12, 1990, all contacts taking place at the Hamilton County Criminal Justice Center (HCJC). This included interviews as well as administration of the Wechsler Adult Intelligence Scale - Revised (WAIS-R), Bender Gestalt, Wechsler Memory Scale (WMS), and Minnesota Multiphasic Personality Inventory (MMPI). Mr. Foster was also interviewed by Louise Camblin, MSW, LISW, Clinical Social Worker, on August 31, September 7 and 17, 1990, these contacts also taking place at the HCJC. Prior to all interviews and testing, the nonconfidential nature of the evaluation was explained to Mr. Foster and he acknowledged understanding such. This examiner made collateral contact with the prosecutor, James Applegate. Ms. Camblin made collateral contact with the defense attorney, Bill Whalen; the defendant's mother, Anna Sorber; the defendant's grandmother, Helen Bowling; the defendant's wife, Amy Foster; the defendant's sister, Tanya Benge; Dennis Merryman, of Roadway Express; Mike Hayes, co-worker at Savage Auto Supply; and psychiatric staff at the HCJC. Records were requested and received from Fairfield High School, and Mercy Hospital in Hamilton, Ohio; and requested but never received from the Fairfield schools covering elementary and junior high years. A draft of the pre-sentence investigation by the Hamilton County Probation Department was provided to us with the defendant's release. What follows is a summary of our findings.

Across all contacts with this defendant, Mr. Foster was
pleasant, cooperative and appeared to be in good contact with
reality. His thoughts were always delivered in a logical,
relevant, coherent fashion that was free of any preoccupations,
eccentricities, disorganization, bizarre thought content, or the
like. His concentration and attention span were good, and there
were no indications from his behavior that he was suffering any
kinds of hallucinations. Further, Mr. Foster never claimed to
suffer hallucinations. No unusual motor behaviors were observed.
He was always alert and oriented. Emotionally, he appeared
mildly tense and depressed, but made good eye contact, smiled
appropriately at times, and showed a normal range of feelings.
His cognitive functioning appeared to be in the average range, as
based upon his ability to abstract, recall information, and the
like. He always appeared to understand what was asked of him and
was able to give answers in a cogent fashion; both his expressive
and receptive language abilities appeared intact. In summary,
there was nothing in Mr. Foster's presentation to suggest the
presence of any major psychiatric disorder such as psychosis,
significantly deviant mood, or cognitive impairment.

Available information indicates that the defendant's early
developmental years and family life were highly chaotic. Mr.
Foster was born when his mother was sixteen years old. Prior to
the defendant's birth, the biological father was sent to the
penitentiary. When released, the father married another woman
and apparently was never an active force in Mr. Foster's life,
Mr. Foster seeing the father perhaps four or five times. The
last visit was when Mr. Foster was incarcerated on this current
charge. However, he knows nothing about his father's employment,
history, or the like. Because of his mother's youth at the time
of Mr. Foster's birth, Mr. Foster and his mother resided with the
defendant's grandmother. During the daytime, however, he was
cared for by the great-grandmother and grandmother. His mother's
care for Mr. Foster was complicated by the birth of two younger
half-sisters, by two different fathers, and her own involvement
with other men; the mother seemed to lack interest in raising Mr.
Foster. For a while the mother was married to a violent man,
Mike Sorber, who was reportedly involved with drugs and
prostitution. At one point, the defendant's mother was shot by
her husband and required hospitalization, but then returned to
Mr. Sorber upon discharge. Concurrent with that incident, Mr.
Foster was sent to live with an uncle in Texas, as no one in the
Hamilton area seemed willing or able to care for him. While Mr.
Foster lived in Texas, his mother was involved in a car accident
that left her with serious brain damage. Mr. Foster was returned
from Texas and lived with his mother and Mr. Sorber on a farm in
Hamilton, Ohio. Apparently during that time, his mother was
physicaly incapacitated, frequently slept a great deal and had
unpredictable rage outbursts, so that she provided little
supervision or attention for Mr. Foster. The stepfather
apparently wanted no part of raising Mr. Foster. The defendant
then went back to live with his grandmother, was briefly married
to a woman a number of years older than he, returned to his

-2-

grandmother's and finally became involved with a girlfriend with whom he has lived since around 1987 (and recently married).

What is apparent throughout the developmental years is the lack of consistency, the number of traumas in the family, and the lack of psychological validation and warmth towards the defendant. The lack of parental skills and investment in raising Mr. Foster was also obvious. Besides the above mentioned history, Mr. Foster suffered two other significant losses during his developmental years, the death of his great-grandmother to whom he has always felt closest of all his relatives, and the death of his uncle in a car accident, another relative to whom he felt very close. The environment during these early years was also not favorable in that Mr. Foster saw his mother beaten by her husband, Mike Sorber, and also by the father of his younger sister. There are allegations of drug dealing and heavy substance use in the home by the parent figures. Finally, he was also subjected to physical abuse by his mother, on an unpredictable basis.

Academically, Mr. Foster has advanced to approximately the eleventh grade. His school records show that in his earlier years he obtained approximately average grades, with a couple of grades below that and a couple above that. However, as he got towards his freshman year, his attendance slackened, his grades dropped, and ultimately he had to repeat his final year because he had missed so much the semesters before. He was never in special education classes. The school system has indicated that he never received any psychological work-ups through the school. By his report, there are no indications of any difficulties with vision or hearing to suggest a learning disability. He does recall having speech therapy in his earliest grades, but was unclear what that was for. As he advanced through his last two or three years of school, discipline problems are noted, such as smoking in school, fighting with peers, refusing to turn off a radio and give it to a teacher, and being under the influence of marijuana at school. Mr. Foster stated that from the ninth grade on he was involved with work adjustment or work experience classes, simply enjoying work better than school.

Work has perhaps been Mr. Foster's area of greatest strength. Apparently, by family report, he began working when he was but a youngster, selling papers, working in a CETA program for a couple of summers, doing warehousing as part of his OWE, and then was regularly employed by a roofing company, at an auto supply store, at PEASE Home Improvement Company, Rumpke, and his most recent job at Roadway. He reports that at all these jobs, his performance was good. He reported that at only one of the jobs, Rumpke, was attendance ever a problem; he explained that he became upset because some of the other people weren't working as much as he so "I got fed up." Contact with Mike Hayes, a co-worker at Savage Auto Supply, indicated that Mr. Foster was a nice man who was likeable and got along well with others. Mr. Hayes remembered that Mr. Foster always showed up for work and

n time. He was not aware of any alcohol or drug problems
Mr. Foster may have had. Dennis Merryman, of Roadway
ss, was contacted at Mr. Foster's request. However, Mr.
man indicated that he did not know Mr. Foster well and was
able to comment on Mr. Foster either personally or
ssionally.

More personally, Mr. Foster has been married twice. The
 marriage occurred when he was about seventeen years old.
woman resided next door to his grandmother, and she was
y-eight years old at the time that they married. His
nation of the marriage is that "I was young and stupid."
arriage lasted approximately a year or a year and a half.
oster reports being overwhelmed by the situation as his wife
. seven or eight year old child, and after the marriage the
refused to work, and "only wanted to go to her mother's."
ently, this marriage occurred shortly after the death of his
- grandmother, to whom he felt very close. His sister,
 Benge, voiced the opinion that perhaps the defendant
ed this woman because he was looking for mothering. Mr.
hing that they never received from their own mother. Mr.
r is unsure of the date of his divorce, but shortly
after met his current wife, Amy. They have been together
. three years and married in June, 1990 during his current
ceration. They met at a bar. The couple both report that
has been a good relationship, although there have been two
ations. Apparently, these were a consequence of Mr.
r's substance use. On the first occasion, Mrs. Foster
ts that the defendant was using cocaine heavily, that this
d financial problems, and she left in protest. The second
ation was a result of Mrs. Foster essentially telling Mr.
r to leave, because she felt that he was using substances
eavily. However, although the separation lasted two weeks
as interrupted by the defendant's arrest, Mrs. Foster stated
several times she attempted to get her husband to move back
ith her, and she even attempted suicide in hopes that it
l be a serious enough message to him to come back. Mr.
r's explanation for not returning despite these requests
his wife was that he wanted to save up money and impress her
tying a boat before he would move back in with her. However,
tated he did see her almost daily during the separation.
Foster has two children from a prior relationship; only one
ese resides with her and Mr. Foster, and Mr. Foster has
rs presented that child and treated him as his own son. Mr.
r reported he has had a couple of other live-in
tionships, but explained that as he got to know the women
r he did not want to stay with them. He described that "I
never been alone" and apparently does not want to be alone.

Mr. Foster has never before had any psychiatric evaluations
reatment except for those which have taken place after his
ceration. He denies any history of symptoms that would have
sitated psychiatric evaluation or treatment. Specifically,
enies the symptoms of psychosis, major mood disorder, head

injury, or the like. When he was seen by the Mental Health Unit at the jail, he has presented as free of any psychotic disorder. He did minimize his substance abuse upon intake. While incarcerated, he has had suicidal thoughts and an attempt, and for a while was given antidepressant medications. Results of our own evaluation show that Mr. Foster is functioning in the low average to average range of intelligence. On the WAIS-R, he obtained a Verbal IQ of 85, a Performance IQ of 94, and a Full Scale IQ of 87. The discrepancy between Verbal and Performance IQ's is not statistically significant. Such a discrepancy is often seen in people who have a relative disinterest in school or are prone to acting out their psychological conflicts and feelings rather than psychologically working them through. There was nothing on the WAIS-R to suggest organic impairment. On the WMS, Mr. Foster obtained a memory quotient of 105, placing him in the average range. On the Bender Gestalt, Mr. Foster produced all the designs without any errors, suggesting intact functioning in the visual motor realm. His recall was in the average range. His style of production suggests a person who tends to isolate and compartmentalize his feelings. Validity scales of the MMPI show that this is a valid profile. Clinical elevations suggest a person who is free of major psychiatric disorder such as schizophrenia, manic depression, or the like. He scores very high on a scale that is accurate in discriminating substance abusers from nonabusers. His test results suggest a person who is excessively trusting of other people, naive in perceptions of others, and denies having a great deal of distrust or hostility. If anything, he tends to be a very outgoing, dependent individual. It is highly important to him to have other people approve of him and allow him to feel accepted.

With respect to substance use, as noted above, Mr. Foster was exposed early on to an environment in which such use was common. He reports having his first drink of alcohol around age eight, when he would go to his stepfather's body shop. However, he began using substances regularly in high school. Particularly with respect to alcohol, he describes drinking regularly on weekends, going out with friends and getting drunk. This frequently increased gradually across the years to the point that prior to arrest, he would drink primarily on weekends and his days off, and when drinking he would customarily drink perhaps four drinks per hour. He apparently has experienced blackouts, increased tolerance, and complaints from others about his alcohol use. He states that when he does go out to drink, it is with the purpose of getting intoxicated. Regarding drug use, Mr. Foster stated that he used to sneak marijuana as a child from his parents, during high school used marijuana on weekends, and that prior to his arrest was using marijuana almost daily. He denied being addicted to this substance, but reported using a joint or two per day. He does use more frequently if he is out socializing with friends who also use. Mr. Foster reports that he has used amphetamines off and on since he was seventeen, especially to help him stay awake at work. Around two and a half years ago he snorted cocaine for a period of about six or eight

months.  He reports that with his use he experienced an elevated
mood, but no paranoia or nervousness.  He denied other use of
depressant medications, steroids, or sniffing glue or paint or
other intoxicating substances.  By accident he reports inhaling
gasoline a couple of times.  He reports using LSD on a few
occasions, but couldn't recall the time period.  He denies ever
injecting drugs but on two or three occasions a friend injected
him with vitamin B12.  He reports that this was during a period
when he was working out a great deal and taking a lot of other
kinds of vitamins as well.  Mr. Foster has never been in any
treatment for his substance use or abuse.

        Physically, Mr. Foster reports having had an appendectomy
when he was fifteen years old.  This apparently developed
complications, and it was necessary to have a second surgery.  He
denies any head injuries, and no instances of dizziness,
headaches or passing out prior to incarceration were admitted.
Since incarcerated, he reports having headaches a couple of times
a week.  He has never been on any medications to assist his
learning or regulate his mood or behavior.  He reports that he
was active in high school in gymnastics and weight lifting, and
liked to take care of his body via exercise.  He wears a tattoo
that has no particular significance for him except that his
sister bought it for him on his eighteenth birthday.

        With respect to the offenses for which he has been
convicted, Mr. Foster denied the charges.  He stated that he and
a friend had been out visiting several bars, using alcohol and
marijuana heavily.  During the course of the evening they ran
into Mr. Viars, the victim, but Mr. Foster denies that he had any
grudges or hostility towards the victim.  He had known Mr. Viars
since high school but reportedly they have not been close
friends.  While Mr. Foster stated that during the course of the
evening he was irritated with Mr. Viars for not buying some of
the rounds of alcohol, he denies that this irritation was
sufficient to motivate him to kill Mr. Viars.  Mr. Foster's
account is that the defendant, the co-defendant (Mr. Carpenter)
and Mr. Viars were out driving around, the threesome stopped to
get out of the car to urinate, and Mr. Carpenter shot the victim
after asking for his wallet.  Mr. Foster acknowledges that it was
his gun used in the incident, and that he has owned guns
regularly since age sixteen or seventeen.  He stated that for the
several months prior to the offenses he had kept a gun in the car
"for protection" because he would be out late drinking, and would
often not be in full control of his faculties.  Mr. Foster was
unable to estimate the amount of substances he may have ingested
on the night in question, but asserted that he was quite
intoxicated.  He denied being in need of money at the time,
stating that he had a check at work waiting for him, and that he
had in his possession $400 or $500.  Mr. Foster stated that he
admitted to the offense to police because they were pressuring
him by threatening him with the death penalty.

-6-

In conclusion, Mr. Foster presents as the product of a chaotic, physically abusive, emotionally neglecting family of origin in which physical violence and substance abuse were predominant. His family of origin lacked the structure, skills and commitment to meet his psychological/behavioral needs appropriately during his early years. He is of average learning capacities, advanced in school as far as approximately the eleventh grade, but was unable to achieve to his potential because of the interference of substance use, family dysfunction, lack of appropriate supervision and discipline, and lack of interest. He has worked rather steadily since his teen years, an area of strength for him. He has been married twice, had a couple of other relationships between the marriages, and has never lived alone. He has shown no signs of any major psychiatric disorder such as schizophrenia, manic depression, or the like, either by history or in present evaluation. There are no indications in Mr. Foster of significant cognitive dysfunction. He is a substance abuser, particularly of marijuana. He is alcohol dependent. He was a marijuana abuser and alcohol dependent person at the time of the current offense. It seems that the major effect of his chaotic background has been to produce an emotionally shallow individual who lacks deep attachments to other people, despite his need for acceptance and approval from others in order to feel comfortable. We are unable to address the psychological significance, if any, of the current offenses because the defendant reports that he did not commit said offenses.

Thank you for this referral to the Court Psychiatric Center. Please feel free to contact me at 352-3116 if I may be of further assistance in this matter.

Respectfully,

Nancy Schmidtgoessling

Nancy Schmidtgoessling, Ph.D.
Clinical Psychologist

If testimony is required on this case, the Court Psychiatric Center will be represented by Nancy Schmidtgoessling, Ph.D., Clinical Psychologist.

NS/tm
10-18-90

FOSTER.001

*350878    Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Ohio, Second District, Clark County.

**STATE of Ohio, Plaintiff-Appellee,**
v.
**Jermane A. SCOTT, Defendant-Appellant.**
No. 97 CA 107.
July 2, 1998.

DARNELL E. CARTER, Assistant Prosecuting Attorney, P.O. Box 1608, Springfield, Ohio 45502 Attorney for Plaintiff-Appellee

S. TODD BRECOUNT, Atty. Reg. No. 0065276, 707 National City Bank Bldg., Springfield, Ohio 45502 Attorney for Defendant-Appellant

*OPINION*

WOLFF, J.

**\*\*1** Jermane A. Scott was found guilty by a jury in the Clark County Court of Common Pleas of three counts of aggravated murder, one count of aggravated robbery, and one count of aggravated burglary, with specifications, one count of misuse of a credit card, and one count of forgery. After merging several of the offenses, the trial court sentenced Scott to life imprisonment without parole for aggravated murder, to three years of actual incarceration on a firearm specification, and to one year each for misuse of a credit card and forgery. Scott appeals from his convictions.

The facts and procedural history of the case are as follows. The evidence will be set forth in more detail in our discussion of the first assignment of error.

Bertram Thomas was murdered in his home on December 3, 1996. The police suspected Scott of the murder based on the statements of friends and acquaintances who had either been present at the time of the murder or had heard him talk about the murder, the fact that some of the victim's possessions were found at Scott's home, and Scott's use of the victim's checks and credit cards. Scott was indicted on seven counts related to the death of Bertram Thomas: aggravated murder with prior calculation and design; aggravated murder committed in the course of an aggravated robbery; and aggravated murder committed in the course of an aggravated burglary, each with several specifications; aggravated robbery and aggravated burglary, each with a firearm specification; misuse of a credit card; and forgery. He was tried by a jury in September 1997 and was found guilty on each count. The aggravated murder counts carried the possibility of a death sentence, but ~~after a mitigation hearing, the jury recommended that Scott be sentenced to life imprisonment without parole.~~ The trial court merged the three counts of aggravated murder, the count of aggravated robbery, and the count of aggravated burglary, and it convicted Scott of one count of aggravated murder, misuse of a credit card, and forgery. Scott was sentenced accordingly, as described *supra*.

Scott asserts four assignments of error on appeal.

I. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

Scott claims that no reasonable juror could have convicted him because of the discrepancies in the evidence presented at trial. An overview of the state's evidence will be helpful to our discussion of this assignment of error.

Bertram Thomas was a retired Springfield school teacher who often welcomed children and teenagers into his home to play pool and cards, listen to music, and watch television. Many of the young people in his neighborhood considered him a friend and visited him regularly.

According to state's witnesses Mike Enis and Terry Portman, on the evening of December 3, 1996, Enis, Portman, and Scott had visited Thomas. Enis and Portman were apparently well known to Thomas, but Scott was not. Thomas took the young men to buy cigarettes and bought beer for himself, and they returned to the house. The four men then went into Thomas's basement, where Enis and Portman played pool and listened to music in one room while Scott and Thomas watched television in another. After a time, Scott came into the room with Enis and Portman and claimed that he was going to shoot Thomas, but the young men did not take Scott seriously. A few minutes later, Enis and Portman heard a shot and ran out of the room where they had been "relaxing." Enis testified that he had seen Scott standing over Thomas as Thomas fell to the floor and had seen Scott reach into

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

EXHIBIT

2

Thomas's pockets for his car keys. Portman testified that he had seen Scott by the steps leading out of the basement. Enis and Portman then ran from the house and up the street. When they looked back, they saw Scott pulling out of the driveway in Thomas's car and coming toward them. Scott ordered Enis and Portman to get into the car at gunpoint, threatened to kill them if they told anyone what had happened, and then drove the group to Portman's aunt's house. Scott had two guns in the car with him: one that he was known to carry and one that belonged to Thomas. Scott later abandoned the vehicle.

**2  Portman's aunt observed that Enis and Portman seemed shaken up when they arrived at her house the night of the murder and she stated that Scott had said, "I smoked the mother fucker, and he hit the floor." When the aunt questioned Scott about it, however, Scott said that he had been lying. The next day, Scott recruited his friend, Keith Donohoe, to drive him and Enis to the mall. Donohoe testified that, in exchange, Scott had filled Donohoe's gas tank with more than $20 worth of gas. Enis testified that the gas was charged on a BP credit card that he presumed to be Thomas's card. When they arrived at the mall, Scott and Enis went to the Foot Locker store while Donohoe remained in the car. Scott purchased over $700 worth of shoes and jackets for himself and Enis with one of Thomas's charge cards. He then tried to charge two more pairs of shoes to give to the sales associates, but the transaction was aborted when questions arose about the charge card. In the days following Thomas's murder, Scott also tried to negotiate two checks that he had stolen from Thomas and had written as payable to Scott's brother.    One check was successfully negotiated, but the bank refused to cash the other because it had not been completed properly.

Donohoe also testified that, in telephone conversations following Scott's arrest, Scott had told him about disposing of the murder weapon in a dumpster in Bellefontaine.

Thomas's body was discovered on December 9, 1996, with a .22 caliber gunshot wound to the head. The police focused their attention on Enis, Portman, and Scott, who had been seen at the house the night of the murder by another teen.

Two of Scott's friends, Hakeem Stevens and Anthony Eldrige, testified that he had admitted to killing Thomas. According to Stevens, Scott explained that he had been one of the victim's students and had killed him for fear of recognition. A school official verified that Scott had been a student of Thomas's in the fourth

grade. Eldrige identified Thomas's rifle as one that he had seen in Scott's possession in the days following the murder. Scott later sold the gun to an acquaintance. When the police executed a search warrant for Scott's home, they found one of Thomas's credit cards and his keys in Scott's attic, as well as two spent .22 caliber casings and some live bullets.

Scott was arrested on December 9 following a brief chase. In a videotaped interview with the police, he admitted to having robbed Thomas by taking items out of his car, but denied any involvement in his murder. Scott also denied ever having been at Thomas's house. Scott did not testify at trial, but he did present evidence that Enis and Portman had poor reputations for truthfulness and that the police had found gang graffiti in Thomas's house.

Scott claims that his conviction was against the manifest weight of the evidence because the testimony of Enis and Portman was "outrageous" and "preposterous." Scott asserts that Enis's and Portman's testimony could not reasonably have been believed because of the inconsistencies between their stories. Scott points out that, in their versions of the story, despite their alleged friendships with the victim, Enis and Portman did not react to Scott's alleged threat to kill Thomas and did not immediately report the murder to the authorities.   Scott also relies upon a police officer's testimony that he had not verified whether there had been any evidence of card playing or pool playing in the victim's basement as proof that Enis and Portman had lied about their own involvement.

**3  Whether a conviction is supported by the weight of the evidence depends upon whether the inclination of the greater amount of credible evidence presented at trial supports one side of the issue rather than the other. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. If there is substantial evidence in the record that, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt, a court of appeals may not reverse a conviction as against the manifest weight of the evidence. *State v. Walker* (1978), 55 Ohio St.2d 208, 213, 378 N.E.2d 1049.

The record contained ample evidence to support Scott's conviction for Thomas's murder.    We acknowledge that there were some noteworthy contradictions or gaps in the testimony of Enis and Portman that which could have raised questions in the jurors' minds about whether they had disclosed the full extent of their activities at Thomas's house the night of the murder.    However, Enis and Portman did not

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

waiver in their testimony that Scott had been the gunman or that Scott had directed their actions after the murder. These facts were corroborated by other evidence, such as the testimony of Scott's friends and of Portman's aunt that he had admitting to shooting Thomas and his possession of the stolen items. Moreover, the statements of these witnesses did not lack credibility any more than Scott's own statement to the police that he had never been to Thomas's house, notwithstanding the testimony of numerous witnesses placing him either in the house or in its vicinity with Enis and Portman on the night of the murder. In response to Scott's reliance on the police officer's testimony about the crime scene, we simply note that the officer did not refute Enis's and Portman's claims that they had been playing pool and listening to the radio; he merely stated that, in examining the room, he had not verified those claims.

Although all of the events surrounding the murder may not have been thoroughly explained, the greater amount of credible evidence supported a finding of guilty. Moreover, the jury had substantial evidence before it that, if believed, could have convinced it beyond a reasonable doubt that Scott had murdered Thomas. Thus, the jury's verdict was not against the manifest weight of the evidence.

The first assignment of error is overruled.

II. THE TRIAL COURT ERRED BY ALLOWING THE STATE TO CALL A WITNESS TO THE STAND THAT THE STATE DID NOT DISCLOSE IN A TIMELY MANNER.

Scott claims that he was unfairly surprised by the state's revelation, on the third day of his trial, that it had located a woman named Kristy Browning and intended to call her as a witness at trial. Scott contends that he was prejudiced by the trial court's unreasonable decision to allow Browning's surprise testimony and that "foreknowledge of the fact that Ms. Browning was going to testify would have helped Appellant's case." Browning's testimony helped place Scott in Bellefontaine, Ohio, on December 6, 1996, where he had allegedly disposed of the murder weapon, although Browning testified that she never saw a weapon in Scott's possession.

**4 In response to Scott's objection to Browning's testimony, the state explained that it had been working with the Bellefontaine Police Department in an effort to identify Browning as a witness for some time and that it had exercised due diligence in trying to find her. The state indicated that the witness's name and address

had first been identified the same afternoon as her identity had been disclosed to defense counsel. The defense indicated its willingness to accept as true the state's representation that it had been looking for Browning but had not known her name. The trial court permitted the state's late disclosure of Browning as a witness based upon its inability to identify her earlier. Browning testified five days later.

Crim.R. 16(E)(3) permits a trial court to prohibit an undisclosed witness from testifying if the party intending to call the witness has failed to comply with the discovery rules. Here, however, there is no evidence that the state failed to comply with Crim.R. 16. The state asserted that it had not known Browning's name or address until the date of disclosure, and the defense did not challenge this assertion. It goes without saying that the state had no duty to disclose information about Browning pursuant to Civ.R. 16 until it possessed such information. Moreover, Scott has failed to demonstrate that he was prejudiced by the late disclosure. The defense was aware that, under the state's theory of the case, Scott had disposed of the murder weapon in Bellefontaine. In fact, the defense presented a witness, William Cobb, who testified that Scott had traveled to Bellefontaine a few days after the murder but that he had not seen a weapon in Scott's possession. Further, Browning's testimony that Scott had been in Bellefontaine but that she had not seen him with a weapon did not significantly bolster the state's theory that the weapon may have been disposed of in Bellefontaine. Thus, although it may have been "beneficial" to the defense's case to know at an earlier date that Browning would testify, we are unpersuaded that knowledge of her testimony would have had any significant effect on Scott's defense strategy or trial preparation. Under the circumstances presented, the trial court did not err in permitting Browning to testify.

The second assignment of error is overruled.

III. THE TRIAL COURT ERRED WHEN IT REFUSED TO SUPPRESS THE VIDEOTAPED STATEMENT THAT APPELLANT MADE TO THE SPRINGFIELD POLICE DEPARTMENT.

Scott claims that it was apparent from the videotape of his interview with police officers that he was "under the influence of something" and "clearly in no condition to voluntarily waive his right to remain silent." Scott also claims that his alleged intoxication explained the inconsistencies in his statements and that these inconsistencies caused the jury to view him in a negative light. For these reasons, Scott contends that

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

the videotaped interview should have been suppressed.

Scott presented no evidence except for the videotape itself in support of his claim that he had been intoxicated at the time of the interview with police officers. Thus, he relies exclusively on his appearance and conduct, as reflected on the videotape, in arguing that he was too intoxicated to make a voluntary statement.

**5    At the outset, we note that evidence of intoxication, without more, does not compel the conclusion that a statement to police was made involuntarily and must be suppressed. *State v. Stewart* (1991), 75 Ohio App.3d 141, 147, 598 N.E.2d 1275; *State v. Christopher* (April 27, 1989), Montgomery App. No. 10870, unreported.    A defendant must demonstrate that he was intoxicated to such a degree as to render the waiver of his constitutional rights involuntary in order to prevail on such an argument. *Christopher, supra.* Scott has clearly failed to meet this burden.    Nothing about Scott's behavior or appearance on the videotape compels the conclusion that he was under the influence of alcohol or drugs. Scott walked into the interview room without assistance and without difficulty.    Although he mumbled or spoke with his head bowed in portions of the interview, his speech was not slurred and he had no trouble recollecting specific facts from the previous days, such as the amount he had charged at the BP gas station, how the gas pump had worked, and the approximate spelling of the name on the credit card that he had used. Scott also knew what day it was, indicated his understanding that he was not required to talk with the police officers, and signed the waiver of rights form without difficulty. Based on this evidence, the trial court reasonably rejected Scott's claim that he was so intoxicated as to require suppression of the videotaped interview.

The third assignment of error is overruled.

IV. THE TRIAL COURT ERRED BY REFUSING TO SUSTAIN APPELLANT'S MOTION FOR A MISTRIAL, OR AT THE VERY LEAST A CONTINUANCE, WHEN IT BECAME KNOWN THAT THE STATE FAILED TO PROVIDE CERTAIN CRUCIAL DISCOVERY.

Scott contends that trial court should have granted a continuance or a mistrial due to the state's failure to disclose statements made by Keith Donohoe about his conversations with Scott in the days following the murder. Donohoe had not mentioned the alleged statements in his two interviews with police officers,

but the state became aware of the statements through discussions with an investigator. The state then elicited testimony about the statements in its direct examination of Donohoe.    Scott claims that Donohoe's trial testimony was "markedly different" from what he had told the defense prior to trial and that Scott was "severely prejudiced" by the new information.    The state contends that it complied with Crim.R. 16(B) and that it was not required to disclose Donohoe's statements because Donohoe related those statements to an investigator, not to a law enforcement officer. Scott apparently concedes that disclosure of the statements at issue was not compelled by Crim.R. 16. He asserts, however, that Loc.R. 5(D) required disclosure of the statements. Scott acknowledges that the Loc.R. 5(D) had been ruled unenforceable, but he claims that the state should have been bound by the rule because the state gave "the defense attorneys the impression that [it would] comply with the local rule" by not objecting to it.

**6. A local court may enact rules of practice so long as those rules are not inconsistent with those adopted by the supreme court. Article IV, Section 5(B) of the Ohio Constitution. We have held that Loc.R. 5 of the Clark County Court of Common Pleas requires the production of materials privileged and excluded from discovery by Crim.R. 16(B)(2), and that because the rule in inconsistent with Crim.R. 16(B)(2), a rule of the supreme court, its terms are invalid and unenforceable. *State v. Qualls* (June 6, 1997), Clark App. No. 96-CA-68, unreported, citing *State v. Lambert* (March 16, 1993), Montgomery App. No. 13483, unreported. Because we have expressly held that the rule is invalid and unenforceable, the state had no obligation to conduct discovery in accordance with that rule, and Crim.R. 16(B) controlled. *Lambert, supra.* Crim.R. 16(B)(2) states that it "does not authorize the discovery or inspection of * * * statements made by witnesses or prospective witnesses to state agents" except as otherwise provided by the rule. Although the status of the investigator is not clear from the record, even if we presume that he was a state agent, the state was not required to provide the defense with the statements made to the investigator.    Accordingly, the state's failure to provide Scott with Donohoe's statements to an investigator did not require the trial court to declare a mistrial or to grant a continuance.

Moreover, we are unpersuaded that Scott suffered any significant prejudice as a result of Donohoe's trial testimony.    Donohoe was thoroughly cross-examined about contradictions between his statements to the police and his trial testimony, and he denied having made to the police substantial portions of the

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

1998 WL 350878, State v. Scott, (Ohio App. 2 Dist. 1998)

statements attributed to him by the police. Donohoe also readily admitted that he had initially lied to the police because he had not wanted to become involved in their investigation and that he had had a prior felony conviction. Under these circumstances, it is unlikely that the jury found Donohoe to be a very credible witness. Further, although Donohoe was the only witness to provide any information about what may have happened to the murder weapon, the information he provided was scant, and we disagree with Scott's assessment that this testimony was key to the state's case. The weapon was never found, and it appears that the jury found ample evidence to convict Scott without a thorough explanation of how he had disposed of the murder weapon. Thus, the trial court could have reasonably concluded that the possible prejudice suffered by Scott due to Donohoe's undisclosed statement did not warrant a mistrial or a continuance.

The fourth assignment of error is overruled.

The judgment of the trial court will be affirmed.

YOUNG, P.J. and BROGAN, J., concur.

Copyright (c) West Group 2001 No claim to original U.S. Govt. works

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

$\cap \cap \circ 7 - 5 8$

EXHIBIT

exhibit

3

STATE OF OHIO                          :

        Plaintiff                  :

   -vs-                               :

ANDRE D. SPEARS                        :

        Defendant                 :

No. B-870230

SEPARATE OPINION

OF THE PANEL

On February 18, 1987, Andre D. Spears was indicted by the Hamilton County Grand Jury, charging him with Aggravated Murder with a specification.

The indictment alleged that the offense occurred on January 4, 1987, and involved the murder and robbery of Eugene Webb.

Subsequent to the defendant being indicted, he was arraigned on February 20, 1987 and a jury was drawn on March 19, 1987. On May 14, 1987 the Court heard and overruled a Motion to Suppress the defendant's statement to the police. Trial with a jury was then scheduled for June 30, 1987, but before jury selection the defendant advised the Court that he wished to waive trial by jury and elected to be tried before a Three Judge Panel. The defendant was advised of his rights and a jury waiver was accepted by the Court on June 10, 1987.

The members of the Panel were the Honorable Richard A. Niehaus and the Honorable Gilbert Bettman, with the Honorable Donald L. Schott.

FILED

SEP 22 1987

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

The trial began before the Panel on August 10, 1987 and progressed each day thereafter until its conclusion on August 13, 1987. The Panel heard testimony at trial from eleven (11) witnesses for the State and two (2) witnesses for the defense. The defendant did not testify but the statement he gave police on January 7, 1987 was admitted into evidence. During the trial, the Panel admitted and considered exhibits on behalf of the State of Ohio, and exhibits on behalf of the defendant.

After final arguments, the Panel retired and considered the evidence. It was the unanimous finding of the Court that the State of Ohio had proven all of the elements of the charge of Aggravated Murder beyond reasonable doubt, and that the defendant was guilty of Aggravated Murder as charged in the indictment. The Panel deliberated further and unanimously concluded that the State of Ohio had also proven all of the elements of the specification contained in the indictment and that the defendant was guilty of that specification.

Following the announcement of the findings of the Panel, the matter was adjourned until September 2, 1987, at which time the Panel heard evidence in mitigation of the death penalty. Pursuant to the defendant's request, a presentence investigation and mental examination were made and prepared in accordance with Sec. 2929.03 (D)(1) and 2947.06 of the Revised Code. The presentence investigation and mental examination were delivered to the Panel and all parties prior to the mitigation hearing.

At the mitigation hearing, the Panel heard from six (6) witnesses for mitigation together with an oral unsworn statement given by the defendant. In addition to the testimony of the witnesses and the oral unsworn statement of the defendant, the Panel admitted three (3) exhibits, consisting of a neighborhood petition for mercy on behalf of the defendant, the presentence investigation, and the clinical psychologist's mental examination report.

Following the arguments of counsel, the Panel retired to consider the issue of aggravating circumstances against the mitigating factors.

The Panel was unable to reach unanimous agreement that the State had proved beyond reasonable doubt that the aggravating circumstances outweighed the mitigating factors.

The Panel next considered the imposition of a life sentence without eligibility for parole until after having served thirty and twenty (30) and (20) full years imprisonment. The Panel was unanimous in agreement that a life sentence without eligibility for parole until after having served 20 full years of imprisonment was the proper sentence.

Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and presentence and mental examination reports, the Panel was unable to find that the aggravating circumstances outweighed the mitigating factors.

There is no question that the offense committed by the defendant was brutal and excessively violent. Likewise, the existence of the Aggravated Robbery of the victim's apartment made an

- 3 -

already heinous crime even more outrageous. However, the mitigating circumstances in this case are numerous and compelling, at least in so far as they warrant sparing the defendant's life.

First and foremost, the Court believes the limited mental capacity of the defendant requires great consideration. The clinical psychologist performing the mental examination, Dr. Nancy Schmidtgoessling, testified at the mitigation phase that the defendant was of low intelligence, bordering on mental retardation. In addition, the psychologist found the defendant was of a non-violent nature and that in her opinion the murder would not have occurred absent some provocation by the victim. This opinion was reinforced by a school teacher who had taught the defendant for nearly two years, the defendant's prior school and court histories, and the testimony of a former employer of the defendant.

Dr. Schmidtgoessling also reported that the defendant would be a good candidate for rehabilitation. The infusion of structure and order into the defendant's previously unstructured and fatherless childhood was felt to have significant potential for reforming the defendant.

The Panel was also persuaded by the possibilities of provocation and facilitation by the victim. Knowing the defendant to be a young man of low intelligence, the victim nevertheless invited the defendant into his apartment and gave the defendant money, drugs, and alcohol for sexual activities. The defendant's unsworn statement during the mitigation phase also matches up consistently with the defendant's initial statement given by him to the police when he was arrested. These statements identify the victim as the initiator of

- 4 -

the violent conduct. Specifically, the defendant claims the victim was attempting to sexually molest the defendant and the defendant's actions were precipitated by this assault, resulting in his being emotionally overwhelmed and feeling trapped. In this connection it should be noted that the evidence was that the door of the victim's apartment had a special lock which prevented it being opened from the inside without a key.

Additionally, the defendant was only three (3) months over the age of 17 at the time of the offense and had no significant history of criminal convictions. His only prior contact with the court system was a juvenile court minor theft offense.

In conclusion, the totality of the circumstances draws the Panel to the unanimous decision that the aggravating circumstances in this case do not outweigh the mitigating factors, which are numerous and credible. The sentence reflects this decision.

Gilbert Bettman, Judge

Richard A. Niehaus, Judge

Donald L. Schott, Judge

*76228    NOTICE: RULE 2 OF THE OHIO
SUPREME COURT RULES FOR THE REPORTING
OF OPINIONS IMPOSES RESTRICTIONS AND
LIMITATIONS ON THE USE OF UNPUBLISHED
OPINIONS.

### STATE of Ohio, Plaintiff-Appellee,
v.
### Andre D. SPEARS, Defendant-Appellant.

### No. C-870619.

Court of Appeals of Ohio, First District,
Hamilton County.

Oct. 5, 1988.

Criminal Appeal From: Court of Common Pleas.

Arthur M. Ney, Jr., Prosecuting Attorney, Christian J.
Schaefer, Steven Tolbert, and Julie Wilson, County
Courthouse, Cincinnati, for plaintiff-appellee.

Richard F. Spencer, Jr., Cincinnati, for defendant-
appellant.

#### DECISION.

PER CURIAM.

**\*\*1** This cause came on to be heard upon the appeal,
the transcript of the docket, journal entries and original
papers from the Court of Common Pleas of Hamilton
County, the transcripts of the proceedings, the
assignments of error, the briefs and the argument of
counsel.

Appellant Andre Spears was indicted on one count of
aggravated murder (R.C. 2903.01), with the
specification that the homicide occurred while
appellant attempted or committed a robbery, or in
immediate flight therefrom. See R.C. 2929.04(A)(7).
A panel of three judges conducted the trial, and the
panel found appellant guilty as charged. At sentencing,
the panel decided not to impose the death penalty upon
its finding that the aggravating circumstance did not
outweigh the mitigating factors. Appellant instead
received a term of life in prison, with eligibility for
parole after twenty years.

At the time of the homicide, appellant was eighteen
years old and a junior at Withrow High School. He
stood over six feet tall and was of medium build. He
possessed very limited reading and comprehension
skills.

The victim, Eugene Webb, was sixty-five years old
and had partially occluded cardiac arteries. Evidence
showed that Webb had a proclivity for engaging with
young men in homosexual activity. For approximately
one year before his death, he had a relationship with
appellant in which appellant would submit to fellatio in
return for money and alcohol.

The evidence reasonably allows the following facts to
be found. One evening in early January of 1987,
appellant went to Webb's apartment. Webb made
homosexual advances to appellant, who resisted the
overtures. They went into the bedroom, and appellant
hit Webb in the temple with a chip hammer. The
attack continued in the hall, but Webb managed to free
himself and to gain refuge behind the locked bathroom
door. Appellant obtained a screwdriver and knife from
the kitchen. He removed the doorknob from the
bathroom door, and when the door opened, he cut and
stabbed Webb with the knife and screwdriver,
ultimately inflicting over eighty wounds, including
fractures of the rib and sternum and punctures of the
lungs and carotid artery. In the course of the attack,
appellant himself received a cut on the palm of his
right hand. Appellant removed a stereo, money and
jewelry but left behind a bloody pillowcase containing
other items. A friend of Webb's discovered the nude
body, which was lying in a pool of blood by the
bathroom.

Police apprehended appellant at school a few days
later. Appellant gave a taped statement in which he
explained his version of what had occurred. He went
to Webb's apartment to obtain rolling papers for
marijuana cigarettes. Webb served him a couple of
drinks, and as appellant smoked some marijuana he felt
the intoxicating effects. Appellant called a girl whom
he had met at a recent party that he and Webb had
attended. Webb picked up the phone in the bedroom
and, upon hearing the girl's voice, became angrily
jealous and yanked the plug from the jack.

**\*\*2** He attempted to force himself sexually on
appellant, who retreated to the bedroom. The smaller
Webb pinned appellant on the bed. Fearful and
intoxicated, appellant grabbed a nearby chip hammer
and struck Webb in the temple, thus managing to
escape to the bathroom. Webb then removed the knobs
to the bathroom door, which remained secure
nonetheless. Appellant suffered a cut to the palm of his
hand when he wrested from Webb a butterknife that
Webb had thrust through the aperture left by the
removal of the knobs. Taunting appellant while
donning his trousers, Webb feigned departure for

Copyright (c) West Group 1999 No claim to original U.S. Govt. works

EXHIBIT
4

medical care.

Thinking that Webb had left, appellant emerged from the bathroom, only to be jumped by Webb as he lay in wait. As the struggle progressed, appellant located a knife and a screwdriver and began stabbing Webb. Then occurred the following, in appellant's own words:

\* \* \*

\* \* \*

An' uh I stabbed 'im like two times, an' he was still comin' at me. He jus' kept comin' at me so I kept stabbin' 'im. An' then when he us stopped comin' at me he jus' leaned up, holdin' on the wall, that's when I lef' 'im alone. He wasn' comin' at me. Then I tried ta get in there an' get my coat on an' everything. Then he, he start screamin', start screamin' real loud an' I jus' went in there an' I aske' 'im be quiet. He wouldn' be quiet so I, I stabbed 'im again.

\* \* \*

\* \* \*

Yeah he fell on, he was holdin' onto the wall goin' through the hallway, then he start hollerin' an' everything cause I, like I sai', I, I stabbed 'im with the little knife about four times. I didn't stab 'im, I just slashed 'im an' then he, he, he quit comin' at me then. He jus' holdin' on the wall holdin' hisself. Then I was gonna get my jacket an' leave. An' he seen me goin' towards his door an' then he start screamin' help, help, Eli, Eli. An' then I guess, then I killed 'im.

\* \* \*

\* \* \*

When it happened I sat there for a minute. After it was over with I sat there an' he still wouldn' die. He, he didn' keep on screamin' anymore. He got so scared an' he was still alive. I, I tried to defend myself but I didn't want it ta come down to murder or anything. Tha's all I was tryin' to do was defend myself cause I was, you know, kind'a intoxicated. But I know I couldn't leave his body there if he would'a been alive cause all I could say I was intoxicated an' everything an' he tried to attack me, but the evidence probably wouldn' prove it that way. It'd uh prove that I went off on him or somethin' but ...

\* \* \*

\* \* \*

I just couldn't leave, I jus' couldn't leave the body there after I had stabbed 'im because if he would'a got to a hospital or somethin' they would uh, they come an' arrest me, you know, because I was at his house an' he got the, well he got the cut wounds an' I jus' got the little bruise, you know, hand an' the head, tha's uh so tha's why I jus' tried ta, I, I, I jus' couldn' leave im' there. Tried to walk away from 'im but I couldn't.

\* \* \*

\* \* \*

Appellant called a friend, and the two began removing items from Webb's apartment. They placed other articles in a pillowcase that they left by the front door. The friend then gave appellant a ride home.

\*\*3. In his first assignment of error, appellant contends that his conviction is based on insufficient evidence. If reasonable minds can differ as to whether each element of the offense has been proved beyond a reasonable doubt, then sufficient evidence exists upon which to ground the conviction. See *State v. Eley* (1978), 56 Ohio St.2d 169, 383 N.E.2d 132. The body of evidence in the instant case includes appellant's statement, the death of another human being, appellant's agency and robbery, all of which is sufficient to demonstrate that appellant violated R.C. 2903.01(B). Cf. *State v. Williams* (1986), 23 Ohio St.3d 16, 490 N.E.2d 906. The first assignment of error lacks merit.

Appellant next remonstrates that the judgment of conviction is against the manifest weight of the evidence. To resolve this claim, we must review the entire record, weigh the evidence, consider the credibility of the witnesses and determine whether, in analyzing conflicts in the evidence, the triers of fact lost their way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial conducted. *State v. Martin* (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. The weight of the evidence indicating appellant's guilt is overwhelming. Appellant's statement to the police corroborates the inferences which the physical evidence justifies. We overrule the second assignment of error because we cannot say that the triers of fact lost their way in evaluating the evidence.

The third assignment of error is that the judgment is contrary to law because the conviction is based solely on circumstantial evidence that is entirely consistent

Copyright (c) West Group 1999 No claim to original U.S. Govt. works

1988 WL 76228, State v. Spears, (Ohio App. 1 Dist. 1988)

with appellant's reasonable theory of innocence. (FN1)
Appellant's fundamental assertion is that the state did
not prove that he had formed the intent to rob Webb
before the murder, and thus the state failed to show that
he caused Webb's death while attempting, committing
or fleeing after attempting or committing robbery.

The case of *State v. Williams, supra,* is completely
dispositive. In *Williams,* the defendant had visited an
elderly woman at her home one evening.    Police
discovered her body in her house, along with scattered
coins, bank envelopes, an empty purse and a
disconnected phone.    The defendant confided to
cellmates that he had killed the woman to silence her.
The Supreme Court sustained the conviction for
murder and the specification of R.C. 2929.04(A)(7).

Similarly, in the case *sub judice,* appellant admitted
killing Webb, and evidence of a robbery was abundant.
The time at which appellant formed the intent to rob
was a question of fact, and in determining that question
the three-judge panel opted to disbelieve appellant and
to conclude that any reasonable theory of innocence
had been eliminated. See *State v. Williams, supra* at

20-21, 490 N.E.2d at 911.    The third assignment of
error must be rejected.

Accordingly, the judgment of the trial court is
affirmed.

BLACK, P.J., and DOAN and KLUSMEIER, JJ.,
concur.

FN1. Appellant's assignment of error states the rule of
*State v. Kulig* (1974), 37 Ohio St.2d 157, 309 N.E.2d
897, in the positive.    Compare the Court's
pronouncement in *Kulig, supra* at 160, 309 N.E.2d at
899:

\* \* \*

It is settled that where circumstantial evidence alone
is relied upon to prove an element essential to a
finding of guilt, it must be consistent only with the
theory of guilt and irreconcilable with any reasonable
theory of innocence.

\* \* \*

Copyright (c) West Group 1999 No claim to original U.S. Govt. works

SEISep.25. 2003 5:14PM   Murray Murphy Moul Basil                      No.3273708P. 25/26

CC88131

20  AH0: 14

IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO

STATE OF OHIO,                          :        CASE NO. 88-CR-3178

                         Plaintiff,     :        (Judge William MacMillan, Jr.)

        vs.                             :        OPINION AND SEPARATE FINDINGS
                                                 OF MITIGATING FACTORS
EDDIE ROBERTSON,                        :

                         Defendant.     :

                    * * * * *

**EXHIBIT**
5

        This Court finds from the evidence presented that the

Defendant is a youthful offender of thirty years; that he has a

lack of significant history of prior criminal convictions and

delinquency adjudications, and that the following other factors

are significant and are of sufficient weight to counter the weight

of the aggravating circumstances.

        The "other mitigating factors" mentioned in R.C.

2929.03 (F) allows this Court to consider that the Defendant

had no advance plan to harm the employees or patrons of the place.

There is no evidence of any acts of torture.  There is no

evidence that the shooting of Stephanie Hiatt was in furtherance

of organized crime or a part of a criminal business.  The Defendant

was not hired to kill the victim nor was he shooting in

retaliation or to silence witnesses to a prior crime.  The

evidence indicates the Defendant's decision to shoot Stephanie

FILED was impulsive and not planned.  The Defendant pursued

APR 2  education beyond the high school level.  His family considers him

RCIA J. MENGEL, CLERK
PREME COURT OF OHIO

SEISep.25. 2003⁵ 5:14PM   Murray Murphy Moul Basil                      No.3273708P. 26/26
Case 1:00-cv-00493-GLF-MRM   Document 89-2   Filed 09/25/2003   Page 26 of 26

2

a valued member of the family.

These factors provide consideration for mitigation of the death penalty.

The aggravating circumstances were found by the jury to be those listed under R.C. Section 2929.04 (A)(3), 2929.04 (A)(5) and 2929.04 (A)(7) which are respectively:

(A)(3)  The offense was committed for the purpose of escaping detection or apprehension for the aggravated robbery committed by the Defendant;

(A)(5)  The offense was committed as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons;

(A)(7)  The offense was committed while the Defendant was committing, attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery and was the principal offender in the commission of the aggravated murder.

In weighing the mitigating factors against the aggravating circumstances, this Court cannot find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

The reason why the Court cannot find the aggravating circumstances are sufficient to outweigh the mitigating factors is included in the first two paragraphs of this opinion.

Copies of the above are sent today to all parties listed below by ordinary mail.

William MacMillan, Jr., Judge

PROSECUTOR'S OFFICE
ATTORNEYS FOR DEFENDANT
COURT OF APPEALS OF MONTGOMERY COUNTY
CLERK OF OHIO SUPREME COURT
KAY JOHNSON, Bailiff