UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Bobby T. Sheppard, | : | Death Penalty Case |
| | : | |
| Petitioner, | : | Case No. 1:00cv493 |
| | : | |
| -vs- | : | Judge Walter Herbert Rice |
| | : | |
| Margaret Bagley, Warden, | : | Magistrate Judge Merz |
| | : | |
| Respondent. | : | |

---

### PETITIONER'S LIMITED OBJECTIONS TO THE REPORT AND RECOMMENDATIONS OF JUNE 1, 2004

---

Magistrate Judge Merz correctly found that this Court should issue a writ of habeas corpus on Petitioner's Fifth and Tenth Grounds for relief, both of which arise directly or indirectly from the prosecutorial misconduct of the Hamilton County Prosecutor's Office. Additional bases exist on which a writ of habeas corpus should also have been granted as well. Accordingly, Sheppard hereby respectfully submits a limited set of objections to portions of the Report and Recommendation.

Respectfully submitted,

**s/Geoffrey J. Moul**
Geoffrey J. Moul (0070663)
Murray Murphy Moul + Basil LLP
326 S. High Street / Suite 400
Columbus, Ohio 43215
Telephone: (614) 469-0400
E-mail: moul@mmmb.com

Timothy R. Payne (0069329)
Assistant State Public Defender
Office of the Ohio Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215
Telephone:  (614) 466-5394

Counsel for Petitioner Bobby Sheppard

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                                     iii

TABLE OF AUTHORITIES                                                                           vi

INTRODUCTION                                                                                          1

I.      Objection to Report and Recommendation On the Seventh Ground For
        Relief:  Juror Stephen Fox Deprived Sheppard Of His Right to a Trial
        Based On the Evidence                                                                      1

        A.      Sheppard's Defense Revolved Around Dr. Smalldon's
                Unrebutted Diagnosis                                                              1

        B.      Juror Fox Had Doubts About His Verdict of Death, So He Phoned
                And Relied Upon Dr. Helen Jones to Remove Those Doubts          2

        C.      Despite Those Admissions, Judge Crush and Now the Magistrate
                Incorrectly Denied Sheppard a Fair Trial                                   4

        D.      The Magistrate Applied the Wrong Standard Under the AEDPA    5

        E.      In Any Event, Under Any Standard of Review, It Was
                Unreasonable to Conclude No Prejudice Existed                         6

                1.      Fox's Actions And the Whole of His Testimony
                        Overwhelmingly Establish Prejudice                              6

                2.      Even Aside From Fox's Admissions of Prejudice, Jones'
                        Statement Was Likely To Cause Prejudice                        9

II.     Objection to Report and Recommendation on the First Ground for
        Relief:  The Trial Court Violated Petitioner's Constitutional Rights to Due
        Process and an Impartial Jury for the Penalty Determination in a Capital
        Case by Wrongly Excusing for Cause a Prospective Juror Because of Her
        Views on Remorse as a Mitigating Factor                                         12

        A.      Merits Argument                                                                    12

                1.      Ms. Wells' Excusal for Cause Was Wrong.  She Met the
                        Standard for Jury Service in a Capital Case Under the
                        Relevant Supreme Court Decisions.                               16

        B.      Magistrate Judge's Decision                                               18

        C.      Objection                                                                            19

|  | 1. | Procedural Default | 19 |
|  | 2. | Merits | 22 |

III. | Objection to Report and Recommendation on the Third Ground for Relief:  The Trial Court Violated Petitioner's Constitutional Rights By Excluding Relevant Evidence Offered By the Defense at Mitigation | 25 |

A. | Merits Argument | 25 |
B. | Magistrate Judge's Decision | 31 |
C. | Objection | 32 |

IV. | Objection to the Report and Recommendation on the Fourth Ground for Relief (subpart 4):  The Trial Court Erred When it Refused the Defense Request To Instruct Jurors That They Could Consider One of the Life Sentences If They Could Not Unanimously Agree On Death | 34 |

A. | Merits Argument | 34 |
B. | Magistrate Judge's Decision | 38 |
C. | Objection | 39 |

1. | Coe, Scott and Roe are Not Controlling | 39 |

a. | Coe | 39 |
b. | Mapes | 40 |
c. | Scott (Federal District Court) | 43 |
d. | Scott (Sixth Circuit) | 45 |
e. | Roe | 47 |

2. | The *Davis* Court Got the Analysis Right | 48 |

V. | Objection to Report and Recommendation on the Fifth Ground for Relief:  Additional Instances of Prosecutorial Misconduct Existed | 50 |

VI.     Bobby Sheppard's Convictions and Death Sentence are Invalid as a
        Result of the Cumulative Effect of the Constitutional Errors in the Jury
        Instructions, Exclusion of Relevant Mitigating Evidence, Prosecutorial
        Misconduct, and Juror Misconduct in Violation of the Fifth, Sixth, Eighth
        and Fourteenth Amendments                                              51

        A.     AEDPA Standard of Review                                         51

        B.     Procedural Bar To This Claim                                     51

        C.     Merits                                                           51

CONCLUSION                                                                      54

CERTIFICATE OF SERVICE                                                          55

APPENDIX                                                                        A1

## TABLE OF AUTHORITIES

### CASES

*Adams v. Texas,* 448 U.S. 38 (1980)                                   22, 23, 24

*Anderson v. Ford Motor Co.,* 186 F.3d 918 (8th Cir. 1999)            6

*Andres v. United States,* 333 U.S. 740 (1948)                        54

*Beck v. Alabama,* 447 U.S. 625 (1980)                                54

*Boyle v. Million,* 201 F.3d 711 (6th Cir. 2000)                      53

*Brecht v. Abrahamson,* 507 U.S. 619 (1993)                           31

*Brown v. Marshall,* 704 F.2d 333 (6th Cir. 1983)                     21

*Bryson v. Ward,* 187 F.3d 1193 (10th Cir. 1999)                      32

*Burger v. Kemp,* 483 U.S. 776 (1987)                                 54

*Caldwell v. Mississippi,* 472 U.S. 320 (1985)                        48

*California v. Brown,* 479 U.S. 538 (1987)                            30

*California v. Ramos,* 464 U.S. 992 (1983)                            54

*Coe v. Bell,* 161 F.3d 320 (6th Cir. 1998)               38, 39, 40, 43, 45, 47, 48

*Cooper v. Sowders,* 837 F.2d 284 (6th Cir. 1988)                     52

*Davis v. Georgia,* 429 U.S. 122 (1976)                               21

*Davis v. Mitchell,* 318 F.3d 682 (6th Cir. 2003)         36, 37, 38, 39, 48, 49

*Eddings v. Oklahoma,* 455 U.S. 104 (1982)                            32, 34

*Emmert v. State,* 187 N.E.2d 862 (Ohio 1933)                         43

*Francis v. Franklin,* 471 U.S. 307 (1985)                            48

*Gall v. Parker,* 231 F.3d 265 (6th Cir. 2000)            16, 17, 22, 23, 24

*Gray v. Mississippi,* 481 U.S. 648 (1987)                            18

*Gregg v. Georgia,* 428 U.S. 153 (1976)    29

*Harris v. Reed,* 4889 U.S. 255 (1989)    21

*Henderson v. Collins,* 262 F.3d 615 (6th Cir. 2001)    47

*Hitchcock v. Dugger,* 481 U.S. 393 (1987)    32, 34

*Hunt v. Mitchell,* 261 F.3d 575 (6th Cir. 2001)    6

*Jeffries v. Wood,* 114 F.3d 1484 (9th Cir. 1997)    7

*Knight v. Dugger,* 863 F.2d 705 (11th Cir. 1988)    32

*Koontz v. Glossa,* 731 F.2d 365 (6th Cir. 1984)    20

*Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th Cir. 1990)    45

*Kubat v. Thieret,* 867 F.2d 351 (7th Cir. 1989)    35, 45

*Levine v. Torvik,* 986 F.2d 1506 (6th Cir. 1993)    20

*Lockett v. Ohio,* 438 U.S. 586 (1978)    29, 32, 33, 34

*Madrigal v. Bagley,* 276 F.Supp. 744 (N.D. Ohio 2003)    38

*Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999)    39, 40, 41, 42, 44, 45, 46, 47, 48

*Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986)    19

*McCleskey v. Kemp,* 481 U.S. 279 (1987)    29

*McKoy v. North Carolina,* 494 U.S. 433 (1990)    30, 36

*Mills v. Maryland,* 486 U.S. 367, 108 S. Ct. 1860 (1988)    36, 44, 48

*Nevers v. Killinger,* 169 F. 3d 352 (6th Cir. 1999)    5

*O'Connell v. Straub,* 2003 WL 22782413 (6th Cir. 2003)    5, 6

*Picard v. Connor,* 404 U.S. 270 (1971)    19, 20, 21

*Pope v. Netherland,* 113 F.3d 1364 (4th Cir. 1997)    20

*Remmer v. U.S.,* 350 U.S. 77 (1956)    6

*Ried v. Covert,* 354 U.S. 1 (1957)                                                54

*Rodrigues v. Hoke,* 928 F.2d 534 (2nd Cir. 1991)                                   52

*Rodriguez v. Marshall,* 125 F.3d 739 (9th Cir. 1997)                               5

*Roe v. Baker,* 316 F.3d 557 (6th Cir. 2002)                          6, 38, 39, 47, 48

*Romano v. Oklahoma,* 512 U.S. 1 (1994)                                          35, 48

*Ross v. Oklahoma,* 487 U.S. 81 (1988)                                             16

*Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994)                                        19

*Sandstrom v. Montana,* 442 U.S. 510 (1979)                                        48

*Scott v. Anderson,* 58 F.Supp.2d 767 (N.D. Ohio 1998)              43, 44, 45, 46, 47

*Scott v. Mitchell,* 209 F.3d 854 (6th Cir. 2000)                               38, 39

*Skipper v. South Carolina,* 476 U.S. 1 (1986)                              32, 33, 34

*Smith v. Phillips,* 455 U.S. 209, 71 L. Ed. 2d 78 (1982)                           6

*State v. Brooks,* 661 N.E.2d 1030 (Ohio 1996)          35, 36, 41, 45, 46, 47, 48, 49

*State v. Brewer,* 549 N.E.2d 491 (Ohio 1990)                                      13

*State v. Brown,* 168 N.E.2d 419 (Ohio Ct. App. 1953)                           42, 43

*State v. Springer,* 586 N.E.2d 96 (Ohio 1992)                      34, 35, 36, 38, 45

*Strickland v. Washington,* 466 U.S. 668 (1984)                                    52

*Taylor v. Mitchell,* 296 F.Supp.2d 784 (N.D. Ohio 2003)                           38

*United States v. Ashworth,* 836 F.2d 260 (6th Cir. 1988)                          52

*United States v. Barfield Co. Inc.,* 359 F.2d 120 (5th Cir. 1966)                  7

*United States v. Emuegbunam,* 268 F.3d 377 (6th Cir. 2001)                         5

*United States v. Parker,* 997 F.2d 219 (6th Cir. 1993)                            51

*United States v. Pierce,* 62 F.3d 818 (6th Cir. 1995)                             51

*Vasquez v. Hillery,* 474 U.S. 254 (1986)                                                            20

*Vigil v. Zavaras,* 298 F.3d 935 (10th Cir. 2002)                                                5

*Wainwright v. Witt,* 4669 U.S. 412 (1985)                        16, 18, 21, 22, 23, 24

*Walker v. Engle,* 703 F.2d 959 (6th Cir. 1983)                                          51, 52

*Witherspoon v. Illinois,* 391 U.S. 510 (1968)                                      18, 21, 22

*Woodson v. North Carolina,* 428 U.S. 280 (1976)                                    29, 30


**STATUTES**

R.C. §2929.03(D)(2)                                                                                            41

R.C. §2929.04(B)(3)                                                                                              1

R.C. §2929.04(B)(7)                                                                                    1, 13, 29

Tenn. Code Ann. Section 39-2404 (1982)                                                    39

28 U.S.C. §2254(d)                                                                                              5

28 U.S.C. §2254(d)(2)                                                                                        6


**OTHER AUTHORITIES**

Diagnostic and Statistical Manual of Mental Disorders
(4th Ed. 1994)                                                                                            10, 11

Liebman and Hertz, Federal Habeas Corpus Practice and
Procedure (3rd Ed. 1998)                                                                              20

## INTRODUCTION

The Magistrate correctly found that the prosecutors engaged in misconduct so as to deny Sheppard a fair trial, and that Sheppard's appellate counsel was ineffective in failing to address some of that misconduct.

The Magistrate should have also found that juror misconduct and other judicial errors similarly deprived Sheppard of a fair trial.

I.    **Objection to Report and Recommendation on the Seventh Ground For Relief:  Juror Stephen Fox Deprived Sheppard of His Right To A Trial Based On The Evidence**

During penalty phase deliberations, Juror Stephen Fox deprived Sheppard of his right to a trial based on the evidence by phoning a former landlady whom he believed to be a psychologist, asking her for a definition of paranoid schizophrenia, and then relying on that definition to make it "easier to vote for death."

   A.    **Sheppard's Defense Revolved Around Dr. Smalldon's Unrebutted Diagnosis.**

During the sentencing phase before a jury, Bobby Sheppard's entire defense in mitigation revolved around his mental illness, paranoid schizophrenia. The Court qualified Dr. Smalldon as an expert, and Dr. Smalldon testified for nearly an entire day on Sheppard's paranoid schizophrenia, for over 118 pages of transcript.  Dr. Smalldon's testimony on Sheppard's paranoid schizophrenia was evidence to be weighed as part of the mitigation process under either R.C. §2929.04(B)(3) (at the time of the offense the offender lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to requirements of law) or R.C. §2929.04(B)(7) (any other factor relevant to whether the offender should be sentenced to death).   Tr. Vol. VI at 1018 - 1135.

1

As recognized and discussed by Judge Merz at length, rather than respond to Sheppard's mitigation case with evidence, the prosecutor engaged in improper personal attacks on the diagnosis of paranoid schizophrenia, repeatedly and unjustifiably alleged underhandedness and dishonesty on the part Dr. Smalldon and the Defense, and asserted improper personal beliefs and appeals to juror ignorance. *See* Report and Recommendations of June 1, 2004.

And, we now know that at least one juror, Stephen Fox, was persuaded and confused by the prosecutor's misconduct, and that juror sought out and relied on extrinsic information to allay his concerns.

**B.    Juror Fox Had Doubts About His Verdict Of Death, So He Phoned And Relied Upon Dr. Helen Jones To Remove Those Doubts.**

Despite judicial admonishments against such conduct (and obviously manifesting reservations about how to vote), during deliberations in the penalty phase, Juror Stephen Fox called Dr. Helen Jones (a friend whom he believed to be a psychologist) to gather additional information on paranoid schizophrenia.    Fox then asked Jones for a definition of paranoid schizophrenia, and Ms. Jones gave Fox a "boiled down" definition of paranoid schizophrenia, stating "those kind of people are not really in touch with reality." Tr. Vol. VII at 1254 – 1259.

At a later hearing on the subject (not under oath), Fox first stated that the information did not influence his deliberations but then stated that in fact the conversation with Jones allowed him to remove whatever reservations he had about a verdict of death (which obviously had been strong enough to cause him to go to the extraordinary measure of calling Jones).  According to Stephen Fox, the information

2

enabled Fox to "affirm what I had, you know, thought, and it was a serious matter and I just had to be—I felt that I had to make sure that I understood."  Tr. Vol. VII at 1255.

In a hearing before Magistrate Judge Merz, Fox reaffirmed that Dr. Jones' statements allowed him to put aside his reservations of death, admitting that phone call made it easier for him to vote for death:

> Q.    …You do agree with me that the information that Ms. Jones gave to you influenced your verdict; is that correct?
>
> A.    I'm sure to some degree, small degree.
>
> Q.    So the answer's yes?
>
> A.    Yes.
>
> Q.    And, again, to use your words [in your deposition], you agree that it contributed to your verdict of death; is that correct?
>
> A.    If that's, yeah, if that's what I said.
>
> Q.    Well irrespective of whether that's what you said, as you sit here today you agree it contributed to your verdict?
>
> A.    Yes, it must have.
>
> Q    …My understanding is at a minimum, it enabled you to affirm your conclusion that Mr. Sheppard was not paranoid schizophrenic; is that correct?
>
> A.    Yes.
>
> ***Q.    So you will agree with me that the information given to you by Mrs. Jones made it easier for you to vote for death?***
>
> A.    I guess, yes.

6/24/2002 Tr. of Evid. Hearing before J. Merz at 137-138.

3

**C.    Despite Those Admissions, Judge Crush and Now the Magistrate Incorrectly Denied Sheppard a Fair Trial.**

Latching on to only one statement by the juror (an initial statement of "no influence" on his verdict) and ignoring the rest of Fox's testimony and the context of Fox's action, the judge indicated that he was satisfied and ready to go forward with sentencing, finding:  "[T]he testimony I heard indicated that the juror was not swayed towards the prosecution by what he heard.  It did not change his opinion."  Tr. Vol. VII at 1259.

And, here, the Magistrate did the same, despite the fact that Fox expressly admitted the influence upon him, and despite Fox's reaffirmation that the call to Jones provided him the comfort he needed to move forward with sentencing, or as he put it, "made it easier" to "vote for death."    6/24/2002 Tr. of Evid. Hearing before J. Merz at 137-138.  Indeed, the Magistrate refused to grant the writ, despite finding that "what Juror Fox did was completely inappropriate and very, very bad business for a juror to be asking questions during the course of deliberations.  And he was, of course, ordered not to do that…" 6/25/02 Tr. of Evid. Hearing before J. Merz Vol. II at 201-202.

In so doing, The Magistrate afforded the state court the presumption of correctness on a finding of no prejudice and concluded:

> Sheppard has not met his burden [of overcoming the presumption because]…Fox has never stated unequivocally that Jones' definition of paranoid schizophrenia influenced him.  In fact, Fox implicitly suggests that Jones' definition had only the potential to help Sheppard when he testified in this Court that he would have voted against the death penalty if Jones' definition had persuaded him that Sheppard was paranoid schizophrenic.  This statement, along with Fox's others that he had not communicated the "boiled down" definition to any of the other jurors, that he had already made up his mind that death was appropriate

4

> prior to his phone call to Jones, and that Jones' definition did not cause him to view the psychological evidence presented at trial differently, fails to meet Sheppard's high burden under the AEDPA.  *See* 28 U.S.C. 2254(d). Sheppard's suggestions that Fox was "uncomfortable" with the prospect of a death verdict, that the prosecutor's allegedly unfair tactics convinced Fox that a second opinion on paranoid schizophrenia was needed and that Fox's phone call to Jones was only a part of his "investigation" (Traverse, Doc. No. 89 at 22) are not apparent in the record.

R&R at 82-83.

The Magistrate is plainly wrong.

### D.     The Magistrate Applied The Wrong Standard Under the AEDPA.

The Magistrate applied the wrong standards of review. The issue of whether misconduct prejudiced a defendant has always been considered a "mixed question of law and fact" by the Sixth Circuit. *U.S. v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001) (whether prosecutorial misconduct was prejudicial is a mixed question); *see also*, *O'Connell v. Straub*, 2003 WL 22782413 (6th Cir. 2003) (issues of whether counsel's action prejudiced Defendant is a mixed question) (attached).  The Sixth Circuit has explicitly stated that whether a Defendant has been prejudiced by extraneous influences on a juror involves an analysis of a "mixed question of law and fact." *Nevers v. Killinger*, 169 F.3d 352, 360 (6th Cir. 1999) (issue of whether pretrial publicity prejudiced Defendant is mixed question).  Indeed, every circuit that has addressed the issue has stated that the issue of "whether juror misconduct has prejudiced a defendant is a mixed question of law and fact." *See, e.g., Vigil v. Zavaras*, 298 F.3d 935, 941-942 (10th Cir. 2002); *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997). Accordingly, the standard of review for this Court is *de novo*. The presumption of correctness "only

applies to basic, primary facts, and not to mixed questions of law and fact…" *Roe v. Baker,* 316 F.3d 557, 562 (6th Cir. 2002).

And, the question this Court must answer in deciding whether to grant Sheppard's habeas petition on juror misconduct grounds is not whether, as the Respondent and the Magistrate concluded, under U.S.C. §2254(d)(2), the state court made an unreasonable determination of the facts, but rather whether the state's decision "involved an unreasonable application of, clearly established law..." *O'Connell v. Straub*, 2003 WL 22782413, **1 (6th Cir. 2003); *Hunt v. Mitchell*, 261 F.3d 575, 580 (6th Cir. 2001).

> **E.     In Any Event, Under Any Standard of Review, It Was Unreasonable To Conclude No Prejudice Existed.**

The Supreme Court has clearly established that Due Process requires a jury willing to "decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 946, 71 L. Ed. 2d 78, 86 (1982). Due Process and the Sixth Amendment require that verdicts be based on evidence in the record, so that the accused can cross-examine witnesses and rebut evidence. Jurors, therefore, are not entitled to conduct outside investigations, *Anderson v. Ford Motor Co*., 186 F.3d 918 (8th Cir. 1999), because they are not permitted to consider extraneous information learned from outside the courtroom. *Remmer v. U.S.,* 350 U.S. 77 (1956).

When all the facts are examined, prejudice has clearly been established beyond any doubt.

> *1.     Fox's Actions And The Whole Of His Testimony Overwhelmingly Establish Prejudice.*

The record in both the state court and this Court establish prejudice. No conclusion to the contrary is reasonable.

First, Fox stated unequivocally that Ms. Jones' comments "influenced his verdict," and made it "easier" for him to "vote for death." 6/24/02 Evid. Hr. Tr. 137-138. Those admissions are uncontroverted. The Report and Recommendation does not even address those admissions. Indeed, it makes no reference to those admissions.

The state trial court (and apparently the Magistrate), however, refused to find prejudice because the trial court latched on exclusively to Juror Fox's initial statement before Judge Crush that he was "not influenced," ignoring the remainder of Fox's testimony in state court, where he admits that he made the call because he needed affirmation and that the call affirmed his belief.

By culling out that one statement and relying on it, this Court is asked to ignore Fox's whole explanation before Judge Crush by what he meant by "no influence" (namely, reaffirmation of his beliefs, which were weak enough he felt compelled to make the improper call). Such reliance also ignores Fox's admission at the evidentiary hearing before this Court that his verdict was in fact influenced, and most importantly, the age old principle that many others have recognized, namely that jurors are often reluctant to disclose and even unable to discern whether they have been influenced by an improper contact. *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir.1997) (*en banc*) (stating that the prejudicial effect of an extrinsic contact "may be substantial even though it is not perceived by the juror, and a juror's good faith cannot counter this effect") (internal quotation omitted); *United States v. Barfield Co. Inc.*, 359 F.2d 120, 124 (5th Cir.1966) (stating that juror's testimony that he was not influenced by a conversation he had with one of the parties about non-trial related matters was not dispositive because "it would no doubt be difficult to have a juror admit that he was influenced by such an approach.").

7

Indeed, the good reason behind the recognition of that principle is evident here, where the Juror first claimed to the state court he had not been influenced, then admitted he was influenced because he was able to reaffirm his vote, and then admitted before Judge Merz that the phone call made it "easier" to "vote for death,"

Judge Crush and the Magistrate Judge are wrong.  There is no doubt Fox was influenced and Sheppard prejudiced.  Fox's actions and testimony demonstrate that Sheppard was prejudiced, because the testimony and actions of Fox establish that Fox had reservations about his vote, that he sought out Ms. Jones so that he would be more comfortable with his vote, and that he then relied upon Ms. Jones' phone call for that comfort.   That is prejudice.

The Magistrate concluded otherwise wrongly.  Given the admonishments of the trial court to the jury and the incredible stakes on the line, it defies credulity to believe that the juror did not have reservations about his vote.  Indeed, the Report and Recommendation ignores its own finding that Fox was uncomfortable about his verdict, where the R&R states : "Fox acknowledged that at the time of the phone call he was not sure whether Sheppard was a paranoid schizophrenic, [and]…phoned Jones…so he could understand what he was 'dealing with.'"  R&R at 80. Thus, it is plainly obvious that Fox sought comfort for his vote.  Fox admits as much when he testified that the call was made to and did "reaffirm" his believes.

The Sixth Amendment does not allow persons to collect extraneous information so they can find comfort in their votes. Comfort is needed where doubts exist.  If this Court requires a defendant to prove any more prejudice than already demonstrated here, therefore, it will be flipping the scales of justice upside down.  In a judicial system such

as ours, where jurors decided cases based on the level of doubt in their minds, it is hard to conceive how external evidence sought out and obtained by a juror in order to resolve some of those doubts could not be considered prejudicial.

In short, Fox's acts, and his admission before Judge Crush that he was seeking reaffirmation, and his admission in this Court that the call made it easier to vote for death must carry the day and demand that Sheppard be given a new trial based on juror misconduct. In Ohio, Fox's reservations about death and his one vote were all that Sheppard needed to avoid death. A Defendant has plainly been prejudiced where any external influences remove even a proverbial ounce of weight from the heavy consideration of a penalty of death.

A writ should be granted.

> **2.  *Even Aside From Fox's Admissions of Prejudice, Jones' Statement Was Likely To Cause Prejudice.***

Even looking at Jones' statement alone, prejudice has been established because of the misleading nature of the statement, caused by its incompleteness. Jones told Fox that paranoid schizrenia was "a communications disorder that a person would have difficulty communicating because of their lack of reality or they have lost touch with reality." 6/25/02 Tr. Evid. Hearing at 171. She also said that "it's hard to communicate with a schizophrenic." *Id*. at 168. As explained below, these oversimplified definitions are not only grossly misleading; they were wrong.[1] The boiled down definition of Juror Fox was also likely to mislead.

---

[1] And, we now know that Jones had no basis to opine that her statements to juror Fox were consistent with Smalldon's testimony; she does not know what the accepted definition or symptoms of paranoid schizophrenia are, and even if she did, she never reviewed Smalldon's trial testimony. Jones is not a psychologist as a matter of Ohio law; Ohio requires anyone holding herself out as a psychologist to be licensed, and she is not and never has been so licensed. 6/25/02 Evid. Hr. Tr. at 163, 165. Rather, she is a human resource consultant who works with businesses and "[f]ocuses primarily on developing

First, the DSM-IV makes it clear that paranoid schizophrenia is not a communication disorder, and it is not a condition in which troubles communicating are typically present. DSM-IV at 287; 6/05/03 Tr. of Evid. Hearing at 20.[2] Rather, communication disorders are such conditions as "stuttering," "phonological disorder," and "expressive language disorder." DSM-IV at 13.

Second, the definition is certainly misleading as well. The problem here is that the statement is grossly overbroad and does not take into account the complicated nature of the disease and the complicated nature of the diagnosis that experts like Smalldon undertake when diagnosing such a serious disease. *See* Tr. Vol. VI at 1060-1135. It's like saying someone is "crazy," which means quite different things to every single person. The harm here, therefore, is that the introduction of that overbroad definition allowed the juror to impose his own subjective beliefs on what it meant to be "out of touch with reality." Of course, as Judge Merz pointed out, that is exactly what the prosecutors wanted when they asked the jurors to decide for themselves if Sheppard was paranoid schizophrenic, with improper allegations of underhandedness, and statements of personal beliefs and appeals to juror ignorance.

Take for example, the statement "out of touch with reality" in the context of the prosecutor's misconduct of asking the jurors to look at the video and judge for

---

interpersonal skills . . . [a]nd team building." *Id*. at 165-166. Accordingly, she admits she is only qualified to give a description of paranoid schizophrenia as a "layperson" based on the "Webster's Dictionary." *Id*. at 167. She has no idea how the DSM-IV describes the symptoms or diagnostic criteria for paranoid schizophrenia. *Id*. at 175. And, despite her affidavit and the prosecution's statement to the contrary, she stated that she did "not recall" reviewing Smalldon's trial transcript and that "I would not have had occasion to." 6/25/02 Evid. Hr. Tr. at 191-193. Indeed, she stated emphatically that she had not read the transcript of Dr. Smalldon: "No, I did not read that. I didn't specifically - I mean, it's 112 pages." 6/25/02 Tr. Evid. Hearing at 198.

[2] This Court has taken judicial notice of the diagnostic criteria for mental illness, as set forth in the DSM –IV, without any objection by the Respondent. 6/05/03 Tr. of Evid. Hearing at 3.

themselves whether Sheppard was paranoid schizophrenic.  Such a statement certainly

implies that a paranoid schizophrenic person looks and acts delusional, and therefore,

would bolster the prosecutor's assertion that the jurors could look at Sheppard on the

video-tape and judge for themselves.  Yet, both Smalldon and the DSM-IV are quite clear

that in fact people who suffer from paranoid schizophrenia do not exhibit "disorganized

behavior." DSM-IV at 287.  Indeed, as Smalldon testified to, on a relatively superficial

level, paranoid schizophrenics appear quite normal.  Tr. Vol. VI at 1063.

 So, the diminished explanation of "a communication disorder" and someone "out

of touch with reality" played right into the prosecutors' closing argument.  For starters,

the prosecutors asked the jury to conclude that Sheppard was not paranoid schizophrenic

because the videotape showed that he was "communicating, he is communicating very

well with his friends." Tr. Vol. VII at 1221.  Likewise, the prosecutors essentially

equated paranoid schizophrenia with disorganized behavior when they asserted time and

time again that Sheppard must not be paranoid schizophrenic because of the alleged

organized planning and commission of the crime, as well as the organized fashion in

which he interacted with others at the crime scene.  *Id*. at 1221-1225.

And, the Supreme Court of Ohio's analysis simply missed the point.  For starters,

the passage to which the Supreme Court of Ohio refers in Dr. Smalldon's testimony

makes clear that he is speaking not about paranoid schizophrenia in particular but about

the larger family of schizophrenia.  Indeed, although at times Smalldon testified that

Sheppard was delusional, he testified that Sheppard similarly exhibited other symptoms

of paranoid schizophrenia, including hallucinations, *Id*. at 1065, the negative symptom of

effective flattening.  *Id*. at 1065, 1068.  But, more importantly, although the Supreme

Court of Ohio can make the leap that the jury connected "out of touch with reality" to Smalldon's testimony regarding delusional thought, that analysis ignores the high probability that the introduction of the "out of touch with reality" definition actually resulted in Fox placing his own subjective beliefs of what that phrase meant. Indeed, Fox was searching for more information because he did not believe Smalldon had given him enough, so it is highly probable that Jones' statement was connected by Fox not to the definition that Smalldon had given for the disease, but rather to what Fox thought mentally ill people felt and exhibited.

The record establishes the high probability of influential jury misconduct. In the face of the prosecutorial misconduct, it is hardly conceivable that Juror Fox would ignore the statements by Helen Jones, whom he believed to be an expert and who was someone without bias. The information was wrong and oversimplified, and Fox admitted that he relied upon the definition.

A writ should be granted because of the jury misconduct.

**II.**     <u>**Objection to Report and Recommendation on the First Ground for Relief: The Trial Court Violated Petitioner's Constitutional Rights To Due Process And An Impartial Jury For The Penalty Determination In A Capital Case By Wrongly Excusing For Cause A Prospective Juror Because Of Her Views On Remorse As A Mitigating Factor.**</u>

    **A.**     **Merits Argument**

The trial judge wrongly excused juror No. 23 Joyce Wells for cause when she expressed her belief that a defendant's remorse was an important mitigating factor against the death penalty. This was a perfectly permissible consideration that should not have led to Ms. Wells' disqualification. The prosecutor and trial court literally did not allow her

the chance to finish her answers, nor explain her views about how she would weigh the mitigating factor of remorse.

When questioned about the death penalty, Ms. Wells told the attorneys and the court that it was a serious matter she would have to weigh carefully. She also stated that a defendant's repentance or remorse was an important factor to her. Tr. Vol. II at 327.

The prosecutor, Joseph Deters, indicated to Ms. Wells that Ohio law did not permit jurors to consider repentance as a mitigating factor, and then asked if she could sign a death verdict even if she could not consider that. Tr. Vol. II at 327 – 328. In doing so, the prosecutor incorrectly portrayed Ohio law, as remorse or repentance is a proper mitigating factor for consideration under R. C. §2929.04 (B)(7), the catch-all "any other factor" provision. *See, e.g., State v. Brewer*, 549 N.E. 2d 491, 505 (Ohio 1990). Then, before Ms. Wells could even answer the prosecutor's question, the prosecutor interrupted her and challenged her for cause.

A review of the entire colloquy is telling. Prosecutor Deters was exceedingly quick in endeavoring to have Ms. Wells excused for cause. This may have been because of her remarks considering repentance as a factor, and/or it may have been because Ms. Wells related that she had previously had a bad experience with law enforcement. Immediately prior to the discussion regarding her views on the death penalty, Ms. Wells indicated she had once been raped by an employer and had taken the matter to the police. The exchange thereafter went as follows:

> MR. DETERS: Right. Generally, and I don't want any specifics, were you satisfied with the way that the law enforcement performed in your particular case, or did you think the police should have done more?

PROSPECTIVE JUROR NO. 23:  At that point in time, it was before a lot of the women's issues were brought forth and **the police officers were not kind** at that point.

But since I've had, you know, opportunity to meet other police officers who have been very kind and compassionate, so I don't feel that I hold that against them.

MR. DETERS:  Talk about the death penalty.  You heard a lot in the last few days about that.  Generally, **what are your feelings concerning the death penalty?**

PROSPECTIVE JUROR NO. 23:  **I feel that it is very serious, that everything would have to be weighed very carefully**.  And I've had a lot of experience with the law[3], so I don't know if this is even possible, but I would like where, for a person who was convicted that we were considering that, have the opportunity to repent.

MR. DETERS:  **Repent?  Kind of a religious concept.  If the law does not permit something like that, do you have a problem with that?**

PROSPECTIVE JUROR NO. 23:  **No.**

MR. DETERS:  Judge Crush is going to instruct you as to what the law is and hypothetically, for the moment, if we got to the penalty phase where the Judge instructs you to the law, and all of the jurors, including yourself were convinced that we had met our burden, there is no provision for repenting or anything like that, 11 of the other jurors have signed a death verdict, would you be able to put your name on a death verdict that could potentially send him to the electric chair?

PROSPECTIVE JUROR NO. 23:  If he didn't have the opportunity –

MR. DETERS:  Ma'am, you know, some people just feel that way.  That's fine.  If you can't do it, you can't do it, but also keep in mind that the State of Ohio, the victim's family, as well as the defendant have a right to a fair trial here.

---

[3] Given the phrase that follows, *i.e.,* "so I don't know if this is even possible," it appears likely that this is an error in the transcript, and that Ms. Wells likely said that she did NOT have a lot of experience with the law.

> PROSPECTIVE JUROR NO. 23:  That's correct.
>
> MR. DETERS:  If you can't do it, that's fine…. Judge, …
> we challenge for cause….

Tr. Vol. II at 328.

After this one-sided colloquy in which the prosecutor interrupted the juror in mid-sentence, the trial judge asked the juror whether she could impose the death penalty if the prosecution proved its case.  Ms. Wells replied that while she was not familiar with what "circumstances" could be brought to light, if she felt the person was not sorry for what he did, she could impose the death sentence.  Tr. Vol. II at 328 – 329.  The judge then asked a leading converse question:

> THE COURT:  In other words, if he was sorry for it, asked
> God for forgiveness, you could not impose the death
> penalty?
>
> PROSPECTIVE JUROR NO. 23:  Right.

Tr. Vol. II at 329.

Defense counsel then had a turn to question Ms. Wells, who, for the first time, was actually permitted to talk for herself.   She said she would not have a problem with a weighing process where each side presented reasons for or against the death penalty.  Nor would she have a problem assigning different weights to aggravating circumstances and mitigating factors.  Tr. Vol. II at 329 - 330.  Importantly, when asked if she could consider signing a death verdict with the other jurors Ms. Wells replied: "I would have to listen very carefully to the mitigating factors.  If one of those would be remorse or not, then I could deal with it in that way."  Tr. Vol. II at 331.

When defense counsel attempted a follow-up question, the judge interrupted, asserted that Ms. Wells had a "bottom line" and again asked her if she would not be able to impose the death penalty if the person showed remorse and asked for forgiveness.  Tr. Vol. II at 331.  Defense counsel objected to the leading question.  Incredibly, without Ms. Wells even answering the judge's "bottom line" question, the judge then abruptly granted the prosecutor's motion to excuse her for cause.  Tr. Vol. II at 332.

Between the actions of the prosecutor and trial judge, Ms. Wells was interrupted in her attempts to answer questions, was misinformed about whether she could consider remorse as a mitigator, and was asked leading questions that assumed she was unable to impose the death penalty if the defendant showed remorse.

Unlike the trial judge, however, this Court must consider the entirety of Ms. Wells' *voir dire.*  And the record shows that when she was actually permitted to articulate her views, nothing in her responses indicated that she would either automatically impose or refuse to impose the death sentence on the basis of remorse or lack of remorse.

       1.    *Ms. Wells' Excusal for Cause Was Wrong.  She Met the Standard for Jury Service in a Capital Case Under the Relevant Supreme Court Decisions.*

The United States Supreme Court holds that a prospective juror in a capital case may be excused for cause only if that juror's views (either for or against capital punishment) "would prevent or substantially impair the performance of his duties…in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 420 (1985);  *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

The Sixth Circuit's recent capital decision in *Gall v. Parker*, 231 F. 3d 265 (6th Cir. 2000) offers particularly instructive analysis of the applicable Supreme Court

decisions on this issue. In *Gall*, habeas counsel raised the trial court's wrongful exclusion for cause of a juror who was uncomfortable but not unable to return a death sentence. Despite the traditional deference shown to trial judges, the Sixth Circuit examined the entirety of the juror's responses in voir dire and concluded that the totality of the record "showed that (the juror) was not 'so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its death penalty scheme, the standard that *Witt* requires for exclusion." *Gall*, 231 F. 3d at 331.

The trial judge's disqualification of Ms. Wells likewise does not justify complete deference in habeas review. Ms. Wells' voir dire responses – those where she was able to speak for herself – indicated that a defendant's remorse or repentance was important to her; that she could engage in the weighing process; that she could assign different weights to different aggravating and mitigating factors; and that she could deal with remorse as part of the weighing process. Ms. Wells demonstrated the ability to consider fairly all the possible penalties while giving weight, but not dispositive weight, to remorse or repentance. Under Ohio law, this was a perfectly legitimate way to weigh the sentence in a capital case, yet the trial judge ignored these responses in favor of the dogmatic conclusion that Ms. Wells had a "bottom line."

This is an instance where fair consideration of the record as a whole indicates that Ms. Wells' consideration of remorse or repentance did not substantially impair or prevent her from performing her duties as a juror in accordance with the court's instructions and her oath. As in *Gall*, her exclusion for cause was constitutional error.

### B. Magistrate Judge's Decision

Judge Merz began his assessment of this issue by first correctly noting that a *Wainwright-Witt* juror exclusion violation is not amenable to harmless error analysis. R&R at 30, citing *Gray v. Mississippi*, 481 U.S. 648, (1987).

Judge Merz then, in what he acknowledged was an unusual judicial act, *sua sponte* raised the issue of Sheppard's possible procedural default of this claim, even though the defense was not raised by the Warden.   R&R at 31.  Judge Merz determined that the claim was defaulted, based on a finding that Sheppard had "de-federalized" the claim in state court on direct appeal.  The reasoning offered was that, though Sheppard had acknowledged the United States Supreme Court's modification of the *Witherspoon v. Illinois,* 391 U.S. 510 (1968) standard in the *Witt* decision, he had "argued that Ohio's constitution and statutory law provided greater protection against dismissal of a prospective juror who might have general objections to the death penalty than the federal constitution provided after *Witt*."  *Id*.

Sheppard disagrees with the finding that he de-federalized his claim in state court and disagrees with the finding that it was defaulted.   Indeed, the issue presented is not even one of procedural default, as there is no state procedural rule that Sheppard allegedly violated and no procedural bar applied by the state courts, but the issue is correctly legally analyzed as a question of exhaustion.  Sheppard submits that the claim was exhausted in the state courts.

Judge Merz alternatively addressed the merits of this claim.  Judge Merz found the claim unavailing, finding that prospective juror Wells had testified that she could not

impose the death penalty on someone who was repentant, and conversely, she could only impose it on someone who was not sorry for what he had done. *Id.* at 32.

Sheppard disagrees and believes that this claim has merit.

**C.    Objection**

*1.    Procedural Default*

Sheppard raised this claim before the state courts, and it is not defaulted, as recognized by the Warden.   For a federal judge to *sua sponte* find a habeas claim in a death penalty case to be defaulted, one would imagine it must involve a clear case of default, *e.g.*, where the petitioner plainly omitted or failed to raise the claim at the appropriate procedural juncture in state court.   Here, however, Judge Merz found the claim defaulted even though Sheppard did raise the claim in a procedurally appropriate and timely manner on direct appeal in the state courts.   Moreover, the state courts applied no procedural bar to the claim, a prerequisite for application of procedural default. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) (applying 4-step analysis, including whether state courts actually enforced the procedural  sanction).

Judge Merz questioned whether Sheppard adequately federalized his claim in the state courts.  Judge Merz found that Sheppard "de-federalized" his claim in state court, thereby defaulting the claim, but cited no authority in support of this proposition.  The issue concerning whether Sheppard adequately federalized his claim, however, raises a question of exhaustion, not procedural default.  Under principles of exhaustion, a petitioner must "fairly present" his federal claims to the State's highest court, giving the State a full and fair opportunity to rule on the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  Fair presentation means

that the petitioner presented the federal claim in a manner that adequately apprised the state courts of the claim and gave them "an opportunity to apply controlling legal principles to the facts bearing upon [the] constitutional claim." *Picard*, *supra*, at 277. The basic rule is that petitioner must "present[ ] the substance of his claim to the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986); see also *Pope v. Netherland*, 113 F.3d 1364,, 1368 (4th Cir. 1997) ("it is not necessary to cite 'book and verse' on the federal constitution' so long as the constitutional substance of the claim is evident"). [4]

Factors to be considered in assessing whether a federal claim has been fairly presented to the state courts are:  1) reliance on pertinent federal cases employing constitutional analysis; 2) reliance on state cases employing constitutional analysis [in factually similar situations]; 3) assertions of claims in terms so particular as to call to mind a specific right protected by the Constitution; and 4) allegations of a pattern of facts that is well within the mainstream of constitutional litigation.  *See* Liebman and Hertz, Federal Habeas Corpus Practice and Procedure (3 Ed. 1998), Vol. 2, pp. 887-88 (citations omitted); see also *Levine v. Torvik*, 986 F.2d 1506 (6th Cir. 1993); *Koontz v. Glossa*, 731 F.2d 365 (6th Cir. 1984).

Here, Sheppard meets the standard for fair presentation of his federal claim in the state courts.   A fair reading of Sheppard's appellate briefs before the Court of Appeals for Hamilton County and the Ohio Supreme Court reveals that Sheppard was basing his argument on state statutory law "in addition to" federal constitutional law.  Dkt. 12, Appendix to Return of Writ,  Vol. VI, pp. 129-33 (Merit Brief for Appellant, pp. 83-87);

---

[4] Though the question of whether a claim in state court has been federalized -- *i.e.* "fairly presented" as a federal claim -- is clearly one of exhaustion, in fairness to Judge Merz's ruling, there is precedent that where a federal habeas petitioner raises a claim that was <u>never</u> presented in any state forum, a federal court

Dkt. 12, Appendix to Return of Writ, Vol. IV, pp. 176-78 (Brief for Defendant-Appellant, pp. 83-85). Sheppard not only sets forth specific facts underlying the claim that are well within the mainstream of constitutional litigation, and references the federal constitution and federal constitutional case law, but also discusses at length the federal constitutional holdings in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985). *Id*. He also cites to *Davis v. Georgia*, 429 U.S. 122 (1976). This is more than sufficient to apprise the Ohio Supreme Court of the claim and give it an opportunity to rule on the claim.

Sheppard does state in his Ohio Supreme Court brief that the improper excusal of juror Wells violated his rights under state statutory law and the Ohio Constitution, "regardless of the decisions of the Supreme Court of the United States with respect to the Sixth Amendment." Dkt. 12, Appendix to Return of Writ, Vol. VI, p. 131 (Merit Brief for Appellant, p. 85). However, this argument cannot fairly be construed to mean that Sheppard rested his claim "exclusively" on state law, as Judge Merz concluded. *See* R&R at 32.

In sum, Sheppard's briefs and arguments to the state courts most certainly gave the state courts "an opportunity to apply controlling legal principles to the facts bearing upon [the] constitutional claim." *Picard*, *supra*. As such, Sheppard's federal claim was fairly presented to the state courts and was adequately exhausted. The Warden has never made any assertion to the contrary. Judge Merz's unnecessary *sua sponte* decision that this claim was defaulted, in which he inaccurately failed to apply the "fair presentation"

---

may properly determine whether the claim has been procedurally defaulted under state procedures. *Harris v. Reed*, 489 U.S. 255, 269 (1989); *Brown v. Marshall*, 704 F.2d 333, 334-35 (6th Cir. 1983).

doctrine pursuant to principles of exhaustion as opposed to procedural default, was in error.

> 2.    *Merits*

Prospective juror Ms. Wells was improperly excused for cause from Sheppard's jury in violation of his Sixth Amendment rights.  As noted above, the Sixth Circuit decision in *Gall v. Parker*, *supra*, is on point.   There, although acknowledging the deference owed to the trial judge's determination, the Sixth Circuit found that the trial court's exclusion of the juror in question was not supported by the record transcript and constituted reversible error.  The discussion in *Gall* is quite instructional for our purposes here:

> We find that the trial court committed reversible error in excluding [juror] Correll.  Its decision is not supported by the record, and violated clear precedent. In a series of cases beginning with *Witherspoon*, the Supreme Court has consistently held that the Sixth Amendment right to an impartial jury is infringed when, through the procedures used to obtain a jury for a particular trial, the trial judge allows the selection of a jury "uncommonly willing to condemn a man to die." 391 U.S. at 521. In *Witt*, the Court clarified that a juror is properly excluded for cause when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 44, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980)). The *Witt* Court noted that this standard does not require that a juror's bias be proved with "unmistakable clarity," *id*., and noted that generally, deference ought be paid to the trial judge. *See* 469 U.S. at 426.

> Notwithstanding the deference owed to the trial judge, we find that the factual record does not fairly support Correll's exclusion under the standards of *Adams* and *Witt*.  Correll's discomfort with the death penalty did not appear to "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams*, 448 U.S. at 44). Correll

rejected the proposition that his mind was "closed" to imposing the death penalty--"No, I would say it isn't closed, but it - I am just undecided." J.A. at 507; "it is just one of those things you would have to cross when you got to it." J.A. at 506-07. Moreover, on several occasions, he informed counsel and the judge that he would possibly or "very possibly" feel the death penalty was appropriate in certain factual scenarios. J.A. at 507. He also told the judge that he believed he could and would follow the law as instructed. J.A. at 508. These statements showed that he was not "so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its" death penalty scheme, the standard that *Witt* requires for exclusion. *Adams*, 448 U.S. at 51. Correll's statements that his decision would likely depend on the facts he was faced with also suggested that his selection would comport with a trial court's "quest" to find jurors who "conscientiously apply the law and find the facts." *Witt*, 469 U.S. at 423. Similarly, Correll's uncertainty as to how the option of a death sentence would affect his decision should not have led to his exclusion. In Adams, the Court reversed a conviction on a scheme that precluded prospective jurors "whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected." 448 U.S. at 50-51. Finally, unlike the juror who was properly struck in *Witt* because she repeatedly "affirmed that her beliefs would interfere with her sitting as a juror," 469 U.S. at 434, Correll not once stated that his beliefs would deter him from serving as an impartial juror. Correll's exclusion was thus error.

*Gall*, at 330-32.

Here, by comparison, the statements by juror Wells were even less problematic than the statements by juror Correll in *Gall*. The statements of the juror in *Gall* at least went to the heart of the matter in question -- whether he was capable of imposing capital punishment at all -- to which the juror stated he was "undecided." Here, there was no such testimony. Rather, juror Wells made it clear that she could impose the death penalty.

23

Ms. Wells' testimony must be read as a whole.  All that Ms. Wells can be fairly said to have stated was that, if remorse was a lawful mitigating factor, then she would give that factor (*i.e.* the extent to which the defendant showed any remorse) a lot of thought in reaching her decision.  Contrary to the finding of Judge Merz, it is not accurate to characterize her testimony definitively as being that the existence of remorse, no matter in what degree, was dispositive of the issue to her.  She stated that "everything would have to be weighed very carefully" and also that she "would have to listen very carefully to the mitigating factors."   Tr. Vol. II at 328 and 331.

She went on to say that "If one of those [mitigating factors] would be remorse or not, then I could deal with it in that way."  Tr. Vol. II at 331.  This demonstrates that juror Wells was willing to follow the law and that if she was not to give any weight to remorse under the law, then she would not do so.  Conversely, if remorse was to be considered under the law, she would have to weigh it carefully.  Just as with the juror in *Gall*, juror Wells' statements "comport with a trial court's 'quest' to find jurors who 'conscientiously apply the law and find the facts.'"  *Gall*, at 331, citing *Witt*, 469 U.S. at 423.  Also, just as in *Gall*, Wells' statements demonstrate "that [s]he was not 'so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its death penalty scheme, the standard that *Witt* requires for exclusion."  *Id.*, citing *Adams v. Texas*, 448 U.S. 38 at 51.

Further, as discussed in some detail above (see part II A, Merits Argument), the situation here was exacerbated by:

- the prosecutor Joseph Deters' misleading suggestion to Ms. Wells that remorse was not a lawful mitigating factor;

- the prosecutor's possible ulterior motive to have Ms. Wells removed because she indicated a previous unpleasant experience with law enforcement;

- the prosecutor cutting off Ms. Wells in mid-sentence before immediately moving for her excusal for cause;

- the trial court asking Ms. Wells leading questions;

- the trial court cutting off the defense attorney's efforts to question Ms. Wells; and

- the trial court not even waiting for Ms. Wells' answer to his final "bottom line" question before abruptly ruling to dismiss her.

For all of these reasons, the trial court's ruling to exclude prospective juror June Wells was improper and in violation of Sheppard's rights under the Sixth Amendment to the United States Constitution. This error is structural and requires reversal of Sheppard's conviction.

**III.** **Objection to Report and Recommendation on the Third Ground for Relief: The Trial Court Violated Petitioner's Constitutional Rights By Excluding Relevant Evidence Offered By The Defense At Mitigation**

**A.    Merits Argument**

At Sheppard's mitigation hearing, the trial court improperly excluded relevant evidence of the Sheppard family's history of mental illness on the maternal side, including Mrs. Sheppard's hospitalization for depression and the multiple forensic psychiatric hospitalizations of Mrs. Sheppard's brother Darryl Sheppard. In an arbitrary fashion, the trial judge allowed admission of only one page of Delores Sheppard's records (Defendant's Exhibit 18 A), which contained no detail at all on her diagnosis of depressive disorder. Tr. Vol. VI at 1138 – 1145.

The Darryl Sheppard records which the trial judge excluded were from the Pauline Warfield Lewis, Oakwood and Dayton psychiatric hospitals. They documented his sad mental deterioration which, for Darryl Sheppard, had its onset at about the same

time as when Bobby's occurred in his late teens. Darryl was sentenced to prison at

Chillicothe Correctional in early 1990 on a conviction for breaking and entering. There,

he had a psychotic episode in which he feared that bugs were crawling all over him and

eating him. Darryl was then transferred to the Oakwood Forensic Center and from there

to the Dayton Mental Health Center Forensic Unit. At the conclusion of his criminal

sentence (virtually all of which was served in forensic centers), the Dayton facility sent

Darryl to the Pauline Warfield Lewis community psychiatric facility for further treatment

before his release. The records of these institutions showed that, like Bobby Sheppard,

Darryl's family reported that he exhibited psychotic behaviors such as abrupt acts of

violence, paranoid suspicions about his food and other people, and voicing complaints

that bugs and rats were invading his body beginning at about the age of twenty. The

records document Darryl's history of "delusional ideations," also a trait of Bobby

Sheppard's, and document that, like Bobby, Darryl Sheppard consistently denied mental

illness, appeared withdrawn and remote and had used alcohol and drugs to self-medicate.

   The trial court's obstinate refusal to allow Sheppard's proffered evidence

regarding his family's history of mental illness denied Sheppard his right to have his

sentencing jury consider all relevant mitigating evidence. A reading of the sentencing

transcript of defense counsel's efforts to put this evidence before the jury, and of the trial

judge's responses to these efforts, is telling. *See* Tr. Vol. VI at 1137-49. The transcript

reveals a trial judge who was unaware of the law or refusing to follow the law, and who

was bent on having his judgment regarding the value of the evidence replace the

judgment of Sheppard's jury. Some of the more revealing comments made by the trial

judge during this exchange, regarding the medical and mental health records of

Sheppard's mother, were as follows:

>THE COURT:  Well, I'm just trying to look through this record.  Impression which I guess is a diagnosis is depressive disorder, diabetes, hypertension, bronchial asthma, gout, obesity.

>MR. RANZ:    Testified to by Mrs. Sheppard –

>THE COURT:  **I don't know that that shows a mental problem**.

Tr., Vol. VI at 1140 (emphasis added).

*     *     *

>MR. RANZ:    **It's up to the jury to decide** what is –

>THE COURT:  **It's up to me to decide what they can have.**

Tr. Vol. VI at 1143 (emphasis added).

*     *     *

>THE COURT:  This is a record about all of her physical problems.  Then **her mental problems are not, as far as I can see, severe**.  Depression, doesn't show schizophrenia.

*Id*. (emphasis added).

*     *     *

>THE COURT:  … Now we can put 75 percent of the women and teenagers in the United States in hospitals, not for obesity, but we could for being periodically depressed.

Tr. Vol. VI at 1143-44.

*     *     *

>THE COURT:  Depressed because she has been gaining weight at a rapid weight.  I hope that people who are depressed are not all mental cases.

27

> MR. RANZ: Truthfully, I don't think that the Court's viewpoint of psychological problems should be the criteria for deciding whether or not the jury is seeing this.

Tr. Vol. VI at 1145.

The trial judge made similar comments regarding the proffered records of

Sheppard's uncle:

> THE COURT: Okay. Well, again, **the person being diagnosed here is the defendant. It's not his whole family.** The history of schizophrenia has some relevance, but so far I have not seen the word schizophrenia in any of it.

Tr. Vol. VI at 1146 (emphasis added).

*     *     *

> THE COURT: **Why do you need all this stuff? He [Sheppard's uncle] is not on trial, not being sentenced.**

Tr. Vol. VI at 1148.

*     *     *

> THE COURT: **You end up inferring that, because the uncle is nuts, that the nephew is crazy.**

*Id*. (emphasis added). Sheppard had every right to present any evidence in his possession to make this very argument, *i.e.*, that because his uncle had a severe mental illness -- possibly schizophrenia that included having auditory and visual hallucinations -- he (Sheppard) was more likely to have the same. Indeed, the mitigation psychologist testified about schizophrenia running in families.

The Supreme Court has never wavered from the command that a capital defendant ought to be able to introduce *any* relevant evidence in support of a sentence less than death: "So long as the evidence introduced and the arguments made … do not prejudice

28

a defendant, it is preferable not to impose restrictions.  We think it desirable to the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 203 – 204 (1976).  Indeed, the R.C. §2929.04(B)(7) "residual category" (under which the excluded testimony was offered) was added to the Ohio code because the Supreme Court struck Ohio's death penalty law as too restrictive in *Lockett v. Ohio*, 438 U.S. 586 (1978).  As the *Lockett* Court held, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering,  as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604.  The Court has often re-emphasized this:  "States cannot limit the sentencer's consideration of any relevant circumstance that would cause it to decline to impose the death penalty…. [T]he State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant."  *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).

In *Woodson v. North Carolina*, 428 U.S. 280 (1976), the Supreme Court explained the need for individualized sentencing in capital cases and its rationale for affording a defendant great leeway in presenting mitigation evidence:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of  a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

*Id*. at 304.

The opinion in *Woodson* went on to specify that unlike individualized-sentencing procedures in noncapital cases that were simply a matter of policy, such procedures in capital cases were of constitutional significance:

> While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Id*. n. 3.  *See also California v. Brown*, 479 U.S. 538, 545, (1987) (concurring opinion) ("evidence about the defendant's background and character is relevant because of the belief,  long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.").

And, the relevance of mitigating evidence is an expansive, not limited, concept in capital sentencing.  The Supreme Court explained this in *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990):

> Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.  Whether the fact-finder accepts or rejects the evidence has no bearing of the evidence's relevancy….It is not necessary that the item of evidence alone convinces the trier of fact of the truth of the proposition for which it is offered.

The Sheppard family's history of mental illness on the maternal side was an important factor supporting Dr. Smalldon's diagnosis, but the trial judge excluded

virtually all of these records.  He admitted only one page of Delores Sheppard's records (Defendant's Exhibit 18 A), which contained no detail at all on her diagnosis of depressive disorder.  Tr. Vol. VI at 1138 – 1145.[5]  The sparse information contained on these two pages gave jurors no real idea about how devastating Darryl Sheppard's mental illness, paranoid schizophrenia, was, or about the striking parallels between Darryl Sheppard's disease and Bobby Sheppard's.[6]  The exclusion of the evidence, therefore, had a substantial or injurious effect or influence on the jury's verdict, because it precluded the jury from considering evidence that would have helped Smalldon fend off the improper assault by the prosecutors on the foundation for his testimony.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### B.    Magistrate Judge's Decision

Judge Merz found that Sheppard's constitutional claim based on the trial court's exclusion at mitigation of the medical records of family members revealing a family history of mental illness was without merit.  R&R at 39.  His entire reasoning consisted of the following:

> Since this issue was presented to the state courts only on direct appeal, where no supplementation of the record is permitted in Ohio, the medical records claimed to have been erroneously excluded are not a part of the habeas corpus record.  Thus, even if Sheppard could show that exclusion of those records amounted to error of a constitutional dimension, which he has not, he cannot make out the prejudice necessary to succeed on this issue.

*Id*.  Sheppard disagrees with this reasoning.

---

[5] On March 14, 2001 Respondent submitted to this Court all of the excluded records in its Motion to Submit Trial Exhibits Pursuant to Order Dated December 13, 2000. Dkt. 26.

[6] Defense counsel proffered the excluded records from Delores Sheppard's hospitalization (defense trial exhibit #18) and the excluded records of Darryl Sheppard's hospitalizations (defense trial exhibit #22) for the record on appeal. Tr. Vol. VI at 1137 - 1149.

### C.    Objection

Contrary to Judge Merz's ruling, the content of the medical records in question are a part of the record.  As noted in footnote 3 above, their contents were proffered into the trial record by defense counsel for purposes of appeal.  Tr. Vol. VI at 1137 - 1149.  Defense counsel Ranz specifically states that he is proffering in defense exhibits #18 (medical records of Delores Sheppard's hospitalization), and #22 (records of Darryl Sheppard's hospitalizations).  *Id*. at 1149.  Also, as stated in footnote 2 above, these records in their entirety have been submitted to this Court as attached to Respondent's Motion to Submit Trial Exhibits Pursuant to Court Order, filed on March 14, 2001.  Dkt. 26.

In light of the clear pronouncements by the United States Supreme Court in *Lockett, supra*, as discussed above, and in decisions following in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Skipper v. South Carolina,* 476 U.S. 1 (1986), and *Hitchcock v. Dugger*, 481 U.S. 393 (1987), holding that "the sentencer in capital cases **must** be permitted to consider **any** relevant mitigating factor," *Eddings*, *supra*, at 112, it is practically undeniable that the trial court erred in excluding Sheppard's proffered mitigation evidence regarding the medical records of his  mother and uncle.   The question is then whether Judge Merz's decision that Sheppard "cannot make out the prejudice necessary" is correct or not.

Though it is noted that the Supreme Court has never clearly addressed whether "harmless error" even applies to *Lockett* errors in capital sentencing cases,[7] the Supreme

---

[7] *See  Bryson  v.  Ward*, 187 F.3d 1193 (10th Cir. 1999) ("The Court, however, has never specifically addressed whether the erroneous exclusion of mitigating evidence can ever be harmless," citing *Hitchcock*, 481 U.S. 393, at 398-99, and *Skipper*, 476 U.S. at 7-8); *see also Knight v. Dugger*, 863 F.2d 705, 710 (11th

Court did apply a test in *Skipper*, *supra*, in making a finding of sufficient prejudice.  The test employed in *Skipper* was whether it appeared "reasonably likely" that the excluded evidence "may have affected the jury's decision to impose the death sentence."  *Skipper* at 8.   A review of the decision in *Skipper* is useful for purposes here.

In *Skipper*, the trial court had excluded the testimony offered relative to the defendant's good behavior and adjustments since his incarceration for the offense. The Supreme Court concluded that the "exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." *Id*. At the end of the decision, the Supreme Court addresses the State's suggestion that the exclusion of the proffered testimony was proper because the testimony was merely cumulative of testimony of petitioner and his wife regarding his satisfactory behavior in jail and his desire to be productive while incarcerated.   The Supreme Court rejected this suggestion.  The Court reasoned that the evidence regarding petitioner's conduct in jail offered by the petitioner and his wife "was the sort of evidence that a jury would naturally tend to discount as self-serving."  *Id*.  However, noted the Court, "the testimony of more disinterested witnesses … would quite naturally be given much greater weight by the jury." *Id*.

This reasoning in *Skipper*  applies with equal force to the case *sub judice*.  The content of the excluded medical records of family members were important in not only corroborating a family history of mental illness but also in presenting to the sentencing jury firm, factual evidence from disinterested witnesses of that family history.  It is

---

Cir. 1988), and cases cited therein (noting harmless error analysis applies to *Lockett* errors, but that precise guidelines of analysis are unsettled).

reasonable to conclude that such confirming evidence from a disinterested source "may have affected the jury's decision to impose the death sentence."   Sheppard was thus prejudiced by the trial court's refusal to admit this evidence, and his death sentence, just as the death sentences in *Lockett*, *Eddings*, *Skipper* and *Hitchcock*, should be reversed.

**IV.** **Objection to the Report and Recommendation on the Fourth Ground for Relief (subpart 4):  The Trial Court Erred When It Refused The Defense Request To Instruct Jurors That They Could Consider One Of The Life Sentences If They Could Not Unanimously Agree On Death.**

**A.     Merits Argument**

At the conclusion of penalty phase evidence, Bobby Sheppard's attorneys asked the trial judge to instruct jurors that they could turn to consideration of a life sentence if they could not reach a unanimous finding that the death penalty was appropriate.  Tr. Vol. VII, at1155 - 1156.  The trial judge refused to give this instruction unless the jury was "hung." Tr. Vol. VII at 1156. This refusal was an important legal error that appellate counsel should have raised on appeal.

The instruction that counsel requested was entirely proper under Ohio law.  As the Ohio Supreme Court explained in *State v. Springer*, 586 N.E. 2d 96, 100 (Ohio 1992):

> We believe that the requirement of Ohio's death penalty statute that a life sentence be recommended and imposed under circumstances where the penalty of death cannot be recommended or imposed represents a clear statement of policy that an offender be sentenced to a term of life imprisonment where the trial jury is unable to unanimously agree that the penalty of death is appropriate.

This trial judge instructed jurors that their penalty phase verdict had to be unanimous yet refused to explain that jurors could turn to consideration of a life sentence if they did not unanimously agree on death.  The court's refusal was clear legal error not

only under *Springer*, but also under the state supreme court decision in *State v. Brooks*, 661 N.E. 2d 1030 (Ohio 1996).

In *Brooks*, the state supreme court held that Ohio's death penalty statute "contains no limiting language as to when a jury may contemplate a life sentence." *Brooks*, 661 N.E. 2d at 1041. The *Brooks* court held that Ohio law required the jury to be instructed that "when it cannot unanimously agree on a death sentence, to move on in their deliberations to a consideration of which life sentence is appropriate, with that determination to be unanimous." *Id.* at 1042. The purpose of giving this instruction is to ensure that jurors understand they can properly contemplate and impose a life sentence when one or more jurors believes that mitigating evidence is sufficient to preclude the death penalty, even though the rest of the jurors are of the mind to impose death. The *Brooks* court recognized that failure to give correct instructions on the process to be used in determining the sentence risks juror confusion and the possible erroneous imposition of the death sentence. *Id.* at 1041 - 1042.

All that defense counsel requested was that the trial judge correctly inform Mr. Sheppard's jurors that they could move to considering a life sentence in the event they could not all agree that death was the appropriate penalty. The judge refused. Thus, as in *Kubat v. Thieret*, 867 F. 2d 351, 373 (7th Cir. 1989), Bobby Sheppard's jurors "were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, [Bobby Sheppard] would not be sentenced to death." The trial court's refusal to correctly inform jurors on their role in the sentencing process as defined by state law constituted a violation of the Eighth and Fourteenth Amendments. *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).

This instruction was needed to assure no violation of Fourteenth and Eighth Amendment rights.   In a line of cases beginning with *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988) and including *McKoy v. North Carolina*, 494 U.S. 433 (1990) the Supreme Court made it clear that any requirement that mitigating factors must be found unanimously is incoherent.  For that reason, the Sixth Circuit in *Davis v. Mitchell* held that a Ohio jury instruction that excludes a *Springer/Brooks* type instruction is defective if the omission of that instruction leaves the jury with the impression that it "must first unanimously reject the death penalty before it can consider a life sentence." *Davis v. Mitchell*, 318 F.3d 682, 689 (6th Cir. 2003).   The Court held that the Ohio jury instruction at issue (which is nearly identical to the instructions for Sheppard's case) that omitted the *Springer/Brooks* instruction ran afoul of *Mills v. Maryland*, 486 U.S. 367 (1988) because without such an instruction the "constitutionally required non-unanimous mechanism that will prevent a recommendation of death is obscured to such an extent that it cannot even be said to be implied by the instructions in this case." *Id*. at 689.

The reasoning in *Davis* controls this case.  Sheppard's requested instructions were proper under Ohio law and required to make the proposed (and ultimately offered) instructions clear that unanimity was not required on whether mitigating factors were outweighed by the aggravating factors.  In finding the Ohio instruction was defective, the *Davis* court found that the following substantive provisions at issue in *Davis* and present in Sheppard's instructions -- coupled with the omission of the *Brooks* instruction -- would lead a jury to conclude that unanimity was required in all of the jury's conclusions.

**First**,  instead of instructing the jury that it need not be unanimous in rejecting the death penalty, both the trial court in *Davis* and Sheppard's trial court instructed that in

order to return a verdict for life imprisonment, each juror must first affirmatively find that

death was not appropriate:

> **Davis Instruction:** "you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors."

*Davis* at *16.

> **Sheppard Instruction**: "If you find that the prosecutor has proved, beyond a reasonable doubt, that the aggravating circumstances outweigh mitigating factors, then you must impose the death penalty.
>
> If you find that the prosecutor has failed to prove, beyond a reasonable doubt, that the aggravating circumstances outweigh mitigating factors, then you must impose a life sentence."

Tr. Vol. VII at 1233.

**Second**, both the *Davis* instruction and the Sheppard instruction then emphasized

the unanimity principle at all stages of the deliberations:

> **Davis Instruction**: "since this is a criminal case the law requires that in order for you to reach a decision all 12 of you must be in agreement."

*Davis* at *17.

> **Sheppard Instruction**: "Your verdict *must* be unanimous. That means, that you *must* agree to it. Cannot be 11 to 1, 10 to 2, 9 to 3 et cetera. *It must be 12 nothing*."

Tr. Vol. VII at 1239.

**Third**, in *Davis*, the verdict form stated a unanimity requirement, by "setting out

twelve signature lines under the statement 'we the jury . . do find.'" *Davis* at *18.

Likewise, the trial court for Sheppard ordered that all jurors sign the same verdict form:

"with regard to the verdict that you render, *all 12 must sign in ink*." Tr. Vol. VII at 1239.

In short, in Sheppard's case, the requested ***Springer*** instruction was requested and required. The trial court refused to give them. Without those, the jury may well have mistakenly believed that a bottom-line vote of 11 to 1 for death would amount to a "hung jury" or sentencing "mistrial," and/or that a life sentence could not properly be imposed. As such, the instructions "would have led a reasonable jury to apply an unconstitutional standard of unanimity at all stages of the deliberative process."

### B.    Magistrate Judge's Decision

Judge Merz denied relief on this claim.[8]  R&R at 44-52. The denial of relief was based essentially on the determination that *Davis v. Mitchell*, *supra*, was not controlling authority. Instead, prior decisions in *Coe v. Bell,* 161 F.3d 320 (6th Cir. 1998),  *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), and *Roe v. Baker*, 316 F. 3d 557 (6th Cir. 2002) were considered controlling.  *Id*. at 47.   Following a recent decision in the Northern District of Ohio, Judge Merz reasoned that the three prior decisions in *Coe*, *Scott* and *Roe*, with which *Davis* was construed to be in conflict, remained controlling authority based on the principle that a panel of the Sixth Circuit cannot overrule the decision of another panel. In such circumstances, the prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or the Sixth Circuit sitting *en banc* overrules the prior decision.  *Id*., citing *Madrigal v. Bagley*, 276 F.Supp. 744 (N.D. Ohio 2003), in turn citing *Taylor v. Mitchell*, 296 F. Supp.2d 784, 813 (N.D. Ohio 2003).  Petitioner  believes, however, that 1) the

---

[8] Sheppard also raised this under Ground Ten of his habeas petition as a claim underlying an ineffective assistance of appellate counsel claim for failing to raise the issue on direct appeal.  *See* Amended Petition, Dkt. 77 at p. 50-56.  The Respondent did not contend that the underlying claim was procedurally defaulted. Judge Merz found the underlying claim was not defaulted and addressed the claim on its merits.  In an abundance of caution, Sheppard nonetheless also objects to Judge Merz's finding with respect to Sheppard's claim of ineffective assistance of appellate counsel based on the arguments asserted herein and arguments asserted in his September 25, 2003 Merits Brief/Traverse, Dkt. 89, part XIII, p. 110-115.

decisions in *Coe*, *Scott* and *Roe* are not controlling, and 2) in any event the *Davis* panel got the analysis right and should be followed here.

### C.    Objection

#### 1.    Coe, Scott and Roe are Not Controlling.

The Magistrate Judge improperly deemed the decisions in *Coe*, *Scott* and *Roe* to be the controlling authority regarding Petitioner's jury unanimity instruction claim. Instead, as to claims of improper jury unanimity instructions in Ohio death penalty cases, the Sixth Circuit decision in *Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999), should serve as the controlling authority.

A review of the case law is necessary for a correct assessment of this issue.

#### a.    Coe

In its 1998 decision in *Coe*, the Sixth Circuit addressed issues of improper jury unanimity instructions at sentencing under the State of Tennessee's statutory death penalty scheme.  Specifically, petitioner Coe had claimed that the instructions given at sentencing were improper because 1) there was a reasonable probability that the jurors believed that they could consider only those mitigating factors that they unanimously agreed were present,  and 2) because the jurors were not told that the petitioner would receive a life sentence if they failed to reach a unanimous sentence.   Pertinent to the second claim, a life sentence under the applicable Tennessee death penalty statute expressly has to be by unanimous verdict.  *See* Tenn. Code Ann. Section 39-2404 (1982). In the case of a deadlock, however, Tennessee has a statutorily defined default rule mandating a life sentence.  Yet the Tennessee death penalty statute explicitly states that this qualification to the unanimity requirement is not to be relayed to the jury.  *Id*.

The Sixth Circuit held that the jury instructions at issue were not unconstitutional. Regarding the instruction claimed to misleadingly require unanimity with respect to individual mitigating factors, the court reasoned that the language in question required unanimity as to the results of the weighing of aggravating versus mitigating factors, but not as to the presence of a mitigating factor. *Coe* at 338. The court stated that "nothing in [the] language could reasonably be taken to require unanimity as the presence of a mitigating factor." *Id*.

Regarding the failure to instruct the jury that lack of unanimity mandated a life sentence, the court reasoned that the jury was not misled by such failure, because "it does not mislead the jury to impress upon it the importance of unanimity." *Coe* at 339. The court further reasoned that:

> The jury was given incomplete information, but not misleading information. Coe's scenario -- a minority juror who interprets the unanimity requirement as directing him to give in to the majority -- is simply not reasonable.

*Id.* at 340.

### b.     *Mapes*

In 1999, the Sixth Circuit addressed, for apparently the first time, the merits of alleged improper jury unanimity instructions under Ohio's death penalty statutory scheme.

In *Mapes, supra,* the Sixth Circuit assessed the following instructions given by the trial court to the jury at sentencing:

> Now, as I have indicated, if all twelve jurors find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors ... then you must return a finding to this court.

40

I instruct you, as a matter of law, that if you make such finding then you have no choice and must recommend to the Court that the sentence of death be imposed on the defendant, David Mapes.

*       *       *

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, the other evidence, the unsworn statement of David Mapes, the evidence of the State of Ohio, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, David Mapes, was found guilty of committing outweigh the mitigating factors, then you will return your verdict reflecting your decision. That is, you must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors.  In this event you will then proceed to determine which of two possible imprisonment sentences to recommend to the Court.

*Mapes,* at 416 (emphasis added).

The court found that in providing such instructions, the trial court erroneously misapplied R.C. §2929.03(D)(2) by requiring the jury to unanimously reject the death penalty before considering a life sentence.  The court noted that in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), the Ohio Supreme Court had held that such an instruction violated the Eighth and Fourteenth Amendments by creating a risk of an erroneous imposition of the death penalty.  *Mapes* at 416.

The Sixth Circuit Court reconfirmed that the Ohio death-sentence statute contains no requirement that a jury's rejecting of a death sentence, *i.e.*, opting for a life sentence, be by a unanimous vote.  Rather, as the Sixth Circuit stated, under the Ohio statute:

A recommendation of death must be unanimous, but **"absent such a [unanimous] finding**, the jury shall recommend that the offender be sentenced to [some variety of life sentence.]"  [citation omitted]  Thus, under the

> statute, a jury that was not unanimous either way on a death
> sentence could consider a life sentence.

*Mapes*, *supra*, at 416 (emphasis added).

Because this error had not been raised by the defendant Mapes on direct appeal, the Sixth Circuit determined that this error was subject to procedural default. The court recognized, however, that Mapes had properly raised independently the claim of ineffective assistance of his appellate counsel for failing to raise the improper unanimity instruction claim on direct appeal. A claim of ineffective assistance of appellate counsel, under the doctrine of procedural default, may serve as cause and prejudice to overcome application of procedural default. The court therefore remanded the case to the district court to determine if appellate counsel had been constitutionally ineffective in failing to raise, *inter alia*, the underlying jury unanimity instruction error pursuant to the delineated legal standards used to assess appellate counsel ineffectiveness. *Mapes* at 419, 427.

Interestingly, *Mapes* also involved a similar claim that the death sentence verdict actually delivered by the jury was not unanimous. This claim stemmed from hesitation expressed by one juror during repolling. When asked if the verdict was her own, juror June Chatman equivocated by asking "I have to say yes or no?" *Id*. at 423. She then acknowledged that she had signed the verdict, but when asked again if the verdict was hers, she stated, "It's to me, it's the State's verdict." *Id*. Her responses suggest a juror who may very well have given into the majority for the sake of reaching a unanimous decision, without understanding that her sole vote against death requires a life sentence for the defendant under Ohio law. That a juror or jurors might acquiesce to the majority vote under the belief that the majority rules is certainly known to happen. *See Mapes, supra,* at 422, citing *State v. Brown*, 168 N.E.2d 419 (Ohio Ct. App. 1953) (juror

responded when polled "May I tell the truth? … I went with the rest because I was the

only one left"), and  *Emmert v. State*, 187 N.E. 2d 862 (Ohio 1933) (juror responded

when polled, "Mine [verdict] was because the majority rules is all.").   Such instances of

jurors giving into the majority undercut the rationale of the *Coe* decision, noted above,

that "*Coe*'s scenario -- a minority juror who interprets the unanimity requirement as

directing him to give in to the majority -- is simply not reasonable."   *Id.* at 340.

*c.*        *Scott (Federal District Court)*

Around the same time as *Mapes* was decided by the Sixth Circuit, the Federal

District Court for the Northern District of Ohio granted habeas relief based on similar

improper jury unanimity instructions.  *Scott v. Anderson*, 58 F.Supp.2d 767 (N.D.Ohio

1998).

At issue in *Scott* were the following sentencing instructions:

> *If all 12 members of the jury find*, by proof  beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such finding to the Court.  I instruct you as a matter of law that if you make such  a  finding,  then  you  have  no  choice  and  must recommend to the Court that the sentence of death be imposed upon the defendant, Jay Scott.
>
> 

*      *      *

>
> On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the statement of Jay Scott, and the arguments of counsel, you find  that  the  State  of  Ohio  failed  to  prove  that  the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.
>
> In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court.

43

*Scott v. Anderson*, *supra*, at 790-91 (emphasis in original).  The court thereafter read to

the jury the verdict forms, stating in part that :

> "We, the jury, recommend that the sentence of death be imposed upon the defendant, Jay Scott," *and, again, signed by the foreman or forelady and all 12 of you must sign*.
>
> The second form is: "We, the jury in this case being duly empanelled and sworn, do find that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are not sufficient to outweigh the mitigating factors present in this case.
>
> "We, the jury, recommend that the defendant, Jay Scott, be sentenced to life imprisonment with parole eligibility after sentencing," and then there's blank with an asterisk which refers down and says, "insert in ink 20 or 30," whichever you decide, "full years of imprisonment," *and, again, the signatures, and the first line is reserved for the foreman or forelady, and the remainder of the eleven of you must sign that verdict form.  It must be unanimous*.

*Id.* (emphasis in original).  The court thereafter instructed:

> *After you have retired, first select a foreman or forelady, and when all 12 of you -- I repeat -- 12 of you agree upon a verdict, you will sign the verdict in ink, and advise the Court of this fact.*  You will remain in the jury room until summoned back into the courtroom.  When you return to the courtroom, your verdict will be returned to me, as you did before, and I will read it for you.

*Id.,* (emphasis in original).

The federal district court found these instructions violated Scott's constitutional

rights pursuant to *Mills v. Maryland*, 486 U.S. 367 (1988) and the due process clause of

the Fourteenth Amendment.  *Scott v. Anderson*, at 792-93.   First the court found, as the

Sixth Circuit had done in *Mapes*, that under the Ohio death penalty statute, "a

recommendation of life imprisonment need <u>not</u> be unanimous; rather, the jury should

recommend life imprisonment if they are anything <u>other than</u> unanimously in favor of death." *Id*. at 791. In support of its finding that Ohio law does not require the sentence recommendation to be unanimous, the court cited *State v. Brooks*, *supra*, and *State v. Springer*, 586 N.E.2d 96 (Ohio 1992). *Id*. On this basis, the court found that the instructions at issue created a substantial possibility that the recommendation of death rested upon an improper ground, since the instructions left the jurors unaware that a single juror could prevent a death sentence. *Id.*, citing *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990) and *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989).

### d.    *Scott (Sixth Circuit)*

On appeal in *Scott*, the Sixth Circuit's assessment of this issue took a curious turn. There, the Sixth Circuit, rather than follow the on-point holding in the Ohio capital case of *Mapes v. Coyle*, instead relied upon the decision in *Coe v. Bell*, a Tennessee case, in reversing the district court's decision. The *Scott* court's reliance on *Coe* was inexplicable. The decision in *Coe* is of little precedential value to Ohio death penalty cases. *Coe* involved analysis of sentencing instructions under the Tennessee death penalty statute, not the Ohio death penalty statute. The two statutes are readily distinguishable, as discussed previously, a point not acknowledged by the *Scott* court. To reiterate, in Tennessee, a non-death (or life) verdict is required explicitly by state statute to be unanimous. In Ohio, by statute, a non-death verdict is required **in the absence of** a unanimous verdict for death, and as such, a life sentence does not have to be by a jury that unanimously agrees on life for the defendant. Also, though Tennessee does have a default provision mandating a life sentence in the event of a hung jury, the Tennessee

death penalty statute explicitly precludes the jury from being so told.  The Ohio statute does not have this requirement.

In order to avoid the precedential value that had been created by *Mapes*, the *Scott* court declared that the *Mapes* holding as to improper jury unanimity instructions was *dicta*.  The decision in *Mapes*, however, was not *dicta*.  The Sixth Circuit panel in *Mapes* addressed and  found that the jury instructions given were erroneous.  This finding of error was germane to the decision, as it formed the basis for the remand to address appellate counsel's ineffectiveness – which the law requires assessment by a separate legal test beyond merely the erroneousness of the underlying claim.

The opinion by Judge Siler, concurring in part and dissenting in part with the majority opinion, supports that the majority decision was not *dicta*.  Judge Siler dissented from the majority's decision to remand for consideration of ineffective assistance of appellate counsel for failing to raise the improper jury unanimity instructions claim. *Mapes* at 430-31.  Specifically, Judge Siler disagreed that the instruction at issue was erroneous, arguing that while the Ohio Supreme Court had stated in *State v. Brooks*, *supra*, that similar instructions were erroneous, the decision in *Brooks* "was decided many years after the trial in [Mapes'] case."  *Id*. at 431.  Therefore, stated Judge Siler, "at the time of the trial here, there was no authority that such an instruction was erroneous under Ohio law."  *Id*.  Had the majority's decision regarding the erroneous jury instructions been perceived as *dicta*, Judge Siler would not have felt compelled to dissent therefrom.

The reason given by the *Scott* court for finding the *Mapes* decision to be *dicta* was that *Mapes* court had found the claim regarding the improper jury unanimity

instructions to be subject to procedural default. The problem with this reasoning is that the procedural default doctrine entails analysis of whether or not there exists "cause and prejudice" to avoid application of any default. It was the *Mapes* court's recognition of this principle that required the court to address the merits of the issue and remand the case to assess whether appellate counsel's failure to raise the underlying instructional error was itself a constitutional violation. Ironically, it was the panel in *Scott*, which also had determined the jury unanimity claim before it to be procedurally defaulted, that completely unnecessarily addressed the merits of the issue. The *Scott* court went out of its way to do so in order, so it stated, to "clarify" the decisions. [9]

> e.    *Roe*

In 2002, the Sixth Circuit again, following the *Scott* decision, denied habeas relief on a claim regarding improper jury instructions addressing unanimity in sentencing in an Ohio capital case. *Roe v. Baker*, 316 F. 3d 557 (6th Cir. 2002). Roe had claimed, based on instructions informing the jury that their verdict for a death or life sentence had to be unanimous, that the instructions erroneously failed to instruct the jurors (in accordance with *Brooks)* that unanimity was not required to sentence Roe to a life sentence. *Roe* at 563. The Sixth Circuit noted Roe's reliance on *Mapes v. Coyle*. The court questioned the determination in *Scott* that the decision in *Mapes* was *dicta*. *Roe* at 564. The court nonetheless agreed with the finding in *Scott* that *Coe*, and not *Mapes*, was the controlling authority reasoning that *Coe,* a year prior to *Mapes,* had "addressed the same issue." As discussed above, however, the issue in *Coe* was not the same, as it involved analysis of

---

[9] *See also Henderson v. Collins*, 262 F.3d 615, 625 (6th Cir. 2001), wherein Judge Clay, in dissent, describes the *Scott* court's discussion of the merits of the improper jury unanimity instruction claim as "**dicta**." Judge Clay also asserts that because *Coe* involved interpretation of Tennessee law, and not Ohio

different instructions under a different state statute.  Thus the Sixth Circuit's assessment in *Roe*, like in *Scott*, was incorrect.

### 2.    The *Davis* Court Got the Analysis Right.

Though the United States Supreme Court decision in *Mills v. Maryland*, *supra*, involved a slightly different jury unanimity instruction issue than those involved in the Ohio cases discussed herein, the principles underlying the *Mills* decision are nonetheless applicable.   The Supreme Court noted in Mills that "in reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusion rested on proper grounds."  *Mills* at 376.  The critical question, the Court stated, was what a reasonable juror would have understood the instructions as meaning.  *Mills* at 375-76, citing *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985), citing *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979); *see also Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994), citing *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985) (a "jury must not be misled regarding the role it plays in the sentencing decision").   If there is a substantial possibility that the jury rested its verdict on an improper ground, the case must be remanded for resentencing.  *Id*. at 377.

The Sixth Circuit panel in *Davis* correctly recognized -- as did the Sixth Circuit panel in *Mapes*, the federal district court in *Scott*, and the Ohio Supreme Court in *Brooks* -- the substantial possibility that an Ohio death sentence may rest upon an improper basis if the jury instructions inform the jury that a life sentence must be unanimous and fail in any way, impliedly or otherwise, to inform the jury that under Ohio law a sole juror can prevent the death penalty, even though "the resulting non-unanimous jury (as to death)

---

law, that *Coe* should not be regarded as controlling authority in *Scott, Mapes*, or the Ohio case involving petitioner Henderson before him.  *Id*. at 625.

must nevertheless return a unanimous verdict as to which of the sentences of imprisonment should be imposed." *Davis* at 689. The *Davis* court put it well when it stated:

> Given the requirement of unanimity as to the jury's ultimate recommendation of either death or life under Ohio law, **it is not surprising that the unarticulated but constitutionally required non-unanimous mechanism that will prevent a recommendation of death is obscured** to such an extent that it cannot even be said to be implied by the instructions in this case.

*Id*. (emphasis added).

The risk recognized by the *Davis* court, that a jury may rest its death sentence verdict upon an improper basis due to confusion in the instructions, hearkens back to the Ohio Supreme Court's conclusion about the issue in *Brooks*:

> The record reflects that the jury in this case was instructed in a manner completely contrary to law, making it less likely for Brooks to benefit from the opinion of one juror that the death penalty was inappropriate. . . . **[I]f a juror believed his one vote could not affect the ultimate result, he might acquiesce in the death sentence.** In this case, the jury instruction undermined the reliability of the jury verdict and risked erroneous imposition of the death sentence, thereby materially prejudicing Brook's right to a fair trial.

*Brooks*, *supra*, at 1042 (emphasis added).

As discussed above, absent adequate instructions, the risk that an Ohio juror might acquiesce to a death sentence due to the mistaken belief that her one vote could not dictate a life sentence is legitimate. For this reason, the Sixth Circuit's analysis in *Davis* is correct and should be followed here. Bobby Sheppard's death sentence should be remanded for resentencing.

**V.    Objection to Report and Recommendation on the Fifth Ground for Relief:
Additional Instances of Prosecutorial Misconduct Existed.**

Judge Merz correctly found prosecutorial misconduct occurred. He should have,
however, found that additional examples of misconduct occurred.

Petitioner will not go on at length here on the subject. Petitioner's claim of
prosecutorial misconduct will be addressed in great detail in response to Respondent's
objection. It seems that is the more efficient place to address the topic in that
memorandum so that the Court is not subject to reviewing several briefs with essentially
the same facts being discussed.

Suffice it to say for now, in addition to the instances of misconduct found by the
Magistrate to have warranted a grant of a writ of habeas corpus, this Court should find
that the Magistrate should have gone farther, and found that either alone or in
combination, the following acts by the prosecutor require the grant of a writ of habeas
corpus:

1.   The Prosecutor improperly urged jurors to consider non-statutory aggravating
     circumstances in considering death. (Sheppard's first subclaim under the
     claim for Prosecutorial Misconduct).

2.   The Prosecutor improperly suggested that the mitigating factors had to
     outweigh the aggravating circumstances in order for the jury to return
     something other than a death verdict.

The Magistrate found both of these actions to be improper prosecutorial misconduct. The
Magistrate should have looked at them in the context of the other examples of
prosecutorial misconduct and found that in combination with those, they supported the

grant of a writ because they completely served to undermine Defendant's case in mitigation.

Sheppard, therefore, objects to the Report and Recommendation to the extent those examples of misconduct do not form the basis for the Writ recommended by the Magistrate.

**VI.    Bobby Sheppard's Convictions and Death Sentence are Invalid as a Result of the Cumulative Effect of the Constitutional Errors in the Jury Instructions, Exclusion of Relevant Mitigating Evidence, Prosecutorial Misconduct, and Juror Misconduct in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

**A.    AEDPA Standard of Review**

This claim was raised by Petitioner as Proposition of Law Twenty-four in his direct appeal to the Ohio Supreme Court.   The Ohio Supreme Court neglected to review this claim, so review by this Court is *de novo*.

**B.    Procedural Bar To This Claim**

There is no procedural bar to this claim.

**C.    Merits**

Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone may cumulatively produce a trial setting that is fundamentally unfair in violation of a defendant's constitutional rights.  *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983) (individual errors not sufficient to establish a due process violation may do so when aggregated); *United States v. Pierce*, 62 F.3d 818, 834 (6th Cir. 1995)(same).   The accumulation of non-reversible errors must lead the court to the firm belief that an injustice has been done resulting in a "fundamentally unfair" proceeding.  *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993) (finding that

four errors taken in isolation were harmless, but when considered cumulatively

necessitated reversal); *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir. 1988)

(errors not depriving a person of due process considered alone may cumulatively produce

a trial that is "fundamentally unfair").

In *Walker v. Engle*, *supra*, the Sixth Circuit Court of Appeals found that the

"cumulative effect" of state misconduct in prosecuting the case against petitioner

constituted a denial of fundamental fairness.  Similarly, in *Cooper v. Sowders*, 837 F.2d

284 (6th Cir. 1988), the Sixth Circuit held that various trial errors, considered

cumulatively, produced a trial setting that was fundamentally unfair.  It has also been

held that such cumulative effect analysis applies to ineffective assistance of counsel

claims.  *See Rodrigues v. Hoke*, 928 F.2d 534, 538 (2nd Cir. 1991).[10]

The holdings in *Walker* and *Cooper* regarding the cumulative effect of

prosecutorial misconduct, and the cumulative effect of trial court errors, are particularly

applicable here.  As discussed herein, at the sentencing in this case, the prosecutor

committed repeated, flagrant misconduct by, *inter alia*:

- improperly invoking his personal beliefs;

- improperly invoking non-statutory aggravating factors, including gratuitously re-showing the video-tape of the killing;

- improperly suggesting mitigating factors had to outweigh aggravating circumstances;

- improperly denigrating defense counsel;

- improperly denigrating and assailing the credibility of the defense's mental heath expert, Dr. Smalldon, whom the prosecutor referred to as a "[v]ery slick guy."

---

[10] Whether counsel's assistance is constitutionally effective depends on whether it was "reasonably effective assistance, **considering all the circumstances**."  *Strickland v. Washington,* 466 U.S. 668 at 669 (emphasis added).

This prosecutorial misconduct should be considered for its cumulative effect. Indeed, part of the assessment of unconstitutional prosecutorial misconduct is whether the misconduct was isolated or extensive. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

This prosecutorial misconduct should also be considered in conjunction with certain errors of the trial court at sentencing.  This is because the issues are clearly inter-related.  The impact upon the jury of the prosecutorial misconduct regarding the defense's theme of Bobby Sheppard's paranoid schizophrenia and their use of Dr. Smalldon was exacerbated by the trial court's errors in refusing to admit relevant evidence to support the existence of the same mental illness in Bobby's family.  Moreover, the prosecutorial misconduct and the trial court errors should be considered in conjunction with the juror misconduct, as they all served to destroy or diminish the effect of Dr. Smalldon, his opinions and diagnosis of Bobby as suffering from paranoid schizophrenia, and the heart of the defense mitigation theme.  Indeed, it is quite possible that the prosecution's arguments attacking Dr. Smalldon and complaining of their inability to have their own mental health expert examine Bobby and testify at sentencing led or contributed to juror Fox's decision to commit misconduct and turn elsewhere, outside the trial, for psychiatric information.   In any event, the misleading, oversimplified advice given to Fox by supposed psychologist Helen Jones, that paranoid schizophrenics are those who are "out of touch with reality," compounded the prejudicial impact to Petitioner already incurred by the improper actions of the prosecutor and trial court.

Here, given the exacerbating and compounding nature of these various errors and improprieties at Petitioner's sentencing, a consideration of the cumulative effect of these

errors establishes a denial of Petitioner's constitutional rights and warrants a grant of the writ of habeas corpus vacating Petitioner's sentence of death.

The granting of habeas relief in this case due to the unfair sentencing process is especially warranted in light of the sentence imposed  -  the death penalty.  The United States Supreme Court has long recognized that capital cases demand heightened standards of reliability because of the unique severity and finality of the death penalty. *Beck v. Alabama*, 447 U.S. 625 (1980).  *See also Ried v. Covert*, 354 U.S. 1 (1957) advising to bear in mind that "death is different," that "[t]he taking of human life is different," and that "[i]t is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights"); *Andres v. United States,* 333 U.S. 740, 751 (1948) ("[i]n death cases, doubts … should be resolved in favor of the accused");  *California v. Ramos*, 464 U.S. 992 (1983) ("the court … has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determinations.")  *See also, Burger v. Kemp*, 483 U.S. 776, 785 ("our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").

## <u>CONCLUSION</u>

For all of the above reasons, Petitioner objects in part to the Magistrate's Report and Recommendation.  The Court should grant the writ of habeas corpus on grounds in addition to those already recommended by Judge Merz.

Respectfully submitted,

**s/Geoffrey J. Moul**
Geoffrey J. Moul (0070663)
Trial Attorney for Petitioner
Murray Murphy Moul + Basil LLP
326 South High Street, Suite 400
Columbus, OH  43215
Telephone:  (614) 469-0400
Facsimile:  (614) 469-0402
E-mail:  moul@mmmb.com

Timothy R. Payne (0069329)
Assistant State Public Defender
Office of the Ohio Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215
Telephone:  (614) 466-5394

Counsel for Petitioner Bobby Sheppard

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles L. Wille
Assistant Attorney General
Capital Crimes Section
30 E. Broad Street, 26th Floor
Columbus, OH  43215

**s/Geoffrey J. Moul**